

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JASON B. NICHOLAS,

    Plaintiff,

  -against-

WILLIAM BRATTON, Commissioner, New York City Police Department;  STEPHEN DAVIS, Deputy Commissioner for Public Information, New York City Police Department; Detective MICHAEL DEBONIS, New York City Police Department;  and the CITY OF NEW YORK,

    Defendants.

**COMPLAINT**

Jury Trial Demanded

15CV9592

15CV9592

---

## INTRODUCTION

1.   Plaintiff is a professional journalist based in New York City. In January 2015 he was re-issued a press credential by the New York City Police Department (hereinafter "NYPD"). An NYPD-issued press credential allows its holder to cross police and fire lines, "when formed," in order to gather news, both by personally witnessing it, and by visually documenting it with a still camera or video recording device.

2.	On October 30, 2015, Plaintiff was on assignment for the *New York Daily News* and tasked with obtaining still and video imagery of the rescue of two construction workers who had become trapped in a partial building collapse. While documenting the rescue, Defendants Davis and DeBonis removed Plaintiff from the scene, and, on the spot, revoked his NYPD-issued press credential. Defendants' actions were without just cause. Defendants' interference with Plaintiff's news-gathering activity, and their summary revocation of his press credential, violates Plaintiff's federal Constitutional rights.

3.	Defendants' decision to revoke Plaintiff's NYPD-issued press credential was based solely on constitutionally-illegitimate and retaliatory animus derived from Plaintiff's exercise of federal Constitutional rights, including the rights to freedom of the press, speech, association and to petition the government for redress of grievances. In addition, the process by which Defendants revoked Plaintiff's NYPD-issued press credential lacked *any* of the substantive and procedural safeguards required by the Constitution when federally protected rights and liberty interests are at stake, and was simply an irrational and arbitrary exercise of authority.

## JURISDICTION

4.	This is a civil rights action under the United States Constitution and 42 U.S.C. § 1983. The Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

5. This Court is an appropriate venue for this action pursuant to 28 U.S.C. 1391(b)(1) and (b)(2). The actions complained of took place in this judicial district; evidence and other records relevant to the allegations are maintained in this judicial district; and the Defendants are present and regularly conduct business in this judicial district.

## PARTIES

6. Plaintiff Jason B. Nicholas is an independent journalist, producing written reporting, still imagery and video. From January 2007 until the events at issue he was employed as a freelance photojournalist in New York City, by various media outlets, including the *New York Post*, the *New York Daily News* and the *Daily Mail Online*. In addition, Plaintiff's work is internationally syndicated via *Corbis Images*, and regularly appears in print and web-based publications around the world, as well as broadcast television. On October 14, 2015, Plaintiff began publishing an internet-based news website centered on social justice issues called "The Ally" at www.theally.net.

7. William Bratton is the Commissioner of the New York City Police Department, and was at the time of the actions contested in this Complaint. He is responsible for establishing the policies and procedures for officers of the NYPD and its various bureaus to follow. He is sued solely in his official capacity.

8. Stephen Davis is the NYPD's Deputy Commissioner for Public Information, hereinafter referred to as "DCPI." Davis is a civilian employee of the NYPD; all other members of DCPI are police officers, bearing badge, gun and arrest authority. Davis was personally chosen by Bratton to lead DCPI. Davis personally participated in the decision to revoke Plaintiff's NYPD-issued press credential. He is sued in his official and individual capacities.

9. Michael DeBonis is an NYPD detective, currently detailed to DCPI. In DCPI, his primary responsibility is the issuance of press credentials. He also appears at NYPD-event scenes and regulates press access to areas otherwise closed off to non-credentialed persons. He personally participated in the decision to revoke Plaintiff's NYPD-issued press credential. He is sued in his official and individual capacities.

10. Defendant New York City is a duly organized municipal entity within the State of New York. It is responsible for supervising its police officers to ensure that they do not violate citizens' constitutional rights. It is sued in its official capacity.

11. At all times relevant to this Complaint, Defendants acted under color of state law.

## FACTS

12. In 2006 Plaintiff began earning a living as freelance photojournalist. The following year, he applied for and was issued a press credential by the NYPD.

13. The eligibility criteria for an NYPD press credential is set forth in the NYPD's website. http://www.nyc.gov/html/nypd/html/press_relations/credentials.shtm If those criteria area met, the NYPD issues the applicant a press credential as a matter of course. When issued, a press credential is good for two years, after which it must be renewed. The same criteria apply for renewals as apply to initial applications and, like initial applications, if the criteria is met, the NYPD issues the applicant a press credential as a matter of course. Hundreds of press credentials are issued by the NYPD every year.

14. Other than the eligibility criteria refereed to in paragraph 13, no other rules, regulations or publicly-known policies or procedures govern the issuance or revocation of an NYPD press credential.

15. Upon the seizure or revocation of a press credential, no hearing or other review is required, allowed or contemplated. There are no charges or formal accusations of any kind, because there are no formal, written rules of conduct, other than to follow the lawful orders of police officers and not violate any criminal laws. When confronted with some allegation of misconduct in relation to their NYPD press credentials, journalists are not entitled to call witnesses, present evidence or even to argue in their defense. They are not entitled to an impartial adjudicator. A "finding" of guilt does not have to be based on any quantum of evidence, or even acknowledged. Lastly, Defendants do not have to provide any kind of statement of reasons for the revocation of a press credential, or to even acknowledge that they have revoked a particular credential.

16. An NYPD-issued press credential is the functional equivalent of a professional license, particularly for the photojournalist.

17. In order to gain meaningful access to various venues in which much of the news for New York City is generated an NYPD-issued press credential is required, even by agencies and officers not under the control of the NYPD. For example, in order to bring cameras into the state and city courthouses in New York City, state court officers enforce a policy requiring the presentation of an NYPD-issued press credential. In order for any journalist, not just a photojournalist with a camera, to gain entry to press conferences and other events held at Police Headquarters, the Manhattan District Attorney's office, City Hall, MTA headquarters, and the Office of the United States Attorney for the Southern District of New York, among others, all require the presentation of an NYPD-issued press credential.

18. Similarly, possession of an NYPD-issued press credential is necessary to cover crime scenes, parades and other special events, such as events attended by visiting dignitaries, as only a person bearing an NYPD-issued press credential is allowed to cross the police perimeters that are set up around such events.

19. In light of the facts set forth above, in paragraphs 17-18, most if not all all of the editors responsible for assigning journalists to cover events in New York City consider the possession of an NYPD-issued press credential to be a necessary pre-requisite for employment, either as a writing or photographing journalist.

20. In September 2014 Plaintiff possessed a valid, NYPD-issued press credential.

21. On September 17, 2014, Plaintiff was on assignment for the *New York Daily News*. His job that day was to obtain a picture of Roger Goddell, the Commissioner of the National Football League. While carrying out his assignment, Plaintiff was attacked and assaulted by Goodell's bodyguard, Thomas Crowe, a retired NYPD detective. Crowe intentionally hit Plaintiff with the SUV he was driving, then jumped out, yelled that he was a police officer, and proceeded to strike and choke Plaintiff, in the middle of Park Avenue, leading a number of passersby to call 911. When the police arrived, however, they arrested Plaintiff, and charged him with assaulting Crowe. After an investigation by the Manhattan District Attorney's office, the charges against Plaintiff were dismissed. No charges were ever brought against Crowe.

22. Upon information and belief, as a result of Plaintiff's September 17, 2014, arrest, an officer from DCPI was dispatched to the police precinct were Plaintiff was being held pending arraignment. Upon information and belief, the DCPI representative searched Plaintiff's property, then being held by the police, and seized his NYPD-issued press credential. No process of law accompanied the revocation of Plaintiff's press credential. Plaintiff went without his NYPD-issued press credential for four months before the District Attorney dismissed the charges against Plaintiff. After the charges were dismissed, Defendant DeBonis re-issued Plaintiff NYPD press credentials, in January 2015.

23. A year later, on or about October 1, 2015, Plaintiff attended a press conference at NYPD headquarters, where all of the Defendants were present. During the press conference, Plaintiff asked a question of Defendant Bratton concerning the NYPD's then recently announced decision to issue more Tasers to its officers. Plaintiff attempted to elicit comment on a notorious scandal from 1985, that resulted in an NYPD policy limiting Tasers to a select group of specially-trained officers. But Defendant Bratton cut-off Plaintiff's question, and said "I'm not going to be worried about 1985 being quite frankly." This lead Plaintiff to interrupt Defendant Bratton, "They tortured a drug defendant with Tasers."

24. Previously, Plaintiff had never asked a quesiton during any press conference at police headquarters, and ordinarily press photographers leave the questions to the reporters. After the press conference concluded, Defendant DeBonis approached Plaintiff and asked him, in substance, if he was going to be asking questions on a regular basis. Plaintiff answered that yes, he might be. At that, Defendant DeBonis joked about Plaintiff breaking news on his "blog." Plaintiff did not have a blog at that time, though he had previously published several.

25. Two weeks later, on October 14, 2015, Plaintiff launched "The Ally.net," an Internet-based news publication offering social justice reporting and commentary. The Ally's first story reported on a police officer facing felony charges in the Bronx for wrongly arresting a photojournalist and then lying about the reason for the arrest. http://www.theally.net/reporting/ Subsequent stories have reported, to date, on the state of newspaper photojournalism in New York City, disproportionate NYPD security measures for kindergarten students at a public school in Manhattan, Shia LaBeouf, Charlie Sheen and a colony of outlaw berrypickers in the Shawangunk Mountains.

26. On October 30, 2015, Plaintiff was on assignment for the *New York Daily News* as a photojournalist. That morning, Plaintiff was assigned to cover an event at City Hall. After the event, news broke that two construction workers had become trapped in a partial building collapse in mid-town Manhattan, approximately in the middle of the 38th Street, between 5th and 6th Avenues. Plaintiff's employer directed him to go to the scene and get images of the efforts to rescue the trapped men.

27. When Plaintiff arrived one of the men had already been brought out, dead. Efforts were underway to free the second worker, who was alive but trapped. The rescue effort itself could not be seen from the street, as the partial collapse had occurred in the rear of the building. As Plaintiff waited on the sidewalk next to the building, his NYPD-issued press credential plainly visible, a man in a suit appeared and ordered Plaintiff to leave. Plaintiff asked the man to identify himself. He refused, but persisted in his demand that Plaintiff leave. In order to avoid a confrontation, Plaintiff entered an adjacent store. Workers in the store allowed Plaintiff to be there. The man in the suit left.

28. As Plaintiff waited inside the store, and unbeknownst to him at the time, personnel from DCPI arrived on the scene, including Defendants DeBonis and Davis. Upon information and belief, Defendants Davis and DeBonis rounded up many but not all of the NYPD-credentialed journalists who had been on the block where the event was taking place, and corralled them into a "press pen" at the corner of 5th Avenue and 38th Street, far away from the action, where they would be unable to either personally observe or record any meaningful aspect of the official operations on the block. All they would see was an ambulance driving toward them and turning the corner in front of them.

29. Roughly an hour and half passed as emergency personnel worked to free the trapped man. As Plaintiff waited, he saw numerous photographers outside the store, in the middle of the scene, taking pictures. There were photographers from the Fire Department, the Police Department, the Buildings Department, the Office of Emergency Management and Consolidated Edison, a utility provider. These photographers operated freely and without interference from any officer or official. In addition, on the other side of the street, opposite the building that had partially collapsed, numerous passersby could be seen, occasionally stopping to takes pictures with their cell- and smart-phones.

30. Finally rescue workers brought the injured man out, and began rolling him in a stretcher toward an ambulance. At this point, Plaintiff exited the store he was in, and stepped out onto the street to document events. Plaintiff walked approximately 150 feet through a scene filled with police, firefighters and paramedics and not one questioned or challenged his right to be present. He stopped about 7 feet away and to the side of the waiting ambulance, behind emergency workers, totally out of their way. As Plaintiff was making still images and video of the injured man being put into an ambulance, Defendant DeBonis approached and physically seized Plaintiff and pulled him away from the scene, preventing Plaintiff from further capturing images. As he did so, Defendant DeBonis said "What are you doing? What are you doing? You're not allowed behind this press line."

31. Defendant Davis was present. He saw the events described above, in paragraph 30. As Defendant DeBonis was leading Plaintiff away from the scene, Defendant Davis approached and said to Plaintiff: "This is the last time you'll do that." When Plaintiff asked what Defendant Davis meant, Davis responded "You know what I mean. Everyone else is over there working with us. We work with you all the time. Don't bullshit me!" He then ordered defendant DeBonis to "hold on" to Plaintiff's press credential, and to "talk to me before you think of giving it back. Me personally." When Plaintiff attempted to further engage Defendant Davis, he ordered Plaintiff to leave the scene "Get out of here. Get out of here. Team player."

32. Defendant DeBonis ordered Plaintiff to surrender his press credential to him, and Plaintiff did. Defendant DeBonis escorted Plaintiff to the corner where a police line had been established and ejected Plaintiff from the scene. As Plaintiff was being lead to the corner, some journalists in the press pen recorded the encounter. After Defendant DeBonis ejected Plaintiff from the scene, he went over to the journalists in the press pen and said, in a loud voice that many of them heard, "Tell your boys in the Press Photographers association he's never getting another press card," in substance, referring to the New York Press Photographer's Association.

33. The *New York Daily News* published Plaintiff's still images and video from the event. http://www.nydailynews.com/new-york/5-story-midtown-building-partially-collapses-article-1.2417609

34.     As a result of the Defendants' revocation of Plaintiff's NYPD-issued press credential he is no longer working regularly for the *New York Daily News*, and has lost other employment as well.

35.     Plaintiff has sent several emails to Defendant DeBonis seeking the return of his press credential. Defendant DeBonis has only responded once, with two cryptic words "frozen zone."

36.     The NYPD has a pattern and practice of suppressing and attempting to shape legitimate news-gathering activities through the selective issuance and revocation of press credentials. For example, when Ray Kelly was Police Commissioner, journalist Leonard Levitt was a longtime columnist at *Newsday*, headquartered in Melville, Long Island. Levitt had written a number of articles critical of the NYPD, and Commissioner Kelly couldn't take it anymore. Kelly actually rode out to *Newsday* headquarters, in his government-issued vehicle, with his government-issued security detail, and demanded that Levitt be silenced. *Newsday* refused, and stood by their man. The NYPD then revoked Levitt's press credential, and barred him from Police Headquarters, where journalists maintain collective offices known colloquially as "The Shack." The NYPD refused to re-issue Leavitt a press credential for several years.

37. The NYPD also has a pattern and practice of suppressing legitimate news-gathering activities by refusing to let even properly credentialed journalists access police scenes. In 2004, for example, during the Republican National Convention, several high-ranking NYPD officers beat an NYPD-credentialed photojournalist for documenting police action during a protest. On assignment for the *New York Times*, Robert Stolarik was in Union Square documenting protests when a squad of white-shirted officers, indicating a rank of lieutenant and above, moved in to arrest a protester. Stolarik began to photograph the scene, NYPD-credential visible on his person. One of the white-shirted officers shoved him backward, and he was then gang-tackled by a number of the white-shirted officers and beaten. He sued for damages, and the City of New York offered him a settlement, which he eventually took.

38. Similarly, on November 14, 2011, the NYPD initiated an operation to clear Zuccotti Park of encamped Occupy Wall Street protesters. As part of the operation, hundreds of NYPD officers established a security perimeter several blocks away from the park, from behind which no view of police activity inside the park was observable. Scores of NYPD-credentialed journalists learned of the action and arrived at the scene, attempting to get to Zuccotti Park and witness the action. None of them were allowed through the police lines, notwithstanding that they were properly credentialed. In addition, upon information and belief, NYPD helicopters closed the airspace above the park, preventing news helicopters from getting to the scene.

39. Additionally, on September 17, 2012, during protests celebrating the first anniversary of the birth of the Occupy Wall Street protest movement, members of the NYPD "interfered with, assaulted, detained and in some cases arrested members of the media who were on a public street," according to a letter from the *National Press Photographers Association* to the NYPD. According to the letter, an NYPD lieutenant "repeatedly told journalists, including many with NYPD credentials," they could not be on a public street. He was also heard "telling a group of reporters and photographers, including several with NYPD-credentials, that they could not continue to use cameras in a public area. Officers then used batons to shove groups of credentialed journalists north on Broadway and also threatened another group of credentialed journalists with arrest if they did not leave the sidewalk on the west side of Broadway. This occurred at the same time police allowed members of the public access to that area."

40. These are but a few examples for the NYPD directly suppressing, through the abuse of their police powers, freedom of the press and associated rights in New York City. Nearly every photojournalist who has regularly worked in New York City has been affected; nearly every photojournalist who has regularly worked in New York City can tell a story of either being personally asaulted, arrested, threatened with arrest or having his or her press credential summarily revoked, for activity that is totally with the scope of their legitimate and constitutionally-protected news-gathering activity. As such, the NYPD has a pattern and practice of suppressing legitimate news-gathering activity.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION

41. Defendants, as alleged above and incorporated here by reference, violated Plaintiff's Fourteenth Amendment right to due process of law by failing to provide Plaintiff any process of law when they revoked his NYPD-issued press credential. Particularly, Defendants did not afford Plaintiff notice of the charge or charges against him; did not afford Plaintiff the opportunity to confront the evidence against him, or to call witnesses or present evidence in his defense; nor did Defendants provide Plaintiff a meaningful, legitimate or lawful reason for the revocation of his press-credential, nor was that decision based on any quantum of evidence; and the final decision to revoke Plaintiff's press credential was made by the same people who made the initial decision, denying Plaintiff a fair and neutral adjudicator.

### AS AND FOR A SECOND CAUSE OF ACTION

42. Defendants, as alleged above and incorporated here by reference, violated Plaintiff's First and Fourteenth Amendment rights to freedom of the press, speech, assembly and to petition the government for redress of grievances, when Defendants Stephen and DeBonis personally interfered with Plaintiff when was his acting in a news-gathering capacity, affirmatively prevented him from capturing still and video images of the October 30, 2015, rescue, detailed above, and, further, punished him by revoking his NYPD-issued press credential for documenting and attempting to document the rescue.

## AS AND FOR A THIRD CAUSE OF ACTION

43.    Defendants, as alleged above and incorporated here by reference, violated Plaintiff's First and Fourteenth Amendment rights to freedom of the press, speech, assembly and to petition the government for redress of grievances, when Defendants Stephen and DeBonis revoked his NYPD-issued press credential based upon a false, pretextual reason, when the real reason for the revocation was a desire to silence a journalist who was beginning to express views critical of the NYPD, as he did in the lawsuit he failed against the NYPD for falsely arresting him in September 2014, as he did in the press conference on or about October 1, 2015, and as he did online in *The Ally* beginning on October 14, 2015.

## AS AND FOR A FOURTH CAUSE OF ACTION

44.    Defendants, as alleged above and incorporated herein by reference, violated Plaintiff's Fourteenth Amendment right to equal protection of law, when Defendants Davis and DeBonis revoked his press credential, and refused to re-issue him a press credential, not based on a legitimate and rational government interest, but based solely on an illegitimate desire to punish Plaintiff for exercising federal Constitutional rights, including holding and expressing views critical of the NYPD, thereby subjecting Plaintiff to invidious discrimination.

45.    Plaintiff demands a trial by jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests judgment against Defendants as follows:

1. For appropriate declaratory relief regarding the unlawful and unconstitutional acts and practices of Defendants;

2. For appropriate preliminary and permanent injunctive relief against all Defendants, enjoining the unconstitutional acts and practices of Defendants, and directing Defendants to take such affirmative action as necessary to ensure that Defendants' unconstitutional and unlawful pattern and practices, and their consequences, are eliminated, and do not continue to affect Plaintiff's, or others', constitutional rights, liberties and interests;

3. For appropriate compensatory and punitive damages in an amount to be determined at trial;

4. For an award of costs Plaintiff incurred in bringing and litigating this action; and

5. For such other and further relief as the Court deems just, proper and equitable.

Pursuant to, and in accordance with, 28 USC § 1746:

I swear the foregoing under the penalty of perjury; as to matters alleged upon information and belief, I believe them to be true.

JASON B. NICHOLAS
Plaintiff, *Pro Se*
SUITE #305
240 BROADWAY
BROOKLYN, NEW YORK 11211
212-470-8983