```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
  JASON B. NICHOLAS,                                        :
                                                            :
                              Plaintiff,                    :
                                                            :       15-CV-9592 (JPO)
                   -v-                                      :
                                                            :       OPINION AND ORDER
  THE CITY OF NEW YORK, et al.,                             :
                                                            :
                              Defendants.                   :
------------------------------------------------------------X
```

J. PAUL OETKEN, District Judge:

Plaintiff Jason B. Nicholas, a professional photojournalist, filed this action *pro se* against Defendants William Bratton, Stephen Davis, Michael DeBonis, and the City of New York on December 8, 2015.  (Dkt. No. 2.)  Nicholas alleges that Defendants violated his First and Fourteenth Amendment rights by revoking his New York Police Department ("NYPD") press credential without due process and in retaliation for the content of his speech.  (*Id.*)  Nicholas moved for a preliminary injunction compelling Defendants to return the press credential that they had revoked.  (Dkt. No. 3.)  The Court denied Nicholas's motion without prejudice.  (Dkt. No. 34.)  Nicholas thereafter filed an amended complaint (Dkt. No. 48 ("Compl.")), which Defendants now move to dismiss under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1).  (Dkt. No. 52.)  For the reasons that follow, the motion is denied.

**I.    Background**

The facts described herein are, unless otherwise noted, taken from the operative amended complaint, papers appended to the complaint, or, consistent with the Court's responsibility to liberally construe a *pro se* plaintiff's papers, from Nicholas's opposition to the motion to dismiss.

*See Escoffier v. City of N.Y.*, No. 13 Civ. 3918, 2016 WL 590229, at *1 (S.D.N.Y. Feb. 11, 2016).  Nicholas's allegations are presumed true for the purposes of this motion.

Nicholas is a professional photojournalist.  (Compl. ¶ 52.)  The NYPD first issued him a press credential (or "press pass") in 2007.  (*Id*.)  According to Nicholas, an NYPD press credential is essentially required for photojournalists because it permits them to gain entry to official press conferences, to cross police lines, and to cover crime and fires scenes.  (*Id.* ¶¶ 54-56.)  For that reason, Nicholas alleges, most editors who hire journalists and photojournalists to cover New York City news consider a press credential to be a "necessary prerequisite for employment."  (*Id.* ¶ 57.)

In his amended complaint, Nicholas details several encounters with the NYPD that led to the summary revocation of his press pass, including the incident that prompted the filing of his initial motion for a preliminary injunction.

First, on September 17, 2014, Nicholas, on assignment for the *New York Daily News*, was "attacked and assaulted" by Thomas Crowe, a retired NYPD detective who was working as a bodyguard for someone Nicholas was trying to photograph.  (*Id.* ¶ 59.)  When the police arrived on the scene, they arrested Nicholas and charged him with assaulting Crowe.  (*Id.*)  Nicholas alleges that, as a result of the incident, Deputy Commissioner, Public Information ("DCPI") Lieutenant Eugene Whyte seized Nicholas's press credential.  (*Id.* ¶ 60.)  Nicholas claims that his press credential was not returned until the charges against him were dropped four months later.  (*Id.*)

Second, on January 4, 2015, NYPD officers prevented Nicholas from photographing the funeral of a slain NYPD officer, despite the fact that Nicholas was standing across the street from the funeral home on a sidewalk that, according to Nicholas, was "open to the public."  (*Id.*

¶ 61.)  Nicholas alleges that NYPD officers "ordered" him to get into a "press pen" about 150 yards away.  (*Id.*)  When Nicholas refused, Whyte appeared and declared the sidewalk on which Nicholas had been standing to be a "'floating' frozen zone," where pedestrians could pass but credentialed press could not stand.  (*Id.*)  When Nicholas tried to film this exchange, Whyte took his press credential.  (*Id.*)  It was returned later the same day.  (*Id.*)

Third, as detailed in the Court's earlier Opinion and Order in this case, on October 30, 2015, Nicholas went to the scene of a building collapse in midtown Manhattan to obtain photographs of the rescue effort for the *New York Daily News*.  (*Id.* ¶ 62.)  When Nicholas arrived at the scene (which was under the control of New York City Fire Department ("FDNY") as a "fire scene" (*id.* ¶¶ 75-77)), one construction worker had been brought out of the collapse dead and another worker was trapped but still alive (*id.* ¶¶ 63-64).  Because the rescue effort could not be seen from the street, Nicholas positioned himself on the sidewalk next to the building—his press credential in plain view.  (*Id.* ¶ 65.)  An individual who refused to identify himself asked Nicholas to move, so he entered a store next door.  (*Id.*)

Shortly thereafter, DCPI personnel, including Defendants Michael DeBonis (a DCPI detective (*id.* ¶ 12)) and Stephen Davis (the Deputy Commissioner (*id.* ¶ 11)), arrived and promptly "rounded up" the NYPD-credentialed journalists who had been up on the public street, and "corralled" them into a "press pen" located so far from the scene that the journalists were unable to witness the rescue (*id.* ¶¶ 66-68).  Nicholas, meanwhile, continued to wait in the store to witness the ongoing rescue attempt.  (*Id.* ¶ 66.)

When the second worker was finally freed and wheeled out on a stretcher, Nicholas left the store and walked "unimpeded" and not "challenged"—about 150 feet into the street and up to the ambulance—to take photographs.  (*Id.* ¶¶ 91-92.)  Nicholas maintains that he was "totally out

of [the] way" of emergency workers, keeping a distance "standard among professional photojournalists." (*Id.* ¶ 93.)

It was only when Nicholas began to raise his camera, to photograph the worker's being loaded into the ambulance, that DeBonis "physically seized" him and "pulled [him] away from the scene." (*Id.* ¶ 94-95.) Davis, who was also present at the scene, said to Nicholas: "This is the last time you'll do that," and "[e]veryone else over there is working with [the City]." (*Id.* ¶¶ 98-99.) Davis also remarked, "We work with you all the time." (*Id.* ¶ 99.) He ordered DeBonis to "hold on" to Nicholas's press credential and to talk to Davis "personally" before returning it. (*Id.*) Davis added: "Get out of here. . . . Team player." (*Id.*) DeBonis then instructed Nicholas to hand over his press credential, and Nicholas complied. (*Id.* ¶ 100.) As Nicholas left the scene, as directed, DeBonis remarked that the worker "was probably going to die," and Nicholas understood him additionally to imply that it would be problematic for Nicholas to use any photographs he might have taken. (*Id.* ¶¶ 101-02.) (The *New York Daily News* did, ultimately, publish Nicholas's photographs and video from the incident. (*Id.* ¶ 106.)) DeBonis loudly announced, in front of the "press pen," where the other journalists had been gathered, that Nicholas's credential had been revoked because he "jumped on the back of the ambulance" and that he was "never getting another press card." (*Id.* ¶¶ 103-04.)

Nicholas alleges that Defendants knew that the second trapped worker could not be saved and that Defendants therefore restricted press access to the scene to avoid "imagery created of a dead worker being brought out." (*Id.* ¶¶ 80-83.) While Defendants removed photojournalists and journalists from the scene, other photographers remained "in the middle of the scene, taking pictures." (*Id.* ¶ 84.) These photographers included individuals from city agencies, such as the FDNY and the NYPD, as well as a utility provider. (*Id.*) Nicholas alleges that these

photographers were "charged, in part, with creating imagery for public distribution," and that none of their ultimately disseminated photographs depicted images of the two victims of the collapse. (*Id.* ¶ 105.) Members of the public were also permitted to walk on the sidewalk across the street from the scene, and some passersby took photographs or videos on their cell phones or cameras. (*Id.* ¶ 86.) DeBonis and Davis also knowingly, according to Nicholas, permitted two NYPD-credentialed photojournalists (from *Reuters* and the *New York Post*) to photograph the scene from "behind police lines, opposite the damaged building," from "within a commercial establishment"; they did so without consequence. (*Id.* ¶¶ 88-90.)

Nicholas sent four emails to DeBonis in an attempt to recover his press credential. Each contained evidence that Nicholas had not been interfering with rescue personnel. (*Id.* ¶¶ 107-15.) DeBonis responded with only the phrase: "FROZEN ZONE." (*Id.* ¶ 113.) This was the first Nicholas heard of a "frozen zone"—an area that the NYPD has designated as off-limits to certain journalists—during the rescue effort. (*Id.* ¶¶ 118-20.) Nicholas twice requested an opportunity to meet regarding the revocation of the credential, but DeBonis ignored these requests. (*Id.* ¶¶ 114-16.)

Nicholas first learned that the revocation of his press credential was "temporary" and that he had a right to a hearing on the subject on May 12, 2016, during oral argument on his preliminary injunction motion in this case. (*Id.* ¶ 126.) The next day, he demanded a hearing. (*Id.* ¶ 127.) As discussed in this Court's previous Opinion and Order denying Nicholas's motion for a preliminary injunction, the procedures for obtaining an NYPD press credential, and for contesting its revocation, are codified in Sections 11-01 and 11-11 of Title 38 of the Rules of the City of New York. *See* 38 R.C.N.Y. §§ 11-01, 11-11. Under Section 11-11, a person whose press credential is summarily suspended may request a hearing before the NYPD ("Section 11-

11 hearing") within five business days. *Id.* at § 11-11(b). The Commanding Officer of the NYPD Office of the DCPI must provide a written opinion explaining its decision within forty-five days of the hearing. *Id.* § 11-11(e).

On May 19, 2016, Edward Mullen, DCPI's Commanding Officer, served as the hearing officer in Nicholas's proceeding, but Nicholas alleges that the proceeding was not "fair and impartial," in part because Whyte also presided over the proceeding, and because both Whyte and Mullen report to Davis (who made the decision to revoke Nicholas's credential in the first instance). (Compl. ¶¶ 128-30, 132-39.) According to Nicholas, another "member of the NYPD without an authorized role" was also present and was a biased participant in the decision-making process. (*Id.* ¶ 131.) Nicholas further alleges that he was not told what rule he had violated or afforded an opportunity to confront adverse witnesses or review adverse evidence, which he infers were presented and reviewed without him present. (*Id.* ¶¶ 140-47).

On June 21, 2016, Whyte emailed Nicholas, inviting him to call at his convenience to discuss the results of the hearing. (*Id.* ¶ 149.) Two days later, at a status conference in this lawsuit, Nicholas learned that Defendants had decided to return the press credential. (*Id.* ¶¶ 150-51.) Nicholas's credential was returned to him on June 27, 2016. (*Id.* ¶ 154.) He was not provided with a written explanation of the decision. (*Id.* ¶¶ 150-51)

Nicholas alleges that, because of Defendants' revocation of his press credential, his "news-gathering activity has been significantly abridged," and he was unable to get assignments from December 12, 2015, lost regular work for the *New York Daily News*, and missed out on other employment opportunities. (*Id.* ¶ 153.) (Nicholas separately represents that he is once again working as a photojournalist, as of July 4, 2016. (Dkt. No. 59 at 17-18.))

Nicholas brings a claim pursuant to 42 U.S.C. § 1983 against DeBonis and Davis, for violating his First, Fourth, and Fourteenth Amendment rights when they removed him from the rescue scene on October 30, 2015. He alleges that they engaged in "content-based prior restraint of news-gathering," or in the alternative, that even if their actions were content-neutral, they were not reasonably related or narrowly tailored to a legitimate purpose; he also alleges that they violated the Equal Protection Clause by targeting Nicholas in particular. (Compl. ¶¶ 156-57.)

Nicholas also brings a Section 1983 claim against William Bratton (then Police Commissioner of the NYPD), Davis, and the City of New York for violations of his First, Fourth, and Fourteenth Amendment rights by creating, following, encouraging and enforcing an unwritten policy, custom, or practice of interfering with news-gathering by: (1) physically blocking some news-gatherers' access; (2) confining journalists and photojournalists to "press pens" or other areas out of earshot or sight of news-worthy events; and (3) confiscating the press credentials of individuals who try to assert their rights.[1] (*Id.* ¶ 159.)

He additionally contends that DeBonis and Davis violated his due process rights by failing to give "fair warning" before revoking his pass and further by failing to afford Nicholas a "meaningful opportunity to be heard," at his Section 11-11 hearing. (*Id.* ¶ 158.)

Nicholas seeks injunctive and declaratory relief, as well as damages. (*Id.* at 47-51.)

## II.   Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on

---

[1] Nicholas also discusses Whyte as a putative defendant (*see* Compl. ¶ 159), but has failed to name Whyte in the caption or to serve him. Any claims against Whyte, to the extent Nicholas purports to assert them, are therefore dismissed without prejudice based on failure to serve. *See* Fed. R. Civ. P. 4. Nicholas may seek leave to amend his pleadings to include Whyte if he wishes.

its face." *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 128 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation mark omitted)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted).

When evaluating whether a complaint meets these requirements, courts assume that all "factual allegations contained in the complaint" are true, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007), and "draw all inferences in the light most favorable to the non-moving party[]," *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted). Additionally, a complaint "filed *pro se* is 'to be liberally construed,' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

**III.     Discussion**

Nicholas challenges Defendants' actions and practices in two general respects: their restrictions on news-gathering and their summarily revoking his press credential. The Court addresses each in turn. It then addresses municipal liability and Nicholas's standing to seek injunctive and declaratory relief.

**A.     Defendants' Restrictions on News-Gathering**

Defendants argue that their removal of Nicholas from the rescue scene on October 30, 2015, did not violate his constitutional rights to news-gather because Defendants had a "legitimate purpose, rational basis, and even a compelling reason." (Dkt. No. 54 at 5.)

"Under the [F]irst [A]mendment, press organizations have a . . . right of access to newsworthy events in their capacity as representatives of the public and on their own behalf as members of the press." *WPIX v. League of Women Voters*, 595 F. Supp. 1484, 1489 (S.D.N.Y. 1984) (collecting cases holding that news-gatherers have a right to attend criminal and civil trials and should be granted fuller access to political events and emergency situations); *see also N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 675 F. Supp. 2d 411, 431 (S.D.N.Y. 2009) (collecting cases finding that press access is protected for presidential press conferences, legislative hearings, university disciplinary hearings, voter lists, state municipal planning meetings, and federal administrative hearings), *aff'd*, 652 F.3d 247 (2d Cir. 2011). After all, "sunlight," in the words of Justice Brandeis, "is the most powerful of all disinfectants." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 305 (1964) (citing Paul A. Freund, The Supreme Court of the United States 61 (1949)). The right of access, however, is "limited," not absolute. *WPIX*, 595 F. Supp. at 1489.

Nicholas sets out two theories under which his rights were unconstitutionally infringed: (1) exclusion from news-gathering that was either arbitrary or viewpoint-based, by allowing some photographers to access the scene and not others; and (2) content-neutral limits on news-gathering, through the establishment of a "frozen zone" and "press pen," that were overly broad. Because Nicholas has stated a First Amendment claim based on the arbitrary or else viewpoint-based exclusion of some photographers and not others, the Court does not reach Nicholas's second argument, that the "frozen zone" and "press pen" limits were overly broad.

"[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d

9

Cir. 1977); *see also WPIX*, 595 F. Supp. at 1489 ("[I]n order to maximize diversity of coverage, individual news-gatherers also have a limited right of equal access to important public events."). For example, it has been held impermissible to exclude a single television news network from live coverage of mayoral candidates' headquarters and to withhold White House press passes in a content-based or arbitrary fashion. *See Huminski v. Corsones*, 396 F.3d 53, 84 (2d Cir. 2005) (citing *Am. Broad. Cos.*, 570 F.2d at 1083; *Sherrill v. Knight*, 569 F.2d 124, 129-30 (D.C. Cir. 1977)). Equal press access is critical because "[e]xclusion of an individual reporter . . . carries with it 'the danger that granting favorable treatment to certain members of the media allows the government to influence the type of substantive media coverage that public events will receive,' which effectively harms the public." *Id.* (internal alterations omitted) (quoting *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986)); *see also Sherrill,* 569 F.2d at 129-30 ("Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the [F]irst [A]mendment in assuring . . . that individual newsmen not be arbitrarily excluded from sources of information."). Courts thus recognize that equal access of the press is necessary in order to prevent government officials from "affect[ing] the content or tenor of the news by choreographing which news organizations have access to relevant information." *Id.* (quoting *Anderson,* 805 F.2d at 9).

Because of the nature of the First Amendment interest—both as regards the public and as regards the news-gatherer—the protection for press access exists whether an exclusion is "based upon the content of the journalist's publications" or "arbitrarily impose[d]." *Stevens v. N.Y. Racing Ass'n, Inc.*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987).[2]

---

[2] "[I]f a restriction which affords different degrees of access to members of the press is not content-based, the limitation must 'serve a legitimate governmental purpose, must be rationally related to the accomplishment of that purpose, and must outweigh the systemic

Nicholas's allegations can be read to support a theory of his exclusion from news-gathering—as either viewpoint-based or arbitrary—that Defendants cannot defeat at this stage of litigation.  Both versions of the argument stem from the purported presence of some photojournalists *outside* the press pen, allegations that belie Defendants' argument that their restrictions on others (including Nicholas) were justified by the exigency of the situation.  First, Nicholas represents that Defendants DeBonis and Davis knowingly permitted two photojournalists to take pictures of the scene from "behind police lines," while the rest of the journalists and photojournalists were corralled in the "press pen," out of sight and earshot. (Compl. ¶¶ 88-90.)  Second, Nicholas alleges that Defendants impermissibly allowed photographers who were employed by the City or a utility company, while excluding members of the press, in an attempt to prevent the public from seeing images of the dead workers and failed rescue attempt.  (*Id.* ¶¶ 84, 105.)

Nicholas's complaint can be read to allege that his exclusion—as compared to those photojournalists' permitted presence—constituted viewpoint (or content-based) discrimination because of his work and the NYPD's prior experiences with him.  In *Stevens*, for example, the court held that it was "probable" that the plaintiff could show that a restriction was content-based, because the plaintiff alleged that he had been told defendants were unhappy that "his coverage made him appear bigger than defendant's events."  *Stevens*, 665 F. Supp. at 175. Similarly here, Nicholas has alleged that DeBonis and Davis targeted him because they did not believe him to be a "[t]eam player," and they had experienced previous run-ins with him. (Compl. ¶¶ 98-103.)  In any event, the motivation underlying the limitations on news-gathering

---

benefits inherent in unrestricted (or lesser-restricted) access.'" *Id.* (quoting *D'Amario v. Providence Civic Ctr. Auth.*, 639 F. Supp. 1538, 1543 (D.R.I. 1986)).

is properly the subject of additional factual development, especially where, as here, there are allegations that the reasons provided for the restriction are "pretextual." *See Stevens*, 665 F. Supp. at 175. (Dkt. No. 59 at 6.).

Another reading of Nicholas's allegations supports a theory that the admission of some members of the press but not others was simply arbitrary. DeBonis and Davis may have had no particular reason for admitting the two photojournalists that they did, while excluding others and evicting Nicholas. Even so, arbitrary restrictions on news-gatherers may run afoul of the First Amendment, unless Defendants can explain the need, because the First Amendment "protects the public against the government's 'arbitrary interference with access to important information,'" including the diversity of media outlets covering an event. *N.Y. Civil Liberties Union*, 684 F.3d at 298 (quoting *Richmond Newspapers,* 448 U.S. at 583 (Stevens, J., concurring)). The nature and potential arbitrariness of the limit on some news-gatherers but not others is an additional area for more factual development. *See Stevens*, 665 F. Supp. at 167 (finding the extent of the exclusion, and its putative rationale, to be a question of fact).

As regards Nicholas's allegation that the City impermissibly excluded photojournalists while allowing photographers who worked for the City or for utility companies to capture images of the rescue effort, the Court need not reach the question of whether such practice constitutes "pre-emptive censorship" (Compl. ¶ 83), because his claim survives on other grounds. But the nature and Defendants' administration of the "frozen zone" and "press pen" on October 30, 2015, remain live issues in the case because of Nicholas's suggestion that the restrictions against him, as compared to some other photojournalists, were either viewpoint-based or arbitrary.

### B. Nicholas's Due Process Claims

To state a claim for a violation of procedural due process, a plaintiff must show: (1) a protected liberty or property interest; and (2) that defendants denied him that interest without sufficient process. *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005). Defendants challenge Nicholas's claims on both counts.

#### 1. Nicholas's Interest in the Press Credential

First, Defendants argue that Nicholas lacks a protected liberty or property interest in his NYPD-issued press credential. They characterize the credential as the property of the NYPD and capable of being revoked at will, thus defeating any property interest Nicholas purports to have. But Nicholas argues that the pass operates as a *de facto* professional license for photojournalists in New York City and that, as a result, he has a protected interest in it. (Dkt. No. 59 at 7; Compl. ¶¶ 54-57.)

The Second Circuit has recognized that holders of professional licenses have a protected interest in those licenses, once issued, where the licensor's discretion in revocation is "carefully constrained." *Spinelli v. City of N.Y.*, 579 F.3d 160, 169 (2d Cir. 2009) (finding a protected property interest in gun-dealer license); *see also Sisay v. Smith*, 310 Fed. App'x. 832, 848 (6th Cir. 2009) ("Plaintiffs rely on their taxicab licenses to operate their businesses and have a well-founded expectation that the licenses will not be revoked absent culpable conduct.").

Under Second Circuit precedent, the question of whether Nicholas has a protected interest in the NYPD-issued press credential is an open one.

Defendants' arguments begin from the premise that the NYPD press credential is akin to at-will employment and thus does not engender an expectation of continued possession. (*See* Dkt. No. 54 at 8 (citing *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002).) To support their

argument, Defendants cite *Kalfus v. New York & Presbyterian Hospital*, 706 F. Supp. 2d 458, 468 (S.D.N.Y. 2010), *aff'd*, 476 Fed. App'x 877 (2d Cir. 2012), as a holding by a court in this District that a plaintiff lacked a protected interest in an NYPD-issued press credential. However, the *Kalfus* court so held in part due to the absence of any specific claims by the plaintiff "that a press pass is necessary in order for a member of the press to perform his job." *Id.* at 468 & n.3.

Unlike the plaintiff in *Kalfus*, Nicholas vigorously maintains and specifically pleads that the press credential is necessary for a member of the press to perform his job. According to the complaint, an NYPD press credential is functionally required for photojournalists because it permits them to gain admission to official press conferences, to cross police lines, and to cover crime and fires scenes. (*Id.* ¶¶ 54-56.) Nicholas alleges that, because this kind of access is necessary to work as a journalist or photojournalist in New York City, most editors consider a press credential to be a crucial "prerequisite for employment"; he also represents that he, in fact, lost employment as a result of the revocation of his credential. (*Id.* ¶¶ 57, 153.)

Moreover, courts have recognized that a protected interest is perhaps especially likely to attach to a press credential given the First Amendment interests at stake. *See Sherrill*, 569 F.2d at 131 n.22 ("[W]hen the substance of the property interest involves first amendment values to the degree of this entitlement to a White House press pass, it would be difficult not to infer constitutional recognition of this interest."). That press access implicates First Amendment rights and interests—held not only by the journalists, but also by the public at large—provides additional support for finding a protected interest in NYPD-issued press credentials. *See, e.g.*, *WPIX*, 595 F. Supp. at 1489; *N.Y. Civil Liberties Union*, 684 F.3d at 298. And the First Amendment interests alive here supply additional grounds on which this case is distinguishable from *Kalfus*, where the plaintiff did not directly argue or cite "any authority for the proposition

14

that [he] has a First Amendment interest in the press pass." 706 F. Supp. 2d 468, n.3. Nicholas, in contrast, pleads and argues that his protected interest in the credential derives, at least in part, from a constitutionally inflected right to news-gather. (*See* Dkt. No. 59 at 5-8, 11-12.)

The existence of a protected interest also depends on how curtailed the issuer's discretion is in revoking it, either by policy or in practice. *See Barry v. Barchi*, 443 U.S. 55, 64 n.11 (1979) (finding a protected interest where "state law has engendered a clear expectation of continued enjoyment of a license absent proof of culpable conduct"). Here, the extent of the NYPD's discretion over the revocation of press passes is not entirely clear, and thus merits further factual development.

As pleaded by Nicholas, NYPD regulations restrict officials' authority in revoking the pass, as the press cards themselves clearly state that the credential holder is "entitled to cross police and fire lines" and also provide that the access "will be honored and access will <u>not</u> be denied." (Compl. ¶ 72; Ex. F at 2.) These statements suggest that NYPD officers have little authority to revoke a press credential, and further suggest that the holder has a protected "entitle[ment]" to press access. Elsewhere, however, Nicholas indicates that the text on the reverse of the credential states that it is the "property" of the NYPD and "may be taken away by competent authority at any time." (*Id.* ¶ 30.) These statements paint a different picture: that NYPD authorities *may* revoke the credential, as needed. (Nicholas's pleadings suggest that— except with respect to the NYPD's repeatedly revoking *his* credential—they tend to treat the pass as an entitlement. (*See, e.g.*, Compl. ¶¶ 88-90.))

The space between these two understandings of the credential—one that suggests the credential is an entitlement, and one that suggests it can be revoked at will—complicates the inquiry into whether the holder has a clear expectation of continued enjoyment of the press

credential and thus a protected interest. Considered alongside the alleged importance of the credential to photojournalists like Nicholas and the First Amendment interests at stake, and drawing all inferences in Nicholas's favor (as the Court is required to do at this stage), Nicholas has carried his burden to allege a protected interest in his press credential. However, further discovery as to the NYPD's policies and practices—specifically, into the conditions under which credentials may be revoked and the discretion officers have in making that decision—may reveal that Nicholas lacks a protected interest.

### 2. Nicholas's Pre- and Post-Deprivation Process

In addition to questioning Nicholas's protected interest in the press credential, Defendants suggest that Nicholas cannot state a claim as to the alleged deprivation of process. Specifically, Defendants argue that the revocation of Nicholas's press credential was justified on the basis of emergency circumstances necessitating swift action.

"[D]ue process ordinarily requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest . . . . [But] summary administrative action may be justified in emergency situations." *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299-300 (1981). Defendants argue that summary revocation of the credential (together with a post-deprivation hearing) was justified here because "it was obviously implausible and quite frankly, impossible, to provide plaintiff a hearing given his being in violation of a 'frozen zone' while an emergency rescue was taking place." (Dkt. No. 64 at 5.)

But taking only the facts as pleaded by Nicholas, as discussed above, the frozen zone was established *ex post* and, further, was not called for—or at least need not have been so broadly drawn—by the circumstances. (Compl. ¶¶ 113, 118-20.) Taking Nicholas's allegations as true and drawing all inferences in his favor, it is therefore not plain that immediate revocation of the

press pass was a "necessity." *See Spinelli*, 579 F.3d at 170 (alteration omitted) (quoting *Catanzaro v. Weiden*, 188 F.3d 56, 61 (2d Cir. 1999)). The extent to which such revocation was justified is amenable to the same discovery described above—that is, whether the summary revocation was defensible given the circumstances. *See DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003) ("[T]he issue of whether [there] was or was not an emergency, and the necessity of [defendants' actions] in order to address that purported emergency, involves a disputed issue of fact that is inappropriate to consider in the context of a Rule 12(b)(6) motion.").

To the extent Nicholas alleges that the post-deprivation proceeding that ultimately led to the return of his credential were flawed—including bias, the unauthorized presence of additional participants, and the *ex parte* consideration of evidence—such concerns remain relevant if deprivation of the press credential without advance process was, in fact, justified by the circumstances. *See id.* ("Under *Parratt,* before reaching the question of the adequacy of the state remedies, a court must first find the necessity of quick action due to an emergency or the impracticality of providing any predeprivation process." (internal alterations and quotation marks omitted) (quoting *Burtnieks v. City of N.Y.*, 716 F.2d 982, 988 (2d Cir. 1983))).

    **C.**    **Municipal Liability**

Defendants also argue that Nicholas's municipal liability claims should be dismissed. To state a claim for municipal liability, a plaintiff must allege that his injury was the result of an official policy, custom, or practice of that municipality. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978). Defendants' argument on this score relies on Nicholas's failure to state a claim for any constitutional violation. Because the Court has found Nicholas's constitutional claims to survive the Rule 12(b)(6) motion, as discussed above, Defendants' argument fails. Moreover, based on Nicholas's allegations of three specific run-ins with Defendants and his

claim that their actions constitute an "unwritten municipal policy, custom [or] practice" (*see* Compl. ¶ 159), at this stage, and given the special solicitude owed to *pro se* plaintiffs, Nicholas has stated a claim for municipal liability. *See Bradshaw v. City of N.Y.*, No. 15 Civ. 9031, 2017 WL 325260, at *6 (S.D.N.Y. Jan. 23, 2017) (collecting cases).

### D.     Injunctive & Declaratory Relief

Defendants further argue that Nicholas lacks standing to seek injunctive relief because he has failed to make allegations of future harm. (Dkt. No. 64 at 7.)[3]

To satisfy the constitutional requirement for standing, a plaintiff must "establish[] that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 101–102 (1983)). Where allegations are based on past acts, together with an alleged pattern or practice, as here, a plaintiff must specifically plead that there is "likelihood that [he or she] will again be wronged in a similar way." *Lyons*, 461 U.S. at 111; *see Ligon v. City of N.Y.*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013) ("The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented." (quoting *Nicacio v. U.S. I.N.S.*, 768 F.2d 1133, 1136 (9th Cir. 1985), *superseded*, 797 F.2d 700 (9th Cir. 1985))); *Aguilar v. Immigration & Customs Enf't Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 827 (S.D.N.Y. 2011) (finding that allegations moved from speculative to likely where the complaint stated that officers "explicitly threatened to return to two of the eight homes in which they conducted operations" and that "in another case, agents actually *did* return to the

---

[3]     Defendants initially challenged Nicholas's standing to seek injunctive relief because his complaint suggested he was no longer working as a photojournalist. (Dkt. No. 54 at 13-14.) But Nicholas has clarified that, while he was out of work for a period of time, he has resumed freelance work as a photojournalist in New York City. (Dkt. No. 59 at 17-18.)

home, visiting twice in thirteen months"); *see also Stinson v. City of N.Y.*, 282 F.R.D. 360, 382 (S.D.N.Y. 2012) ("[T]he fact that several Plaintiffs in this case have received multiple summonses alleged to have been issued without probable cause suggests the potential for future harm to rise above the speculative level."). Nicholas, similarly, has pleaded multiple summary revocations of his press credential and additional facts and statements that imply that he was a particular target. These alleged facts, together with the suggestion of an ongoing practice or custom by Defendants and Nicholas's continued reliance on his press credential, render Nicholas a likely victim of such revocation in the future. For these reasons, he has standing to press a claim for injunctive relief.

Because the Court has found an "actual controversy" between the parties, *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (quoting 28 U.S.C. § 2201(a)), not based "only" on "past acts," but grounded also in the threat of future harm, *Chiste v. Travelocity.com, LP*, 756 F. Supp. 2d 382, 407 (S.D.N.Y. 2010), Nicholas also has standing to seek declaratory relief.

**IV.   Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The operative stay on depositions in this matter is also hereby lifted. (*See* Dkt. No. 84.)

The Clerk of Court is directed to close the motion at Docket Number 52.

SO ORDERED.

Dated: February 27, 2017
       New York, New York

_____
J. PAUL OETKEN
United States District Judge

*COPY MAILED TO PRO SE PARTY BY CHAMBERS*

19