UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JASON B. NICHOLAS,
                    Plaintiff,

          v.

WILLIAM BRATTON, Police Commissioner,
New York City Police Department; STEPHEN
DAVIS, Deputy Commissioner for Public
Information, New York City Police
Department; EUGENE WHYTE, Lieutenant,
Office of the Deputy Commissioner for Public
Information, New York City Police
Department; MICHAEL DEBONIS, Detective,
Office of the Deputy Commissioner for Public
Information, New York City Police
Department; and the CITY OF NEW YORK,
                    Defendants.

Case No. 15-Civ.-9592 (JPO)

Oral Argument Requested

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................II

TABLE OF AUTHORITIES ........................................................................................IV

PRELIMINARY STATEMENT ..................................................................................... 1

SUMMARY OF MATERIAL FACTS............................................................................ 3

APPLICABLE LEGAL STANDARD ............................................................................ 8

ARGUMENT................................................................................................................... 8

I.   DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHT TO GATHER
     NEWS WHEN THEY REMOVED HIM FROM THE SCENE OF THE PARTIAL
     BUILDING COLLAPSE AND SEIZED HIS NYPD-ISSUED PRESS CREDENTIAL......... 8

   A.  Defendants impermissibly excluded Mr. Nicholas from the so-called "frozen zone" when
       the City's press personnel and photographers had preferential access. .................................. 9

   B.  Defendants' Removal of Mr. Nicholas from the Scene and Confiscation of His Press
       Credential, While Allowing the Public and Some Members of the Press to Stay, Violated
       Mr. Nicholas' First Amendment Right to Gather News. .................................................... 12

       1.  Defendants Improperly Discriminated Against Mr. Nicholas By Giving Him Less Access
           to the Scene of the Building Collapse Than Members of the Public, Other Members of the
           NYPD-Credentialed Press, and Fire Buffs ........................................................ 12

       2.  Defendants Arbitrarily Interfered with Mr. Nicholas' First Amendment Right to Gather
           News .......................................................................................... 15

           a.  Defendants' Eviction of Mr. Nicholas and Their Confiscation of His Press Credential
               Were Not Justified by Legitimate "Safety Concerns"................................... 17

           b.  Defendants' Did Not Tailor Their Restrictions on Mr. Nicholas to Address Their
               Supposed Safety Concerns and Left Him with No Adequate Alterative Channels to
               Gather Breaking News............................................................... 20

II.  DEFENDANTS VIOLATED PLAINTIFF'S DUE PROCESS RIGHTS WHEN THEY
     CONFISCATED MR. NICHOLAS' NYPD-ISSUED PRESS CREDENTIAL. ..................... 24

   A.  Det. DeBonis and DCPI Davis deprived Mr. Nicholas of liberty and property interests
       involving substantial First Amendment considerations when they confiscated his NYPD-
       issued press credential and prevented him from pursuing his chosen profession................. 24

1.  Mr. Nicholas has a fundamental liberty interest in pursuing his chosen profession as a breaking news photographer, and Defendants' seizure of his NYPD-issued press credential improperly blocked him from work opportunities. .......................................... 24

2.  Mr. Nicholas has an independent liberty interest in gathering news under the First Amendment, and these substantial First Amendment considerations are implicated by NYPD-issued press credentials. ...................................................................................... 27

3.  Mr. Nicholas also had a protected property interest in the continued possession of his credential, once NYPD issued it to him. ........................................................................ 28

    a.  NYPD's Discretion Is Constrained by the First Amendment. ...................................... 29

    b.  NYPD's discretion to revoke press credentials is carefully constrained by the Rules of the City of New York. ................................................................................................ 30

    c.  In practice, the City has treated NYPD-issued press credentials as a license that cannot be taken away without a showing of wrongdoing and an opportunity to be heard. ..... 31

B.  Defendants' confiscation of Mr. Nicholas' NYPD-issued press credential lacked numerous procedural safeguards required by Due Process. ................................................................ 34

    CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC Home Furnishings, Inc.* v. *Town of East Hampton*,
  947 F. Supp. 635 (E.D.N.Y. 1996) ..................................................................33

*ABC, Inc.* v. *Cuomo*,
  570 F.2d 1080 (2d Cir. 1977)........................................................................15

*ABC, Inc.* v. *Stewart*,
  360 F.3d 90 (2d Cir. 2004)............................................................................21

*Adamo* v. *Dillon*,
  2011 WL 864387 (M.D. Pa. Mar. 10, 2011).................................................31

*Akinnagbe* v. *City of New York*,
  128 F. Supp. 3d 539, 549 (E.D.N.Y. 2015) ................................................22n

*Anderson* v. *Cryovac, Inc.*,
  805 F.2d 1 (1st Cir. 1986)............................................................................15n

*Anderson* v. *Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)........................................................................................8

*Assoc. of Social Workers* v. *Hardwood*,
  874 F. Supp. 530 (D.R.I. 1995), *rev'd on legislative immunity grounds*,
  69 F.2d 622 (1st Cir. 1995)..........................................................................10n

*Baldwin* v. *Redwood City*,
  540 F. 2d 1360 (9th Cir. 1976) ....................................................................28n

*Barry* v. *Barchi*,
  443 U.S. 55 (1979)........................................................................................32

*Bd. of Regents of State Colleges* v. *Roth*,
  408 U.S. 564 (1972)......................................................................................28n

*Bell* v. *Burson*,
  402 U.S. 535 ..........................................................................................29n, 33

*Bery* v. *City of New York*,
  97 F.3d 689 (2d Cir. 1996).......................................................................16, 21

*Borreca* v. *Fasi*,
  369 F.Supp. 906 (D. Haw. 1974) ...........................................................15n, 28

*Branzburg* v. *Hayes*,
408 U.S. 665 (1972)................................................................12

*Catanzaro* v. *Weiden*,
188 F.3d 56 (2d Cir. 1999)......................................................36

*Channel 10, Inc.* v. *Gunnarson*,
337 F. Supp. 634 (D. Minn. 1972)..........................................13

*Charry* v. *Hall*,
709 F.2d 139 (2d Cir. 1983)....................................................29n

*Cinderella Career & Finishing Schools, Inc.* v. *FTC*,
425 F.2d 583 (D.C. Cir. 1970).................................................39

*City of Lakewood* v. *Plain Dealer Publishing Co.*,
486 U.S. 750 (1988)................................................................29

*Clubside, Inc.* v. *Valentin*,
468 F.3d 144 (2d Cir. 2006)....................................................34n

*Connell* v. *Town of Hudson*,
733 F. Supp. 465 (D.N.H. 1990)....................................13, 18, 21

*Consumers Union of U.S., Inc.* v. *Periodical Correspondents' Ass'n*,
365 F. Supp. 18 (D.D.C. 1973), *rev'd as nonjusticiable*, 515 F.2d 1341 (1975) .................28n

*Cyr* v. *Addison Rutland Supervisory Union*,
955 F. Supp. 2d 290 (D. Vt. 2013)..........................................28n

*Dayton Newspapers, Inc.* v. *Starick*,
345 F.2d 677 (6th Cir. 1965) ..................................................15n

*Escalera* v. *New York City Housing Authority*,
425 F.2d 853 (2d Cir. 1970)....................................................40

*Forcade* v. *Knight*,
416 F. Supp. 1025 (D.D.C. 1976), *modified sub nom.*
*Sherrill* v. *Knight*, 569 F.2d 124 (D.C. Cir. 1977)................25

*Fund* v. *City of New York*,
2014 WL 2048204 (S.D.N.Y. May 14, 2014) ........................39n

*Furlong* v. *Shalala*,
156 F.3d 384 (2d Cir. 1998)....................................................32

*Galvin* v. *New York Racing Ass'n*,
70 F. Supp. 2d 163 (E.D.N.Y. 1998), *aff'd*, 166 F.3d 1200 (2d Cir. 2000).................... *passim*

*Getty Images News Services* v. *Department of Defense*,
    193 F. Supp. 2d 112 (D.C.C. 2002) ...................................................28n

*Gilligan, Will & Co.* v. *SEC*,
    267 F.2d 461 (2d Cir. 1959)...........................................................39

*Gitlow* v. *New York*,
    268 U.S. 652 (1925) ..................................................................28

*Goldberg* v. *Kelly*,
    397 U.S. 254 (1970) ..................................................................39

*Greene* v. *McElroy*,
    360 U.S. 474 (1960) ..................................................................25

*Hague* v. *C.I.O.*,
    307 U.S. 496 (1939) ....................................................................9n

*Housing Works, Inc.* v. *Safir*,
    101 F. Supp. 2d 163 (S.D.N.Y. 2000) ...........................................30

*Huminski* v. *Corsones*,
    396 F.3d 53 (2d Cir. 2004)...........................................................23

*Jones* v. *Flowers*,
    547 U.S. 220 (2006) ..................................................................35

*Lawshe* v. *Simpson*,
    16 F.3d 1475 (7th Cir. 1994) ......................................................28

*Legi-Tech, Inc.* v. *Keiper*,
    766 F.2d 728 (2d Cir. 1985)................................................... 10-12

*Leibovitz* v. *City of New York*,
    2018 WL 1157872 (E.D.N.Y. Mar. 2, 2018) ...................................22

*Leigh* v. *Salazar*,
    677 F.3d 892 (9th Cir. 2012) ......................................................19

*Lloyd Corp.* v. *Tanner*,
    407 U.S. 551 (1972).....................................................................9n

*Ludke* v. *Kukn*,
    461 F. Supp. 86 (S.D.N.Y. 1978) ...............................................25

*Luessenhop* v. *Clinton County*,
    466 F.3d 259 (2d Cir. 2006)...........................................................34

vi

*Mathews* v. *Eldrige*,
424 U.S. 319 (1976) ........................................................................................... 37

*Matter of N.Y. Enquirer* v. *Kennedy*,
18 Misc. 2d 950 (Sup. Ct., N.Y. Co. 1957) ...................................................... 30

*McCullen* v. *Coakley*,
134 S. Ct. 2518 (2014) ............................................................................ 9n, 21, 23

*Moody* v. *Michigan Gaming Control Board*,
790 F.3d 669 (6th Cir. 2015) ............................................................................ 31

*Mullane* v. *Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950) ..................................................................................... 34-35

*Nat.'l Assoc. of Social Workers* v. *Hardwood*,
69 F.2d 622 (1st Cir. 1995) ........................................................................... 10n

*Nicholas* v. *Bratton*,
2017 WL 766905 (S.D.N.Y. Feb. 27, 2017) ............................................. *passim*

*Nnebe* v. *Daus*,
184 F. Supp. 3d 54 (S.D.N.Y. 2016) ................................................................ 36

*Padberg* v. *McGrath-McKechnie*,
203 F. Supp. 2d 261 (E.D.N.Y. 2002) ............................................................. 37

*Perry* v. *Sindermann*,
408 U.S. 593 (1972) .......................................................................................... 33

*Quad-City Community News Services, Inc.* v. *Jebens*,
334 F. Supp. 8 (S.D. Iowa 1971) ............................................................. 28n, 30

*Ricci* v. *DeStefano*,
557 U.S. 557 (2009) ............................................................................................ 8

*Richmond Newspapers, Inc.* v. *Virginia*,
448 U.S. 555 (1980) .......................................................................................... 12

*Sessions* v. *Dimaya*,
138 S. Ct. 1204 (2018) .................................................................................... 27n

*Sherrill* v. *Knight*,
569 F.2d 124 (D.C. Cir. 1977) ................................................................. *passim*

*Simard* v. *Board of Education of Town of Groton*,
473 F.2d 988 ..................................................................................................... 28n

*Smith* v. *Daily Mail Publ'g Co.*,
443 U.S. 97 (1979)............................................................................................10

*Spinelli* v. *City of New York*,
579 F.3d 160 (2d Cir. 2009)........................................................................29, 36n

*Stadium Motors, Inc.* v. *N.Y. City Dep't of Consumer Affairs*,
2007 WL 2288040 (E.D.N.Y. Aug. 8, 2007)........................................................39n

*Stevens* v. *N.Y. Racing Association*,
665 F. Supp. 164 (E.D.N.Y. 1987) .......................................................................16n

*Tarpeh-Doe* v. *United States*,
904 F.2d 719 (D.C. Cir. 1990) ...............................................................................31

*Tu* v. *NTSB*,
470 F.3d 941 (9th Cir. 2006) .................................................................................35

*United Pet Supply, Inc.* v. *City of Chattanooga*,
921 F. Supp. 2d 835 (E.D. Tenn. 2013).................................................................38

*United Teachers of Dade* v. *Stierheim*,
213 F.Supp.2d 1368 (S.D. Fla. 2002) ...................................................................15n

*Valmonte* v. *Bane*,
18 F. 3d 992 (2d Cir. 1994).............................................................................26, 38

*Villager Pond, Inc.* v. *Town of Darien*,
56 F.3d 375 (2d Cir. 1995)....................................................................................29n

*Ward* v. *Rock Against Racism*,
491 U.S. 781 (1989).................................................................................16, 21, 23

*West Farms Associates* v. *State Traffic Commission*,
951 F.2d 469 (2d Cir. 1991)..................................................................................29n

*Westinghouse Broadcasting Co.* v. *Dukakis*,
409 F.Supp. 895 (D. Mass. 1976) ...........................................................15n, 17, 23

*Westinghouse Broadcasting Co.*,
v. *National Transportation Safety Board*, 8 Med. L. Rptr. 1177 (D. Mass. 1982).................17

*Wolff* v. *McDonnell*,
418 U.S. 539 (1974)...............................................................................................39

*Youngs* v. *Fusaro*,
179 F. Supp. 3d 198, 206–07 (D. Conn. 2016) ....................................................30

viii

**Constitutional Provisions**

First Amendment .................................................................... *passim*

Fourteenth Amendment .................................................................28, 29n

**Regulations**

38 RCNY §11-01 ...................................................................7n, 26n, 28, 29n

38 RCNY §§ 11-01–11-12 ...............................................................30

38 RCNY § 11-11 .................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................8

Plaintiff Jason Nicholas respectfully submits this memorandum of law in support of his motion for summary judgment on his First Amendment and Due Process claims against Defendants Deputy Commissioner of Public Information Stephen Davis ("DCPI Davis"), Det. Michael DeBonis, and Lt. Eugene Whyte.

## PRELIMINARY STATEMENT

This case involves a photojournalist, Jason Nicholas, who was removed from the scene of a partial building collapse by Defendants DCPI Davis and Det. Michael DeBonis, while attempting to photograph an injured construction worker who was being removed from the building and placed into an ambulance. Defendants claim that Mr. Nicholas was removed because he (1) was taking photographs inside a so-called "frozen zone," which was supposedly off-limits to the public and members of the press for safety reasons, and (2) got too close to the emergency workers helping the victim. The undisputed facts establish that:

- Mr. Nicholas was allowed into the allegedly "frozen" area by police before it was supposedly "frozen" and, until he was removed by Defendants, was never told by NYPD he could not be there;

- Some NYPD-credentialed journalists who arrived at the scene after Mr. Nicholas did were placed in a "designated press area" or "press pen" by Defendants Davis and DeBonis, far enough away from the rescue efforts that they could not see the victim being removed from the building and placed into the ambulance;

- At least 15 City photographers took photos of the rescue from inside the so-called "frozen zone," six of whom either posted the photos to the City's social media accounts or made them available to be posted; some of the City photographers were as close to the victim as (or even closer to the victim than) Mr. Nicholas was when he took his photos;

- Pedestrians were permitted inside the allegedly "frozen" area to shop, eat at restaurants, or go to work; many took photos or video of the rescue on cellphones within the so-called "frozen zone" without anyone telling them to leave;

- At least two self-proclaimed "fire buffs" took photos and video inside the so-called "frozen zone" that they posted to the Internet, and nobody ever asked them to leave the area; and

- DeBonis allowed two NYPD-credentialed journalists to take photos of the rescue efforts from inside a restaurant located inside the so-called "frozen zone."

On these facts, the Court must determine whether Defendants' removal of Mr. Nicholas from the scene and confiscation of his press credential violated Mr. Nicholas' First Amendment rights, given the selective and inconsistent application of the access restrictions listed above and Mr. Nicholas' lack of notice as to what was or was not permitted. We respectfully submit that it did, and that summary judgment is due to be granted on Mr. Nicholas' First Amendment claims.

After DeBonis and DCPI Davis took Mr. Nicholas' press credential, Mr. Nicholas attempted to get it back, requesting an informal meeting and opportunity to be heard. Mr. Nicholas was never given written notice of (1) whether his press credential had been revoked or suspended, (2) the reason his press credential had been seized, and (3) his right to a hearing. After over six months from the date DeBonis and DCPI Davis seized Mr. Nicholas' press credential, Defendants' counsel, in response to an inquiry from this Court, opined for the first time that the press credential had been suspended, not revoked. Mr. Nicholas immediately asked for a hearing and was given one a week later. At no time, was Mr. Nicholas told what he would need to show at the hearing to get his press credential back. Before and at the hearing, Mr. Nicholas asked the City representatives, Defendant Whyte, Chief Edward Mullen, and NYPD counsel Lisa Bland, to see the evidence against him and be given an opportunity to cross examine all adverse witnesses, but those three individuals did not permit him to do so, even though Mullen *had* actually engaged in an *ex parte* conversation with DeBonis about DeBonis' version of events and *did* take it into account in deciding whether to reinstate Mr. Nicholas' press credential. On June 26, 2016, nearly eight months of not having a press pass (and, as a result, not being able to get regular work as a photojournalist covering breaking news), Mr. Nicholas' press credential was returned to him, without any explanation.

2

On these facts, the Court must determine whether the procedures outlined above (or lack thereof) violated Mr. Nicholas' Due Process rights. We respectfully submit that they did, and that summary judgment is due to be granted as to liability on Mr. Nicholas' Due Process claims.

## SUMMARY OF MATERIAL FACTS[1]

On October 30, 2015, two construction workers were trapped inside a building that partially collapsed at a demolition site on 38th Street between 5th and 6th Avenues in Midtown Manhattan. ¶ 11. Mr. Nicholas, an NYPD-credentialed photojournalist and reporter on assignment for the *Daily News*, was dispatched to the scene by the newspaper to cover the accident. ¶ 14. In the days before the October 30 collapse, the *Daily News* had written two articles on the rise in construction fatalities in New York City. ¶ 12.

When Mr. Nicholas — who was wearing his NYPD-issued press credential around his neck — arrived at the scene, the block was closed off to vehicular traffic, but an NYPD officer permitted him to enter the block. ¶¶ 15–16. Defendants say that, at some point, a so-called "frozen zone," spanning the entire block, was established at the scene for safety reasons, and that only "authorized emergency personnel" were allowed inside. ¶ 23. But no police officers (or anyone else) ever told Mr. Nicholas that the scene had become "frozen." ¶ 26. Video and photographic evidence from the scene show that the so-called "frozen zone" was not, throughout the incident, clearly cordoned off with police tape or barricades. ¶ 27; Nicholas Video (Exhibit 95) at 0:03–:04, 0:17–:24. Stores and restaurants on the block remained open to the public. ¶ 34. Police let pedestrians inside the so-called "frozen zone," allowing them to go to work, eat

_____

[1] For a complete list of undisputed material facts, see Plaintiff's Rule 56.1 Statement. References to "¶ __" are to Plaintiff's Rule 56.1 Statement, and references to "Exhibit __" are to the Declaration of Joel Kurtzberg, Esq., filed herewith. Unless specified otherwise, internal citations and quotations are omitted.

at restaurants, or shop at stores.  ¶¶ 34–35.  Throughout the rescue efforts, pedestrians were permitted to take photographs and videos on their cell phones while on the block.  ¶¶ 37–38.

The City's official press apparatus — including press relations personnel from various City agencies — also flocked to and milled about the scene.  ¶ 39.  The undisputed evidence shows that the NYPD permitted at least fifteen City employees to take photos and/or videos without restrictions inside the so-called "frozen zone."  ¶ 41.  During the rescue efforts, six of these City employees made their photographs taken from inside the so-called "frozen zone" available to be posted — and some were posted — to various official City of New York social media accounts.  ¶ 42–46.[2]  Among these employees were FDNY's Social Media Director, Nikki Haney, who was primarily responsible for managing FDNY's official social media accounts, and a Department of Buildings' Communications Unit photographer, Samantha Modell, whose was responsible for taking photographs for the City's official social media accounts.  ¶¶ 43, 46.

Other members of the media also arrived at the scene and were granted varying levels of access.  When DCPI Davis arrived at the scene, he created a "designated press area" or "press pen" down the block from the partially-collapsed building, and NYPD-credentialed members of the press were directed by DCPI to stay in the pen.  ¶¶ 28–29.  Some journalists, however, were permitted closer access.  DeBonis allowed two NYPD-credentialed photographers to photograph the scene from inside a deli on the block.  ¶ 33.  In addition, two self-proclaimed "fire buffs"

--------------------------------

[2] The City utilized an internal email group named "FDNY Social Media," which received rescue photos taken by four FDNY and Department of Buildings employees, some of which were then posted to the City's social media pages.  ¶¶ 45–46.  As a result of Defendants' discriminatory access, media outlets like the *New York Post* resorted to re-publishing photos tweeted by FDNY in their coverage of the collapse.  ¶¶ 47, 48.  In another instance, an *AP* reporter replied to a tweet on FDNY's Twitter account containing a photo taken from inside the so-called "frozen zone," asking if the AP could use FDNY's photo in its coverage of the collapse.  ¶ 47.  A former spokesman for the City's former Mayor Bloomberg praised FDNY's press unit for the media's usage of their social media campaign: "I admire how you and your team are doing your jobs.  The *Post* using FDNY Twitter and Instagram is a real credit to way you guys serve the public and press."  ¶ 48 (quoting D2584 (Exhibit 58).

who frequently post their photos and videos of firefighters on the Internet, took photos and videos of the rescue efforts in plain view and in close proximity to the emergency responders inside the so-called "frozen zone," and nobody asked them to leave. ¶¶ 53, 55.

Mr. Nicholas went into an open store adjacent to the partially-collapsed building, where he observed the rescue efforts from a window, as well as City employees freely taking photographs of the scene. ¶¶ 19–21. One of the injured construction workers died, but the other was removed from the partially-collapsed building and placed inside an ambulance, which was parked on the street outside the building. ¶ 11. When emergency responders removed the injured construction worker from the building and placed him in the ambulance, pedestrians, a "fire buff," two NYPD-credentialed media, and at least six City employees photographed or filmed the rescue from inside the so-called frozen zone. ¶¶ 57–73. Some stood so close that they were nearly touching the medics. ¶ 58. Another City official, Capt. Elizabeth Cascio, stood in front of the open ambulance doors and took pictures on her cell phone. ¶ 70. Once the victim was placed inside the ambulance, Cascio walked around to the side door to lean in and take more photos of the victim inside the ambulance. ¶ 73. Soon after, she made her photos available to be posted — and one was posted — on FDNY's social media accounts. ¶¶ 42, 44–45, 70.

Meanwhile, Mr. Nicholas exited the store, approached the ambulance without anyone asking him to stop, and attempted to photograph and film the rescue (as many other people had been permitted to do) from behind the ambulance doors by raising his camera. ¶¶ 62–71, 74; Nicholas Video at 0:00–:33; Ramos Video at 39:24–:36. In front of him, a line of uniformed emergency workers stood around those tending to the victim, which created a "buffer" ensuring no interference with the emergency workers assisting the victim. ¶ 69; Osterreicher Aff't at Ex. A ¶ 62; Ramos Video at 39:20–:41; Nicholas Video at 0:30–:33. Mr. Nicholas' camera never

touched any of the emergency responders. ¶ 74. Without notice or warning, Mr. Nicholas was quickly approached by DeBonis and the Office of Emergency Management's Press Secretary, Nancy Silvestri. ¶ 75–76; Ramos Video at 39:33–:38. Silvestri physically blocked Mr. Nicholas' camera lens with her cell phone (¶ 76), and DeBonis yelled at Mr. Nicholas, "***What are you doing?! You're not allowed behind the press line***." ¶¶ 77; Nicholas Video at 0:33–:42.

Then, instead of asking Mr. Nicholas to move back or sending him to the "press pen," Defendants DeBonis and Davis removed him from the block completely, preventing him from witnessing, reporting on, and photographing the City's response to the incident. ¶ 78; Nicholas Video at 0:33–1:33. They also seized Mr. Nicholas' NYPD-issued press credential, and Defendant Davis told him, "***this is the last time you'll do that***," and ordered Defendant DeBonis to remove him from the scene and to "***hold on to that*** [i.e., the press credential] . . . . ***And talk to me before you think about giving it back***." ¶ 83; Nicholas Video at 1:09–:20. Mr. Nicholas tried to explain that he had no way of knowing that there was a "press line" and that he had been in the area the whole time, but it did not matter to Defendants Davis and DeBonis what Mr. Nicholas had to say. ¶¶ 82–85; Nicholas Video at 1:07–:22.

Defendants did not tell Mr. Nicholas whether his press credential had been revoked or suspended. ¶ 103. When he asked to meet with Defendant DeBonis to discuss the seizure of his press credential, DeBonis did not respond. ¶¶ 99–101. Mr. Nicholas heard from other journalists that, after Defendant DeBonis removed Mr. Nicholas from the scene, DeBonis came back to the press pen and told the journalists there something to the effect of, "Tell your boys in the NYPPA [i.e., New York Press Photographers Association] he's [i.e., Mr. Nicholas is] never getting his press card back." ¶ 91. Given the circumstances, Mr. Nicholas reasonably assumed Defendants had permanently revoked his press credential. ¶ 103.

Without his NYPD-issued press credential, Mr. Nicholas could not regularly work as a photojournalist covering breaking news in New York City. ¶¶ 126–31; 136–47.[3] Before long, the *Daily News* stopped giving Mr. Nicholas assignments because he had no press credential, and Mr. Nicholas could not get photojournalism work from other media outlets without it. ¶¶ 126–31. After Defendants failed to respond to his requests to be heard, Mr. Nicholas brought this lawsuit, seeking, in part, the return of his press credential. ¶¶ 97–102.

Defendants never provided Mr. Nicholas with written notice of the allegations against him. ¶ 106. He also never received written notice of his right to a hearing to appeal the seizure of his press credential or of what he needed to show at the hearing to get his press credential back. ¶¶ 106–07. Before this incident, the City had never actually held a Section 11-11 hearing for a press credential seizure. ¶ 160. In every prior incident where NYPD seized a press credential, it was returned after the journalist had an informal opportunity to be heard. ¶ 161.

In briefing before this Court, counsel for Defendants referred to the "immediate revocation" of Mr. Nicholas' press credential. ¶ 113; Dkt. No. 14 at 16. It was only five months into this lawsuit, in response to a question from the Court, that counsel for Defendants first claimed that the taking here was a "summary suspension" under 38 RCNY § 11-11(b) and not a "revocation" under 38 RCNY § 11-11(c). ¶ 114. Mr. Nicholas then immediately requested a hearing under 38 RCNY § 11-11(b). ¶ 115. He also requested and was denied access to any evidence that was to be considered against him. ¶¶ 116–18. At the hearing, Mr. Nicholas asked again what other information was being considered, but he was told by Whyte that "this is a

_____

[3] An NYPD-issued press credential entitles the bearer to attend official press conferences and other City-sponsored events open to the press and to, "subject to safety and evidence preservation concerns, cross police, fire lines or other restrictions, limitations or barriers established by the City of New York at emergency, spot, or breaking news events and public events of a non-emergency nature where police, fire lines or other restrictions, limitations or barriers established." 38 RCNY § 11-01(a).

hearing . . . [w]here you present to us." ¶ 124; 11-11 Hearing Tr. (Exhibit 28) at 16. In fact,

Chief Edward Mullen, the ultimate decisionmaker, *did* consider and rely on an *ex parte*

conversation he had had with DeBonis about the incident, but neither he nor Whyte revealed this

when Mr. Nicholas asked about other evidence being considered. ¶¶ 122, 124.

Over one month later — and nearly eight months after the press credential was initially

seized — NYPD decided to return Mr. Nicholas' press credential, with no explanation. ¶ 125.

Once NYPD reinstated his press credential, he got work as a reporter for *Gothamist*, and also as

a journalist and photojournalist for the *Village Voice*. ¶ 132. Mr. Nicholas now works regularly

as a journalist for *Oxygen.com* and as a journalist/photojournalist for *Gothamist*. *Id.*

## APPLICABLE LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is

"material" only if it "might affect the outcome of the suit under the governing law," *Anderson* v.

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if a reasonable factfinder

could decide in the nonmoving party's favor when considering the record as a whole. *Ricci* v.

*DeStefano*, 557 U.S. 557, 586 (2009).

## ARGUMENT

**I.      DEFENDANTS VIOLATED PLAINTIFF'S FIRST AMENDMENT RIGHT TO
         GATHER NEWS WHEN THEY REMOVED HIM FROM THE SCENE OF
         THE PARTIAL BUILDING COLLAPSE AND SEIZED HIS NYPD-ISSUED
         PRESS CREDENTIAL.**

Defendants Davis' and DeBonis' confiscation of Mr. Nicholas' press credential and

removal of Mr. Nicholas from a public street — a place where free speech guarantees are the

strongest and where the government's ability to limit First Amendment rights is "very limited,"[4] — violated clearly established First Amendment law. DCPI Davis and DeBonis allowed the City's own press personnel unrestricted access to the rescue scene, while impermissibly blocking access to NYPD-credentialed reporters and photographers, including Mr. Nicholas. They removed Mr. Nicholas from a place where members of the general public were permitted, and they gave more access to the scene to other photojournalists than they did to Mr. Nicholas. Even if Defendants had legitimate safety concerns over Mr. Nicholas' proximity to the emergency responders (and they did not), Defendants' improperly excluded Mr. Nicholas from the scene and seized his press credential — an unjustified and grossly disproportionate ban on his ability to gather news at this and other breaking scenes in New York City.

A. **Defendants impermissibly excluded Mr. Nicholas from the so-called "frozen zone" when the City's press personnel and photographers had preferential access.**

Defendants' targeted exclusion of NYPD-credentialed journalists, including Mr. Nicholas, from the scene, while allowing the City's own photographers and press personnel to witness, report, and photograph news for public dissemination violates clearly established First Amendment law. Under the First Amendment, Defendants were required to provide Mr. Nicholas with substantially the same access to the scene of the building collapse as the City's own photographers and press personnel. As the Second Circuit has cautioned, the government cannot "accord a state organ of communication preferential access to information":

> The evils inherent in allowing government to create a monopoly over the dissemination of public information in any form seem too obvious to require extended discussion. Government may add its own voice to the debate over public issues, but it may not attempt to control or reduce competition from other

_____

[4] _See, e.g._, _Hague_ v. _C.I.O._, 307 U.S. 496, 515 (1939); _Lloyd Corp._ v. _Tanner_, 407 U.S. 551, 564 (1972); _McCullen_ v. _Coakley_, 134 S. Ct. 2518, 2529 (2014).

speakers. . . . When the state creates an organ of the press, as here, it may not grant the state press special access to governmental proceedings or information and then deny to the private press the right to republish such information. Such actions are an exercise of censorship that allows the government to control the form and content of the information reaching the public.

*Legi-Tech, Inc.* v. *Keiper*, 766 F.2d 728, 733 (2d Cir. 1985); *see also Smith* v. *Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979) ("A free press cannot be made to rely solely upon the sufferance of government to supply it with information.").[5] In *Legi-Tech*, the Second Circuit remanded to the district court with instructions to uphold the state's actions only if the publishing company "has access . . . on substantially the same terms" as the state-owned press. 766 F.2d at 733, 736.

Here, no reasonable jury could find that Defendants gave Mr. Nicholas access on substantially the same terms Defendants afforded to at least seven official press personnel employed by the City of New York who were given unrestricted access to observe, photograph, and film from inside the so-called "frozen zone." ¶ 39. These seven City press personnel were not assisting rescue efforts; rather, they were at the scene doing what any member of the media would do — i.e., trying to document and publicize newsworthy events. Among the City's press personnel allowed inside the so-called "frozen zone" were (1) Nikki Haney, FDNY's Social Media Director, who was primarily responsible for managing FDNY's official social media accounts; (2) Samantha Modell, a Department of Buildings' Communications' Unit Photographer, whose job responsibilities included taking photographs for the City's official social media accounts; (3) the FDNY Director for Public Information, (4) the FDNY Press

_____

[5] *See also Nat'l Assoc. of Social Workers* v. *Hardwood*, 874 F. Supp. 530 (D.R.I. 1995) (allowing governmental lobbyists onto legislative floor while excluding private lobbyists is an impermissible content-based restriction), *rev'd on legislative immunity grounds*, 69 F.2d 622 (1st Cir. 1995) (expressing no opinion on district court's First Amendment analyses); *see id.*, 69 F.2d at 646 (Lynch, J., dissenting) (opining that excluding private lobbyists while allowing governmental lobbyists would result in "speaker-based ban and a content-based bar that gives advantage to the government's viewpoint" and "permits expression of the 'particular message favored by the government and stifles all other speech'").

Secretary; (5) the Office of Emergency Management Press Secretary; (6) the Department of Buildings Press Secretary; and (7) an official Department of Buildings spokesperson. ¶¶ 39, 43. In total, at least fifteen City employees took photographs without restriction inside the so-called "frozen zone." ¶ 41. At least six of these, including three official press personnel, fueled the City's "organ of the press" when they made their photographs from inside the so-called "frozen zone" available to be posted to various Twitter, Facebook, and Instagram social media accounts run by the City of New York. ¶ 42. Indeed, many of these photographs were posted to social media, all while journalists were kept out of the so-called "frozen zone." ¶ 43.

Defendants DeBonis and Davis did not provide Mr. Nicholas and other NYPD-credentialed journalists with substantially the same access to the scene as the City's own photographers and press personnel, as mandated by the First Amendment. *See Legi-Tech*, 766 F.2d at 733, 736. Instead, Defendants selectively enforced a so-called "frozen zone" against only the NYPD-credentialed press. They kicked Mr. Nicholas out of the scene completely and penned up other members of the NYPD-credentialed press into a "designated press area" down the block from the partially collapsed building and out of sight of the rescue. ¶¶ 28–30, 76–89.

Defendants' actions were an egregious speaker-based restraint that gave the City's press personnel and photographers *exclusive* access to the scene, impermissibly allowing "the government to control the forum and content of the information reaching the public." *Legi-Tech*, 766 F.2d at 733. In the words of one City official, giving more access to the City's press officers than credentialed media ensures "that there isn't differing information that is being made public" and "allows multiple press officers from different agencies to gather their agency information and then to be able to work together so that there's a consistent message." ¶ 40; Grimm Tr. at 98–100. Due to Defendants' selective enforcement of the so-called "frozen zone," the City was

able to engage in a one-sided cheerleading exercise and control the content of the news that reached the public. Even viewing the facts in the most favorable light to Defendants, their impermissible speaker-based restrictions on only NYPD-credentialed journalists and photojournalists violated clearly established First Amendment law. *Legi-Tech*, 766 F.2d at 733.

### B. Defendants' Removal of Mr. Nicholas from the Scene and Confiscation of His Press Credential, While Allowing the Public and Some Members of the Press to Stay, Violated Mr. Nicholas' First Amendment Right to Gather News.

In addition to allowing unrestricted access to the City's press personnel inside the so-called "frozen zone," Defendants also permitted some members of the general public, other NYPD-credentialed members of the press, and two "fire buffs" to take videos and photos inside the so-called "frozen zone." Despite the presence of all these other people on the public street where rescue efforts were ongoing, Defendants excluded Mr. Nicholas from the scene and seized his press credential. At a minimum, the First Amendment prohibits Defendants from placing unreasonable limitations on Mr. Nicholas' right to gather news. Defendants' actions targeting Mr. Nicholas violated the First Amendment because they were not justified by a legitimate government interest, nor were they tailored in any way to Defendants' alleged concerns, and they completely foreclosed all means for Mr. Nicholas to cover the not only the rescue, but also eight months of other breaking news events.

### 1. Defendants Improperly Discriminated Against Mr. Nicholas By Giving Him Less Access to the Scene of the Building Collapse Than Members of the Public, Other Members of the NYPD-Credentialed Press, and Fire Buffs

Although "newsmen have no constitutional right of access to the scenes of crime or disaster when the general public is excluded," *Branzburg* v. *Hayes*, 408 U.S. 665, 684–85 (1972), "the media's right of access is at least equal to that of the general public." *Richmond Newspapers, Inc.* v. *Virginia*, 448 U.S. 555, 586 n.2 (1980) (Brennan, J., concurring). And when

some members of the general public gain access to an emergency scene like this, the First Amendment guarantees the press at least equal access as the public. *Channel 10, Inc.* v. *Gunnarson*, 337 F. Supp. 634, 638 (D. Minn. 1972) (recognizing press photographers' constitutional right to film activity when "[t]here was no restriction of the general public from the area"); *Connell* v. *Town of Hudson*, 733 F. Supp. 465, 471–72 (D.N.H. 1990) (recognizing press photographers' constitutional right to photograph from a location that others are also using to view an accident scene). This principle is so clearly established that it is memorialized in NYPD's internal procedures, which explicitly state that, "A member of the press with proper credentials may not be excluded from an area where the general public has access." ¶ 151; NYPD Patrol Guide Procedure No. 212-49 (D289–90) (Exhibit 88)).

But here, according to Defendants, Mr. Nicholas was supposedly removed from the scene, in large part, for taking photographs in a so-called "frozen zone" (¶¶ 93–94) that, the undisputed evidence shows, was not in fact frozen because it was not consistently enforced. That evidence overwhelmingly confirms that, while credentialed journalists were corralled into a "press pen" too far from the rescue efforts to meaningfully cover the rescue, ¶¶ 28–30, pedestrians were permitted inside the so-called "frozen zone" to go to work, get a bite to eat, or go shopping in stores located inside the allegedly restricted area. ¶¶ 34–35. Some pedestrians smoked cigarettes on the sidewalk near the partially-collapsed building, ¶ 36, while others took photographs or video of the ongoing rescue on their cell phone. ¶ 37. None were asked to leave or stop filming. ¶¶ 37–38. Although Defendants knew about these relaxed restrictions, ¶ 35, they continued to keep press at the scene further away in the "press pen." ¶ 29.

Defendants did not even treat all members of the press the same. While most members of the press were relegated to the press pen, a photographer from *Reuters* and another from the *New*

*York Post* were permitted to photograph the rescue from a restaurant in the so-called "frozen zone." ¶ 33. Those photographers, like Mr. Nicholas, arrived at the scene before any "frozen zone" was put in place and were permitted to remain inside the allegedly later-restricted area. ¶ 17. Although another police officer initially told these photographers they could not be inside the restaurant, DeBonis personally instructed them to remain there and photograph the rescue from inside the restaurant. ¶ 33. Neither Defendants nor any other NYPD officer gave Mr. Nicholas any similar instructions or guidance about what he could or could not do. ¶ 31.

Defendants also placed *zero restrictions* on two "fire buffs,"[6] who accessed the so-called "frozen zone," took photographs and videos of the rescue efforts, and posted them in real time to social media. ¶¶ 49–55. One of the "fire buffs," Joseph John Ramos, posted a compilation of nearly fifty minutes of video footage from the rescue scene taken on his iPhone to his YouTube page. ¶ 50. (Mr. Ramos receives payments from YouTube based on the number of times his video gets played. ¶ 49.) His coverage of the FDNY is universally positive; he even deletes negative comments about the FDNY from his YouTube channel. ¶ 49. Additional photographs of the scene taken by the other "fire buff," John Hopper, were posted for sale online and published in *1st Responder News*. ¶ 51. Video and photographic evidence confirms that these two "fire buffs" were standing, camera or iPhone in hand in plain view inside the so-called "frozen zone" mere feet from Defendant DeBonis. ¶¶ 53, 55; Ramos Video at 39:23–:33. Mr. Ramos also recalled standing "pretty close" to the first responders. ¶ 55; Ramos Tr. at 144–45.

---

[6] "Fire buffs" are individuals who actively follow fire departments as an avocation or hobby. They often arrive at scenes where the fire department is working and take, share, or sell photos or video of the fire fighters at work. *See, e.g.*, Robert F. Worth, *With Fire in Their Eyes; Buffs Find Passion in Chasing Sirens and Red Trucks*, N.Y. Times (Apr. 25, 2003), https://www.nytimes.com/2003/04/25/nyregion/with-fire-in-their-eyes-buffs-find-passion-in-chasing-sirens-and-red-trucks.html; International Fire Buff Associates, Code for Fire Buffing, http://ifba.org/wp-content/uploads/2018/02/code-for-fire-buffing.pdf (last visited Jul. 16, 2018) (explaining what fire buffs do). One of the "fire buffs," Mr. Ramos, carries a "freelance videographer" press identification card. ¶ 49.

At one point, when the victim was being placed in the ambulance, FDNY's Public Information Director, Jim Long, asked the "fire buffs" to move back from where they were standing. *Id.* Yet nobody — no official, no NYPD officer, not DeBonis or DCPI Davis — ever asked either of the "fire buffs" to leave the so-called "frozen zone," even though they were openly taking photos and video of the rescue efforts ¶¶ 53, 55.

This inconsistent treatment violates the First Amendment. "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media or the rights of the First Amendment would no longer be tenable." *ABC, Inc.* v. *Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) (impermissible to exclude single news network from coverage of mayoral candidates' headquarters when access granted to other networks). As this Court previously recognized, "[e]qual press access is critical because 'exclusion of an individual reporter . . . carries with it 'the danger that granting favorable treatment to certain members of the media allows the government to influence the type of substantive media coverage that public events will receive,' which effectively harms the public.'" *Nicholas* v. *Bratton*, 2017 WL 766905, at *5 (S.D.N.Y. Feb. 27, 2017).[7]

## 2. Defendants Arbitrarily Interfered with Mr. Nicholas' First Amendment Right to Gather News

Defendants' disparate treatment of Mr. Nicholas as compared to the pedestrians, NYPD-credentialed media, and "fire buffs" who were allowed to take photographs and video inside the

_____

[7] *See also Anderson* v. *Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986) (court could not grant one media entity access to discovery materials while excluding another); *Sherrill* v. *Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977) (White House could not exclude reporter from press facilities arbitrarily or for less than compelling reasons); *Dayton Newspapers, Inc.* v. *Starick*, 345 F.2d 677 (6th Cir. 1965) (police cannot remove reporter from public streets near fire while allowing other photographers access to the same streets unless necessary); *United Teachers of Dade* v. *Stierheim*, 213 F.Supp.2d 1368, 1373–74 & n.2 (S.D. Fla. 2002) (union newspaper could not be excluded from the press room reserved for members of the "general-circulation" media and relegated to a "separate but equal" media room); *Westinghouse Broadcasting Co.* v. *Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976) (news organization could not be selectively excluded from public meetings absent compelling government interest); *Borreca* v. *Fasi*, 369 F.Supp. 906, 909–10 (D. Haw. 1974) (reporter could not be selectively excluded from news conferences).

so-called "frozen zone" was impermissibly content-based.[8]  But even putting aside for purposes

of this motion whether he was removed due to the content of his speech, as this Court has

already held, "arbitrary restrictions on news-gatherers may run afoul of the First Amendment,

unless Defendants can explain the need, because the First Amendment 'protects the public

against the government's 'arbitrary interference with access to important information,''

including the diversity of media outlets covering an event." *Nicholas*, 2017 WL 766905, at *6.[9]

Because Mr. Nicholas was attempting to gather news on a public street, any restriction on his

protected speech can only be justified if it is "'narrowly tailored to serve a significant

governmental interest' and "leave[s] open ample alternative channels for communication.'" *Bery*

v. *City of New York*, 97 F.3d 689, 697 (2d Cir. 1996) (quoting *Ward* v. *Rock Against Racism*, 491

U.S. 781, 790 (1989)).  But as demonstrated below, no conceivable government interest could

justify the eviction of only Mr. Nicholas from the scene or the seizure of his press credential on

these facts.  And even if a legitimate government interest had justified Defendants' actions

banning Mr. Nicholas from the scene and the confiscation of his credential, the restriction was

not "narrowly tailored" because there were numerous less-restrictive alternatives — e.g., asking

---

[8] Defendants' actions are content-based for similar reasons as those in *Stevens* v. *N.Y. Racing Association*, 665 F. Supp. 164 (E.D.N.Y. 1987).  First, Det. DeBonis demonstrated that he disapproved of the photographs Mr. Nicholas took of the injured construction worker when he suggested to Mr. Nicholas in "off the record" comments that he should not use the photographs because the victim was likely to die.  *Id.* at 175–76; ¶ 87.  This was echoed by the Office of Emergency Management Press Secretary blocking Mr. Nicholas' lens, and the Mayor's Press Secretary's email that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ¶¶ 13, 75.  Second, Defendants' evolving justification for the expulsion of Mr. Nicholas from the scene as discovery in this case has proceeded bolsters the conclusion that defendants' actions were content-based.  *See Stevens*, 665 F. Supp. at 176; ¶¶ 77, 93–94, 98.  Third, Mr. Nicholas' presence inside the so-called "frozen zone" and proximity to the victim were "innocuous" — there is no evidence that he actually disrupted the rescue, and he stood near a number of other people observing the rescue, including another person who was taking photographs.  *Stevens*, 665 F. Supp. at 176; ¶¶ 66–74, 95–96.

[9] *See also Sherrill*, 569 F.2d at 129–30 ("Not only newsmen and the publications for which they write . . . but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information.").

Mr. Nicholas to stand back, escorting him to the press pen, allowing him to take photos from inside a store or restaurant, instructing him to return for the press conference after the rescue, or providing clear instructions in advance as to what areas were on or off-limits for taking photos.

        **a.   Defendants' Eviction of Mr. Nicholas and Their Confiscation of His Press Credential Were Not Justified by Legitimate "Safety Concerns"**

Defendants cannot satisfy their burden to prove that their eviction of Mr. Nicholas and confiscation of his press credential were rationally and legitimately justified — e.g., by safety concerns. *See Westinghouse Broadcasting Co.* v. *Nat'l Transportation Safety Board*, 8 Med. L. Rptr. 1177, at *6 (D. Mass. 1982) ("[T]he burden of producing evidence shifts to the defendant to justify or explain, at least, the reason for its actions and the logical necessity and reasonable basis for its actions. . . . It is up to the defendant to establish what the justification is . . . [and] come forward with such evidence."). In *Westinghouse*, the court faced a similar question of whether the government was justified in arbitrarily limiting press access to the scene of an accident. *Id.* There, the court recognized that the First Amendment right of access prevented the government from arbitrarily limiting press access to the scene when they failed to make an evidentiary showing that there existed "some overriding consideration . . . [of] security, orderly process, spatial limitation." *Id.* at *12. The present case is analogous. Defendants have not — and cannot — satisfy their burden to show that their ejection of Mr. Nicholas from the scene and confiscation of his press credential were justified by a legitimate governmental interest.

Defendants claim that Mr. Nicholas was removed from the scene because he allegedly "violat[ed] the 'frozen zone' that was created to ensure the safety of those present at the scene and to enable the victims to receive the medical treatment they needed." *See, e.g.*, DeBonis Decl. (Dkt. No. 13) (Exhibit 22) ¶ 19. In a similar vein, Defendants allege that they confiscated Mr. Nicholas' press credential "[b]ecause of Mr. Nicholas' knowingly egregious and blatant

violations of safety concerns at the scene of this event, and violation of the 'frozen zone." *Id.* But an NYPD officer permitted Mr. Nicholas to enter the scene, and nobody told Mr. Nicholas that the scene was "frozen." ¶¶ 16, 26.[10]

As an initial matter, to the extent the so-called "frozen zone" existed at all, it was amorphous and not "clearly delineated" to block off access. ¶¶ 27, 35; *see Connell*, 733 F. Supp. at 470 (restrictions on photojournalist not "reasonably justified" when he "followed all instructions reasonably designed to prevent interference with police and emergency activities. Although he may have crossed a police perimeter, that perimeter was not clearly delineated, and, when asked to move, he moved."). The evidence is also overwhelming that the area was "frozen" as to some people, but not to others. Pedestrians were permitted in and out of the so-called "frozen zone" to eat, shop, or work, delivery men were able to access stores and restaurants there, "fire buffs" toured the scene, and at least fifteen City employees roamed the so-called "frozen zone" taking photographs and videos of the rescue. ¶¶ 33–38, 41, 53–55. With so many other individuals also inside the so-called "frozen zone," no justifiable and legitimate safety concern with respect to only Mr. Nicholas' presence in the same area can be conjured by Defendants. No reasonable jury could find that his presence presented a unique, legitimate safety concern not somehow triggered by any of the other people they allowed to enter, observe, photograph, or record inside the so-called "frozen zone." As the Ninth Circuit has warned, "a

---

[10] Defendants apparently argue that Mr. Nicholas must have known that the scene was "frozen" because he texted or spoke with Joseph Marino, another photographer from the *Daily News*, who was also at the scene. But like Mr. Nicholas, Mr. Marino also did not know that the scene was "frozen" or that a "press pen" had been established. ¶ 32. (citing Marino Tr. at 30). Det. DeBonis separately testified that Mr. Nicholas "knew" that the scene was frozen because he is "an experienced photographer." DeBonis Tr. at 123–27, 181. But Plaintiff's expert, Mickey Osterreicher — a photojournalist with over forty years of experience — opined that, in his experience, "if you are not instructed a public area is 'frozen,' or otherwise restricted after you have arrived, then it is common practice to assume that you can remain in the area." Osterreicher Aff't at Ex. A ¶ 57. And according to Mr. Osterreicher, "if a perimeter is not clearly delineated with tape or other barriers, then it is reasonable to assume that one may access the area, especially if one observes others standing in the area." *Id.* ¶ 60.

court cannot rubber-stamp an access restriction simply because the government says it is necessary. . . . When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate. . . . [C]ourts have a duty to conduct a thorough and searching review of any attempt to restrict public access." *Leigh* v. *Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

When faced with the overwhelming evidence that the so-called "frozen zone" was not truly "frozen," Defendants changed tactics, arguing that "plaintiff was removed from the scene of the partial building collapse for photographing in a 'frozen zone' *and in too close a proximity to emergency responders*, which created a dangerous situation for the first responders and injured construction worker." *See* ¶ 94 (quoting Defendants' interrogatory responses) (emphasis added). But the undisputed facts do not support this *post-hoc* rationale either. No reasonable juror could conclude that Mr. Nicholas' proximity to the emergency responders — which was a similar to or even further away than the proximity embraced by City photographers inside the so-called "frozen zone" — somehow "created a dangerous situation." At nearly the exact same time that Mr. Nicholas allegedly stood close enough to create a danger, six City employees who were not actively aiding with the rescue were permitted to take nearly identical photographs or videos of the rescue of the victim from a similar or even closer proximity without anyone stopping them.[11] When two City employees photographed the victim as he was transported down the sidewalk toward the ambulance, they were standing so close to the emergency responders transporting the victim that they nearly touched them, while two other City employees were photographing and

---

[11] ¶¶ 58–60, 70–73; JBNICHOLAS_000951 (Exhibit 44) (depicting Samantha Modell, Det. John Alvinez, Nagin Patel, and an unidentified medic taking photographs or video); Ramos Video (Exhibit 96) at 39:11–40:15 (depicting Capt. Cascio and Nikki Haney taking photographs or video); D941–68 (Exhibit 66) (taken by Cascio); D1996–2014 and D2020–24 (Exhibits 89) (taken by Modell); D2135–90 (Exhibit 43) (taken by Alvinez).

recording close by. ¶ 58. As DCPI Davis conceded, photographs of the scene show that these photographers were standing "close to the workers," and Mr. Nicholas would not have been permitted to take photographs from where they stood. ¶ 60; Davis Tr. at 376–85; 388–89. Then, when the victim was moved from the sidewalk to the waiting ambulance, FDNY's Executive Officer, Capt. Elizabeth Cascio, and FDNY's Social Media Director, Nikki Haney, also snapped photographs of the rescue on their cell phones from a close proximity. ¶ 59. Photographs and video footage show that Cascio was standing closer to the victim than Mr. Nicholas while she took photographs — so close that she even appears in Mr. Nicholas' photos. ¶ 71. At one point, Cascio even physically touched the medics and leaned into the open ambulance door to take photographs of the victim inside the ambulance without anyone stopping her. ¶ 73; Ramos Video at 40:00–:16. The unrebutted opinion of Plaintiff's expert, Mickey Osterreicher — a photojournalist and law enforcement officer with over 40 years of experience in each of these fields, and a media law attorney with 20 years of experience advising photojournalists — is that photojournalists routinely stand as close or closer than Mr. Nicholas stood to the victim, and Mr. Nicholas' proximity to the injured construction worker was consistent with the standards of care in the photojournalistic community. Osterreicher Aff't at Ex. A ¶¶ 49–73. With so many other people permitted to take photographs of the victim from an as-close or even closer vantage point than Mr. Nicholas, on this record, no reasonable jury could find that Defendants removed Mr. Nicholas because his proximity to the rescue efforts created a legitimate danger.

### b. Defendants' Did Not Tailor Their Restrictions on Mr. Nicholas to Address Their Supposed Safety Concerns and Left Him with No Adequate Alterative Channels to Gather Breaking News

Even assuming Defendants' safety concerns were legitimate (and they were not), they still violated Mr. Nicholas' First Amendment rights because their solution to the alleged problem was not at all narrowly tailored and there were numerous less speech-restrictive alternatives that

could have readily addressed any legitimate safety concerns. Even "content-neutral" restrictions must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication." *Bery*, 97 F.3d at 697 (quoting *Ward*, 491 U.S. at 790). As the Supreme Court has explained, "by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency." *McCullen*, 134 S. Ct. at 2534 (striking down regulation imposing 35-foot buffer zones outside abortion clinics even when government asserted a "substantial public safety risk"). The Second Circuit has routinely struck down complete bans on speech or press access. *See, e.g., Bery*, 97 F.3d at 697 (compiling cases); *ABC, Inc.* v. *Stewart*, 360 F.3d 90, 105 (2d Cir. 2004) (overturning district court's order excluding media from *voir dire* examinations because it did not choose the "most narrowly tailored course available"). As the facts demonstrate, Defendants made no effort to tailor their limitations on Mr. Nicholas' actions to their alleged concerns over his proximity. Instead, they banned him from the scene and confiscated his press credential — two punishing, vindictive, unreasonable, and overbroad measures that barred Mr. Nicholas from gathering news for seven months.

Mr. Nicholas' complete exclusion from the scene was unnecessary to address Defendants' alleged "safety" concerns. *Connell*, 733 F. Supp. at 471 (police's interest in securing an accident scene did not outweigh photographer's right to photograph the scene). Even if Defendants reasonably believed that Mr. Nicholas' proximity created a safety hazard, there existed many lesser restrictive means of addressing their perceived threat. Most obviously, they could have — and indeed should have — ordered Mr. Nicholas to step back. Defendant DeBonis testified that, in practice, before a press credential is typically seized, "there is usually an interaction where . . . if they're [i.e., the press card holder] in an area where they're not

supposed to be, [they are instructed] 'Hey, you have to be over there,' then something else leads up to the removal of the press card." DeBonis Tr. at 180; ¶ 149. In fact, around the same time, FDNY's Director for Public Information, James Long, gave the "fire buffs" and other observers at the scene a simple instruction to step back, rather than ordering them to leave. ¶ 55. A simple directive to step back, which would have been the first instruction Mr. Nicholas had received about where he was permitted to be, would have undoubtedly been a reasonable and narrowly-tailored limitation on his right to gather news. *See Leibovitz* v. *City of New York*, 2018 WL 1157872, at *9 (E.D.N.Y. Mar. 2, 2018).[12] Nor did Defendants tell Mr. Nicholas that he could remain inside the store where he had been waiting inside, similar to DeBonis' instructions to two other credentialed press photographers in a restaurant on the scene. ¶ 33. Defendants also could have informed Mr. Nicholas of the "designated press area" and instructed him to stand inside it and await the City's official press conference, like they instructed other members of the press. ¶¶ 28–29.[13] All of these alternative measures would have allowed Mr. Nicholas to continue gathering news while addressing Defendants' alleged safety concerns.

But Defendants DeBonis and Davis did not respond rationally. In fact, they refused to hear what Mr. Nicholas had to say; it was irrelevant to them whether he knew the area had been allegedly frozen or whether anyone told him where he could or could not stand. ¶ 85. Rather than hear him out, they instead ordered Mr. Nicholas to leave and completely blocked his access

_____

[12] NYPD's Office of the Deputy Commissioner for Legal Matters, in its guidance on "the recommended proportional response" to when an individual is not recording from a safe distance, instructs officers to simply issue a warning to move back, such as "Please step back!" or "Please get on the sidewalk." ¶ 150; JBNICHOLAS_004145 (Exhibit 90) at 42.

[13] *See Akinnagbe* v. *City of New York*, 128 F. Supp. 3d 539, 549 (E.D.N.Y. 2015) (a "barricaded area, if indeed it was made available to plaintiffs, was . . . an adequate alternative to [protestors'] chosen location a few feet away," and an order to "leave this sidewalk" left open the alternative possibility of simply moving across the street rather than "dispers[ing] completely"). It is worth noting that the "press pen" set up by Defendants was not merely "a few feet away" from the rescue efforts, nor was it even within sight and sound of the rescue efforts. ¶¶ 28–30.

to the scene — a restriction "substantially broader than necessary to achieve the government's interest." *See Ward*, 491 U.S. at 799–800. From outside the block where the partially-collapsed building was located and rescue efforts were ongoing, Mr. Nicholas was not able to photograph and film the rescue efforts at all, nor was he able to attend the City's official press conference, which took place inside the "frozen zone." ¶ 90. Defendants left him with *no* alternative channels to cover the incident, let alone a constitutionally adequate alternative. *See Westinghouse Broadcasting*, 8 Med. L. Rptr. 1177 at *9–*10 (finding "no adequate and clear alternative means of access to the type of information which is required" for television coverage of plane crash investigation besides "photograph[ing] it as it is transpiring").

Likewise, the confiscation and indefinite seizure of Mr. Nicholas' press credential was a plainly overbroad means of enforcing Defendants' alleged safety concerns. Defendants DeBonis and Davis seized and retained his press credential, which he needed to get access to emergency and breaking news scenes in New York City and official press conferences. ¶¶ 5–8. Defendants kept his press credential for nearly eight months, despite his repeated requests for its return. ¶¶ 97–101, 125. Without his press credential, Mr. Nicholas was "indefinitely and virtually completely" barred from covering breaking news — just the sort of broad exclusion that the Second Circuit has struck down as unconstitutional because it is so "plainly overbroad in light of its duration, geographical scope, and scope of proceedings covered." *See Huminski* v. *Corsones*, 396 F.3d 53, 66, 87–88 (2d Cir. 2004) (notices barring journalist from attending all proceedings in state courthouses were unconstitutional when there was "virtually no 'tailoring' at all" to officials' perceived safety concerns); *see also McCullen*, 134 S. Ct. at 2539 ("For a problem shown to arise only once a week in one city at one clinic, creating 35-foot buffer zones at every clinic across the Commonwealth is hardly a narrowly tailored solution."). Defendants' supposed

concerns over Mr. Nicholas' proximity to the victim, even if they were legitimate, simply cannot justify his expulsion from the scene or the perpetual restriction on his newsgathering Defendants ordered. Accordingly, even if not viewpoint-based, Defendants' conduct violated the First Amendment.

## II. DEFENDANTS VIOLATED PLAINTIFF'S DUE PROCESS RIGHTS WHEN THEY CONFISCATED MR. NICHOLAS' NYPD-ISSUED PRESS CREDENTIAL.

DCPI Davis and DeBonis violated Mr. Nicholas' due process rights when they seized his NYPD-issued press credential without affording him timely notice of the "suspension" and a timely and sufficient opportunity to be heard and confront the witnesses who testified against him. Whyte further violated Mr. Nicholas' due process rights by depriving him of the right to confront the witnesses and evidence used against him at the hearing he was finally provided.

### A. Det. DeBonis and DCPI Davis deprived Mr. Nicholas of liberty and property interests involving substantial First Amendment considerations when they confiscated his NYPD-issued press credential and prevented him from pursuing his chosen profession.

Mr. Nicholas has fundamental liberty interests in both pursuing his chosen career and in his right to gather news, and Defendants wrongfully interfered with these when seizing his NYPD-issued press credential, which he needs to work as a breaking news journalist. Mr. Nicholas also has a protected property interest in the continued possession of his NYPD-issued press credential because NYPD's discretion to revoke credentials once they have been issued is carefully constrained by NYPD's practices and the First Amendment.

#### 1. Mr. Nicholas has a fundamental liberty interest in pursuing his chosen profession as a breaking news photographer, and Defendants' seizure of his NYPD-issued press credential improperly blocked him from work opportunities.

Mr. Nicholas' has a protected liberty interest in pursuing his chosen profession as a photojournalist covering breaking news. The "right to pursue one's profession is a fundamental

'liberty' within the meaning of the Fourteenth Amendment's due process guarantee." *See Ludke* v. *Kukn*, 461 F. Supp. 86, 98 (S.D.N.Y. 1978) (quoting *Greene* v. *McElroy*, 360 U.S. 474 (1960)); *see also Forcade* v. *Knight*, 416 F. Supp. 1025, 1037 (D.D.C. 1976) (due process requirements apply when denial of White House press credential impaired reporters' ability to follow their chosen profession of journalism), *modified sub nom. Sherrill* v. *Knight*, 569 F.2d 124 (D.C. Cir. 1977) (finding liberty interest based on First Amendment interests). In *Ludke*, the court recognized the fundamental liberty interest of the plaintiff to pursue her chosen profession of sports reporting. *Id.* And like the reporter in *Ludke*, Mr. Nicholas has a liberty interest in earning his livelihood covering the particular beat of his choice.

Defendants DeBonis and Davis deprived Mr. Nicholas of his liberty interest in pursuing his chosen profession when they seized his press credential. As entirely unrebutted testimony in this case has confirmed, a photographer needs an NYPD-issued press credential to regularly cover breaking news in New York City. All current and former press photographers that have testified in this case have unanimously agreed that a press credential is needed to regularly work as a press photographer covering breaking news in New York City. ¶¶ 137–45. In addition, three current and former editors at the *Daily News*, for which Mr. Nicholas worked as a freelance photographer for several years, all confirmed that the a photographer must possess a valid NYPD-issued press credential to be hired by the *Daily News*. ¶¶ 139–41. One *Daily News* editor testified that its photographers "can't work without a press credential" and even called it one of "the tools that are required to do the job," along with a camera and laptop. ¶ 140; Lewis Tr. at 13, 29–30, 44–46. Another editor testified, "I wouldn't hire somebody without a press pass."

¶ 139; MacDonald Tr. at 41.  A third editor testified, "you obviously need your press credential to work." ¶ 140; Marino Tr. at 50.[14]

Because press photographers need an NYPD-issued credential to work in New York City, Defendants' confiscation of Mr. Nicholas' credential deprived him of a protected liberty interest in pursuing his chosen occupation.  *See Valmonte* v. *Bane*, 18 F. 3d 992 (2d Cir. 1994) (deprivation of liberty interest when plaintiff would not be able to get hired in her field due to state action).  Indeed, after Defendants' confiscated Mr. Nicholas' NYPD-issued press credential, he could no longer access restricted emergency or breaking news scenes in New York City.[15]  And because Mr. Nicholas was stripped of his access to breaking news scenes, the *Daily News* editors could no longer assign him regular work after October 30, 2015.  ¶¶ 126–29.  One editor recalled that Mr. Nicholas could not be given work because, without an NYPD-issued press card, "[h]e didn't have the tools to work." ¶ 129; Lewis Tr. at 13, 30, 44–46.  Thereafter, when Mr. Nicholas called to ask for work, he hung up the phone on Mr. Nicholas.  ¶ 127.  Likewise, another editor testified that "[w]ithout the credential it would be very difficult for him to continue working," and that Mr. Nicholas "was obviously not really able to accept the kind of

_____

[14] These perspectives were reinforced by the expert opinions of Mickey Osterreicher, who opined based on his experience as a photojournalist for over 40 years and 13 years as General Counsel of the National Press Photographers Association, that "possessing an NYPD-issued press credential is a functional requirement to regularly work as a photojournalist in the City of New York covering in person, emergency, spot, or breaking news events and/or public events of a non-emergency nature."  Osterreicher Aff't at Ex. A ¶ 3.  According to Mr. Osterreicher, "[w]hile it may be possible to secure occasional odd jobs as a photojournalist in New York without an NYPD-issued press credential, to succeed and make a living in photojournalism covering breaking news in the City of New York — and to both receive assignments and access many areas, including sometimes public streets — a photographer must possess an NYPD-issued press credential." *Id.* ¶ 78.  Mr. Osterreicher is unaware of any regularly working photojournalist covering emergency, spot, or breaking news events in New York City who does *not* possess an NYPD-issued press credential. *Id.* ¶ 84.  Nobody in this case testified to the contrary.  ¶ 135.

[15] Without an NYPD-issued press credential, he was not entitled to "cross police, fire lines or other restrictions, limitations or barriers established by the City of New York at emergency, spot, or breaking news events and public events of a non-emergency nature where police, fire lines or other restrictions, limitations or barriers established by the City of New York have been set up for security or crowd control purposes, within the City of New York, and subject to space limitations, attend events sponsored by the City of New York which are open to members of the press." 38 RCNY § 11-01(a).

assignments that I would normally give him without the press credential, breaking news assignments specifically. It's hard to produce without one." ¶ 129; Marino Tr. at 47, 49–50, 53. Similarly, a third editor did not hire Mr. Nicholas after October 30, 2015 because, without his NYPD-issued press credential, Mr. Nicholas was no longer "able to cover everything that could potentially happen" during an eight-hour shift. ¶ 138; MacDonald Tr. at 40–41.

Significantly, there has been no evidence to the contrary that Mr. Nicholas could have somehow continued to regularly cover breaking news in New York City without his credential. Recently, the Commanding Officer of DCPI even wrote to a breaking news reporter, "I understand the importance of a NYPD press credential to your continued employment." ¶ 147; Exhibit 84. Accordingly, when Defendants seized and retained Mr. Nicholas' press credential for nearly eight months, they impinged on his fundamental right to pursue his chosen profession.[16]

### 2. Mr. Nicholas has an independent liberty interest in gathering news under the First Amendment, and these substantial First Amendment considerations are implicated by NYPD-issued press credentials.

Aside from the protected liberty interest in pursuing his chosen career, as a professional journalist, Mr. Nicholas also has a separate "[F]irst [A]mendment liberty interest" in gathering news that requires NYPD to afford him procedural protections when barring his access to newsworthy events by confiscating his credentials. *See Sherrill*, 569 F.2d at 130–31 & n.22 ("The interest of a bona fide Washington correspondent in obtaining a White House press credential is protected by the first amendment. This first amendment interest undoubtedly qualifies as liberty which may not be denied without due process of law under the fifth

---

[16] *See Sessions* v. *Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring) (opining that Due Process Clause requires fair notice even in civil cases because today's civil laws impose "confiscatory" penalties "often harsher than punishment for felonies" including "remedies that strip persons of their professional licenses and livelihoods").

amendment.").[17]  Indeed, "the First Amendment has been incorporated into the Fourteenth Amendment *as a liberty interest*."  *Lawshe* v. *Simpson*, 16 F.3d 1475, 1479 (7th Cir. 1994) (emphasis in original) (citing *Gitlow* v. *New York*, 268 U.S. 652, 666 (1925) ("[F]reedom of speech . . . [is] among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the states.")).[18]  Deprivation of NYPD-issued press credentials especially implicates important First Amendment rights because the City grants access to its official press conferences based on NYPD's press credentialing system.  *See* 38 RCNY § 11-01(a); *Borreca* v. *Fasi*, 369 F. Supp. 906, 908–09 (D. Haw. 1974) (due process clause safeguards reporter's right to attend official news conferences).  As this Court has held, these First Amendment considerations "provide[] additional support for finding a protected interest in NYPD-issued press credentials."  *Nicholas*, 2017 WL 766905, at *7.

### 3.  Mr. Nicholas also had a protected property interest in the continued possession of his credential, once NYPD issued it to him.

_____

[17] *See also Getty Images News Services* v. *Department of Defense*, 193 F. Supp. 2d 112, 121 (D.C.C. 2002) (government's allocation of media slots on flights to Guantanamo require satisfying "due process concerns implicated by restrictions on First Amendment rights"); *Consumers Union of U.S., Inc.* v. *Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 27 (D.D.C. 1973) (publisher entitled to due process before denial of press accreditation to congressional press galleries), *rev'd as nonjusticiable*, 515 F.2d 1341 (1975); *Quad-City Community News Services, Inc.* v. *Jebens*, 334 F. Supp. 8, 17 (S.D. Iowa 1971) (Due Process Clause protects interest in obtaining a press credential because credentialing scheme is a "[r]egulation in the area of free expression").

[18] *See also Bd. of Regents of State Colleges* v. *Roth*, 408 U.S. 564, 575 n.14 (1972) ("When a State would directly impinge upon interests in free speech or free press, this Court has on occasion held that opportunity for a fair adversary hearing must precede the action, whether or not the speech or press interest is clearly protected under substantive First Amendment standards."); *Baldwin* v. *Redwood City*, 540 F. 2d 1360, 1374 & n.40 (9th Cir. 1976) (recognizing First Amendment liberty interest in "summary seizure of a political sign for even a few days" and that "free speech interests deserve at least as much protection as property interests"); *Simard* v. *Board of Education of Town of Groton*, 473 F.2d 988, 992 n.6 (2d Cir. 1973) (noting that "due process guarantee may have independent force" when "employee alleges that termination has been terminated in violation of the first amendment"); *Cyr* v. *Addison Rutland Supervisory Union*, 955 F. Supp. 2d 290, 295–96 (D. Vt. 2013) (recognizing liberty interest rooted in First Amendment rights when defendants prohibited parent from attending school board meetings).

In addition to having a protected liberty interest in his NYPD-issued press credential, Mr. Nicholas also has a protected property interest in the continued possession of his credential.[19] Even putting aside whether press credential *applicants* have a protected property interest in a not-yet-issued credential — and they almost certainly do[20] — "the situation changes once the license is obtained." *See Spinelli* v. *City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (recognizing protected property interest in NYPD-issued gun dealer license). Once a license is issued, a protected property interest always vests unless "the licensor has broad discretion to revoke the license." *Id.*; *Nicholas*, 2017 WL 766905, at *7 ("The existence of a protected interest also depends on how curtailed the issuer's discretion is in revoking it, either by policy or in practice."). Because NYPD's practices carefully constrain NYPD's discretion, as does the First Amendment, Mr. Nicholas has a property interest in his already-issued credential.

### a. NYPD's Discretion Is Constrained by the First Amendment.

The First Amendment significantly constrains the City's discretion to revoke press credentials. Does anyone really think that NYPD could revoke press credentials for any reason, including based on the content of a journalist's reporting? *See City of Lakewood* v. *Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ("At the root of this long line of precedent is the time-tested

---

[19] *See Villager Pond, Inc.* v. *Town of Darien*, 56 F.3d 375, 379 (2d Cir. 1995) (permit holder had property interest solely because permit "*already had been granted*" and "once issued, unquestionably was the property of [permit holder]"); *see also Charry* v. *Hall*, 709 F.2d 139, 144 (2d Cir. 1983) ("Judge Friendly has noted that, 'revocation of a license is far more serious than denial of an application for one. . . .'"). This is especially the case here, where Mr. Nicholas' credential is essential to pursuing his profession. *See Bell* v. *Burson*, 402 U.S. 535, 539 ("Once licenses are issued . . . their continued possession may become essential in the pursuit of a livelihood. . . . In such cases the licenses are not to be taken away without that procedural due process required by the Fourteenth Amendment."); *West Farms Associates* v. *State Traffic Commission*, 951 F.2d 469, 473 (2d Cir. 1991) ("[A] license essential to the pursuit of one's livelihood, once issued by the state, cannot be revoked without due process.").

[20] The City's regulations narrowly circumscribe NYPD's discretion to issue press credentials. According to Defendant Det. DeBonis, "[t]he eligibility requirements to obtain an NYPD press card are codified at §11-01 of Title 38 of the Rules of the City of New York," and if an applicant satisfies these criteria, DCPI always grants him or her an NYPD-issued press card. ¶ 133; DeBonis Decl. (Dkt. No. 13) (Exhibit 22) ¶ 4; DeBonis Tr. at 102–103.

knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship."); *Housing Works, Inc.* v. *Safir*, 101 F. Supp. 2d 163, 167–68 (S.D.N.Y. 2000) ("It is a fundamental tenet of First Amendment principles that restrictions on the right to free speech or assembly must not be so vague as to afford unbridled discretion to the government authority seeking to abridge those rights."); *Quad-City*, 334 F. Supp. at 17 (press credentialing scheme would violate First Amendment if "public officials literally have unimpeded discretion to regulate the activity in question in whatever manner they desire"). Clearly content-based and arbitrary restrictions would not survive First Amendment scrutiny.

### b. NYPD's discretion to revoke press credentials is carefully constrained by the Rules of the City of New York.

No language in the Rules of New York provides NYPD with unfettered discretion to revoke credentials. *Compare* 38 RCNY §§ 11-01–11-12 *with Youngs* v. *Fusaro*, 179 F. Supp. 3d 198, 206–07 (D. Conn. 2016) (no protected property interest in license when ordinance expressly stated, "The Chief of Police may in his discretion revoke any such license"). Instead, ever since 1957, it has been the law that NYPD-issued press cards "should not be revoked without a hearing." *Matter of N.Y. Enquirer* v. *Kennedy*, 18 Misc. 2d 950, 952 (Sup. Ct., N.Y. Co. 1957). In 2010, the City of New York amended its regulations to adopt a formal process that limits NYPD's discretion to revoke press credentials. Now, NYPD cannot revoke a press credential without conducting a hearing at which the press card holder is entitled to have counsel present. *See* 38 RCNY § 11-11(c), (d). The City's adoption of formal rules guaranteeing the right of a pre-revocation hearing legitimizes press card holders' expectation of continued enjoyment of their credentials and further cabins NYPD's discretion to revoke credentials. *See Galvin* v. *New York Racing Ass'n*, 70 F. Supp. 2d 163, 192 (E.D.N.Y. 1998) (racing licenses are protected

property interests because, "[u]nder New York law, licensees cannot have their licenses suspended by racing officials without a hearing and therefore have a legitimate expectation of continued enjoyment of their licenses absent a finding of culpable conduct"), *aff'd*, 166 F.3d 1200 (2d Cir. 2000); *Moody* v. *Michigan Gaming Control Board*, 790 F.3d 669, 678 (6th Cir. 2015) (harness driver's license was a protected property interest after state established a hearing process to appeal suspension of license); *Adamo* v. *Dillon*, 2011 WL 864387, at *6 (M.D. Pa. Mar. 10, 2011) (racing licenses are protected property interests when there were "hearing rights guaranteed to a licensee"). The City Rules also require NYPD to issue a written decision if they uphold the revocation or suspension, and this further restricts NYPD's discretion to revoke or suspend credentials. 38 RCNY § 11-11(e); *cf. Tarpeh-Doe* v. *United States*, 904 F.2d 719, 723 (D.C. Cir. 1990) ("[r]egulations fail to restrict sufficiently the decisionmaker's discretion to generate a protected interest implicating the due process clause" when regulations did not require written explanation for denials — a fact the court singled out as "[s]ignificant").

### c. In practice, the City has treated NYPD-issued press credentials as a license that cannot be taken away without a showing of wrongdoing and an opportunity to be heard.

The City of New York has also treated NYPD-issued press credentials as an entitlement. First, the City, on its official website, classifies NYPD-issued press credentials as "licenses" of the sort that are "needed to start, run, or grow a business in New York City." ¶ 134. In practice, NYPD has rarely suspended — and never revoked — credentials. ¶¶ 153–54. For the over seven-year period between August 19, 2010 and April 12, 2018, NYPD suspended NYPD-issued press credentials only seven other times. *See* ¶ 154. These illuminating metrics demonstrate that NYPD tends to treat the pass as an entitlement. *See Galvin*, 70 F. Supp. 2d at 192 (New York Racing Authority (NYRA) credentials are protected property interests "[s]ince NYRA rarely convenes a panel to take action against a credential holder"). Moreover, in the rare instances

when NYPD has suspended valid credentials, the photojournalist has always been either arrested or accused of wrongdoing. ¶¶ 154–56. NYPD's "consistent, positive action" of suspending press credentials only in certain circumstances has created a protected property interest. *See Sherrill*, 569 F.2d at 131 n.22 (the "consistent, positive action of government officials," specifically the Secret Service's pattern of only denying White House press passes for security-related concerns, may create a protected property interest because it gives rise to journalist's "justifiable expectation that the only basis for the government's refusal to grant a White House press pass is concern for the physical security of the President or his family"); *Barry* v. *Barchi*, 443 U.S. 55, 64 n.11 (1979) (finding protected interest where there is "a clear expectation of continued enjoyment of a license absent proof of culpable conduct").

NYPD also treats press credentials as entitlements through its long-standing practice of affording press card holders an opportunity to be heard when press credentials are seized — a practice that not only pre-dated the 2010 amendments to the City Rules adopting a formal hearing process, but has also continued to the present day. ¶¶ 157–59.[21] This "constant, consistent pattern . . . is sufficient to create a property interest." *See Furlong* v. *Shalala*, 156 F.3d 384, 395–96 (2d Cir. 1998). As a result of NYPD's practices, press card holders reasonably believe that their credentials cannot be removed without an accusation of wrongdoing and opportunity to be heard. ¶ 157. Nobody in this case has testified to the contrary. *Id.*

Although Defendants point to language that NYPD prints on the back of press credentials that states that they are the "property of the New York City Police Department" and "may be

_____

[21] According to Mr. Osterreicher, who in his capacity as General Counsel of the NPPA learns of almost all, if not all, instances in which an NYPD-issued press credential has been seized, "in almost every — if not every — instance . . . to date, the holder of the credential has been given a chance to informally plead his or her case, either through email or through a face-to-face meeting, without the need for a formal hearing." Osterreicher Aff't at Ex. A ¶ 101.

taken away by competent authority at any time," (¶ 10; Exhibit 23), the Court has already held

that this language is not dispositive here. *See Nicholas*, 2017 WL 766905, at *8–*9. After all,

the Supreme Court urges courts to ignore this type of blatantly self-serving characterization

when determining what qualifies as a protected interest under the Constitution. *See Bell*, 402

U.S. at 539 ("[R]elevant constitutional restraints limit state power to terminate an entitlement

whether the entitlement is denominated a 'right' or a 'privilege.'"); *Perry* v. *Sindermann*, 408

U.S. 593 (1972) (despite official college publication that expressly stated that college "has no

tenure system," college's "policies and practices" could give rise to legitimate claim of

entitlement to tenure if college "created such a system in practice"). Importantly, the press card

does *not* say that it can be taken away *for any reason.* Exhibit 23. Instead, it says that it "may be

taken away *by competent authority*," which legitimizes press card holders' expectation that there

are standards restraining NYPD's ability and discretion to revoke credentials. *Id.* (emphasis

added). When considered in the context of a system that provides press credential holders the

right to a hearing before revocation or after any summary suspension, 38 RCNY § 11-11, it is

clear that "competent authority" means nothing more than authority that complies with the legal

protections afforded to press credential holders. This language also does not appear on the

application that NYPD requires press card applicants to submit or on the agreement that NYPD

requires successful applicants to sign when receiving credentials. *See* ¶ 10. *Cf. ABC Home

Furnishings, Inc.* v. *Town of East Hampton*, 947 F. Supp. 635, 645 (E.D.N.Y. 1996) (no property

interest in permit where town's ordinance and permit application signed by plaintiff expressly

states that permit was revocable without notice or a hearing). Finally, DCPI's own training

materials instruct officers *not* to remove press credentials at breaking news scenes. ¶ 148. In

sum, no reasonable jury could find that this unilateral language somehow created a mutual

understanding that a press credential is not a protected property interest for purposes of due process.[22]

## B. Defendants' confiscation of Mr. Nicholas' NYPD-issued press credential lacked numerous procedural safeguards required by Due Process.

Defendants ignored fundamental requirements of due process of law when they confiscated Mr. Nicholas' NYPD-issued press credential. As an initial matter, Defendants concede that the only purported "written notice" they provided to Mr. Nicholas of his suspension itself and his right to a hearing was the plain text of Chapter 11 of Title 38 of the Rules of the City of New York. ¶ 108 (citing discovery responses). But notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane* v. *Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "Th[e] right to be heard has little reality or worth unless one . . . can choose for himself whether to appear or default, acquiesce or contest." *Id.* The "notice" provided to Mr. Nicholas failed in several notable respects.

First, even though the Rules of the City of New York make a critical distinction between a suspension and revocation, affording those subject to the latter a pre-deprivation hearing, 38 RCNY § 11-11, Defendants did not let Mr. Nicholas know whether his credential had been suspended or revoked, and they did *nothing* to correct him when he reasonably thought it had been revoked.[23] *See Luessenhop* v. *Clinton County*, 466 F.3d 259, 269 (2d Cir. 2006) (due

---

[22] Mr. Nicholas is also entitled to summary judgment on his alternative claim that Defendants violated his substantive due process rights. *See, e.g.,* Second Am. Compl. (Dkt. No. 88-1), Third and Sixth Causes of Action. That claim only applies to the extent that the Court rejects the First Amendment and procedural due process claims. To prevail on his substantive due process claim, Mr. Nicholas must show "that [he] had a valid property interest" and "that the defendants infringed that property interest in an arbitrary or irrational manner." *Clubside, Inc.* v. *Valentin*, 468 F.3d 144, 152 (2d Cir. 2006). Mr. Nicholas has met those standards for the reasons outlined above in Sections I.B.2 and, II.A.3.

[23] Complaint (Dkt. No. 2) ¶¶ 2, 3, 8, 9, 34, 41–44. Mr. Nicholas reasonably concluded that his press credential was revoked because of Defendants' statements on the scene, including DCPI Davis stating to Mr. Nicholas, "that's the

process requires "notice reasonably calculated, under all the circumstances, to apprise interest parties of the pendency of the action," and notice "made in good faith") (quoting *Mullane*). Even though Det. DeBonis assumed that Mr. Nicholas' credential was suspended solely because NYPD had never revoked a press credential, he could not explain how Mr. Nicholas would understand whether it was suspended or revoked. *See* ¶ 105. Notably, even after Defendants were served with Mr. Nicholas' Complaint that made clear he thought the taking of his credential was a "revocation," Defendants did *nothing* to correct Mr. Nicholas' assumption. ¶¶ 111–13; *see Jones* v. *Flowers*, 547 U.S. 220, 229 (2006) ("Deciding to take no further action is not what someone 'desirous of actually informing' [plaintiff] would do; such a person would take further reasonable steps if any were available."). Worse yet, Defendants did not refer to the alleged suspension in their court filings as a "suspension," instead calling it an "immediate revocation" and a "removal." ¶ 113; DeBonis Decl. (Dkt. No. 13) (Exhibit 22) ¶¶ 19–21; Defs.' Mem. (Dkt. No. 14) at 14, 16. It was only in response to a question from the Court in a hearing over six months after the incident that Defendants, through counsel, gave Mr. Nicholas notice for the first time that they viewed the taking as a summary suspension, rather than a revocation. ¶ 111.[24] Especially considering the important liberty and property interests at stake, the six-month delay in notifying Mr. Nicholas that his credential was suspended cannot comport with due process. *See Tu* v. *NTSB*, 470 F.3d 941, 945–46 (9th Cir. 2006) (notice to pilot of license suspension was constitutionally deficient when delay showed FAA was not "actually desirous of notifying an

_____

last time you'll do that" and ordering DeBonis to "talk to me before you even think about giving that back," and the fact that Mr. Nicholas learned from his colleagues that DeBonis had told them, "Tell your boys in the NYPPA he is never getting another press credential." ¶ 103. He also reasonably believed that Defendants revoked his credential after receiving no response to his emails seeking to discuss his credential. *Id.*

[24] The Court asked counsel for Defendants, "What's your position on why this was revoked in the case of – I guess suspended in the case – was it revoked or suspended?" He responded, "It was summarily suspended. That's the way I would use the term." May 12, 2016 Transcript (Dkt. No. 43) (Exhibit 77) at 26.

individual of his right to be heard" and prevented timely appeal of suspension of license "essential to [pilot's] business").

Relatedly, Defendants critically failed to provide Mr. Nicholas with written notice conveying the factual bases for the suspension, his entitlement to a hearing, and the standard applicable to such a hearing. ¶¶ 106–07. "[N]otice must do more than simply inform an aggrieved party of his entitlement to a hearing. Rather, in order to satisfy the requirements of procedural due process, notice must adequately inform the party as to what the 'critical issues' of the hearing will be." *Nnebe* v. *Daus*, 184 F. Supp. 3d 54, 74 (S.D.N.Y. 2016) (written notice to suspended drivers "constitutionally inadequate as a matter of procedural due process because it did not provide a driver with sufficient 'information' necessary 'to prepare meaningful objections or a meaningful defense'" and did not focus them on the "standard that the [hearing officer] actually and exclusively applied in making the ultimate suspension determination").[25] Here, a written explanation was especially critical to ensure that a compelling First Amendment interest at stake in a press credential was not revoked for "arbitrary or less than compelling reasons." *Sherrill*, 569 F.2d at 131 (when Secret Service denies White House press pass, "notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut is a minimum prerequisite for ensuring that the denial is indeed in furtherance of Presidential protection, rather than based on arbitrary or less than compelling reasons").

In addition, Mr. Nicholas was also entitled to a meaningful opportunity to be heard *before* his credential was confiscated for nearly eight months. *See Catanzaro* v. *Weiden*, 188 F.3d 56,

_____

[25] *See also Spinelli*, 579 F.3d at 172 ("cursory letters" inadequate when they "only informed [gun license holder] of the license suspension and the status of the investigation" but "fail[ed] to provide adequate notice of [the specific] charges . . . needed to prepare meaningful objections or a meaningful defense" and "would have entailed little or no administrative inconvenience to the City"); *Galvin*, 70 F. Supp. 2d at 175 (credential suspension letter inadequate when did not describe "specific charges against [her and thus] had hampered her ability to prepare a defense").

21 (2d Cir. 1999); *Mathews* v. *Eldrige*, 424 U.S. 319 (1976) (weighing private interest at stake; risk of an erroneous deprivation through procedures used and probative value (if any) of alternative procedures; and government's interest, including possible burdens of alternative procedures). No reasonable jury could find that the circumstances necessitated the immediate and lengthy "suspension" of Mr. Nicholas' press card. As an initial matter, "[t]he weight of the private interest depends on both the nature of the private interest and the duration of the deprivation." *Padberg* v. *McGrath-McKechnie*, 203 F. Supp. 2d 261, 277 (E.D.N.Y. 2002). As discussed above, Mr. Nicholas' press credential implicates important liberty interests in pursuing his profession and the freedom of the press, as well as a significant property interest in not being deprived of his livelihood. And "[t]he interference with this significant private interest is further exacerbated by the duration of the summary suspension" —here, an *indefinite* suspension. *Padberg*, 203 F. Supp. 2d at 278.

Moreover, the City had no reasonable interest in immediate deprivation of Mr. Nicholas' credential. As DCPI Davis pointed out, even when press credentials are seized on a scene, they are often returned immediately. ¶ 152; Davis Tr. at 210–12. Defendants' decision to take Mr. Nicholas' press credential and keep it for nearly eight months was atypical and far from a "necessity." Mr. Nicholas was never informed that a so-called "frozen zone" was set up, and even if one existed — and it's far from clear that it did — other photographers and members of the general public and were inside it. ¶¶ 25–27, 31–39, 41–44, 53, 58, 61, 70. Especially because numerous other remedial actions were available to address their alleged safety concerns — like the requests made to others on the scene to move back, remain in a store, or stand in the press pen — no reasonable jury could conclude on this record that Defendants' safety concerns necessitated the "very prompt action" of depriving Mr. Nicholas of his press credential.

In any event, Defendants' alleged concerns that Mr. Nicholas was creating a safety hazard were fully assuaged by evicting Mr. Nicholas from the scene. Defendants' alleged safety concerns also cannot justify the high risk of erroneous deprivation Defendants created by summarily seizing his press credential. On the scene, Defendants did not even allow Mr. Nicholas to explain himself, and testified that his version of events did not matter to them. ¶¶ 84–85; *see Valmonte* v. *Bane*, 18 F. 3d 992, 1004 (2d Cir. 1994) (unacceptable high risk of error when "the factfinder is not required to weigh evidence and judge competing version of events"). They simultaneously ejected him, leaving him with no opportunity to collect testimony or evidence from the many other pedestrians in the area. ¶¶ 86–87, 89–90. In addition, because the hearing eventually provided to Mr. Nicholas resulted in the reinstatement of his credential (*see* ¶ 125), the erroneous deprivation of his credential would have been less likely to occur if he had a pre-revocation hearing. *See United Pet Supply, Inc.* v. *City of Chattanooga*, 921 F. Supp. 2d 835, 851 (E.D. Tenn. 2013) (pre-deprivation hearing would have lessened risk of erroneous deprivation when permit was ultimately reinstated, and "had there been some means of pre-deprivation review, the erroneous deprivation would have been less likely to occur").

Even the post-deprivation hearing ultimately provided to Mr. Nicholas violated his due process right to a meaningful opportunity to be heard because it was tainted by bias and *ex parte* communications. The hearing officer responsible for deciding Mr. Nicholas' appeal, Chief Mullen, reported directly to DCPI Davis, who had personally seized Mr. Nicholas' credential. ¶ 120. After seizing it, DCPI Davis had further instructed his subordinate, Det. DeBonis to "[h]old on to that, Michael, and talk to me before you think about giving that back. Me personally." ¶¶ 83, 120 (quoting Nicholas Video (Exhibit 95) at 0:59–1:03). Because Mullen reported directly to DCPI Davis, and especially because DCPI Davis personally suspended the

credential and then ordered that it not to be returned without his approval, there was an impermissible risk of bias when Mullen decided whether to uphold or reverse DCPI Davis' suspension of Mr. Nicholas' credential. ¶ 120. *See Cinderella Career & Finishing Schools, Inc.* v. *FTC*, 425 F.2d 583, 591 (D.C. Cir. 1970) ("The test for disqualification has been succinctly stated as being whether 'a disinterested observer may conclude that the agency has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.'") (quoting *Gilligan, Will & Co.* v. *SEC*, 267 F.2d 461, 469 (2d Cir. 1959)).[26]

In addition, despite his repeated requests before and at his hearing, Whyte and others denied Mr. Nicholas the opportunity to confront witnesses testifying against him and to consider documentary evidence being considered by the hearing officer. ¶¶ 116–24. Before the hearing, NYPD agency counsel Lisa Bland ignored Mr. Nicholas initial request to examine the evidence against him (*see* ¶¶ 116–18), and at the hearing, Defendant Whyte refused Mr. Nicholas' reiterated request. ¶¶ 123–24; *see Wolff* v. *McDonnell*, 418 U.S. 539, 567, 576 (1974) ("Confrontation and cross-examination present greater hazards to institutional interests. . . . These procedures are essential . . . where a person may lose his job in society."); *Goldberg* v. *Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses."); *Galvin*, 70 F.Supp.2d at 178 ("[T]he lack of effective cross-examination due to the NYRA's failure to present its investigative reports through competent witnesses, made these

_____

[26] *Cf. Stadium Motors, Inc.* v. *N.Y. City Dep't of Consumer Affairs*, 2007 WL 2288040, at *3–4 (E.D.N.Y. Aug. 8, 2007) (no impermissible bias because hearing officer was not commissioner's immediate subordinate, and although commissioner made statements about the case, "[c]ommissioner's statements read from the perspective of a disinterested observer," and could not be "interpreted as implicit or explicit instructions"); *Fund* v. *City of New York*, 2014 WL 2048204, at *11 (S.D.N.Y. May 14, 2014) (no impermissible bias when commissioner who made public comments was the hearing officer's "superior's superior" and there was "no indication that [commissioner]'s comments were intended or will function as express directives to the other members of the [c]ommission").

allegations of wrongdoing essentially irrebuttable. The presentation of evidence in this manner is not consonant with due process."). Because Mullen, Bland, and Whyte all cross-examined Mr. Nicholas and his witnesses (¶ 119), due process also required Mr. Nicholas to be able to examine adverse witnesses. *See Galvin*, 70 F.Supp.2d at 178 n.7 ("fundamental fairness required that effective cross-examination also be available to the defense" when "cross-examination was permitted to [credentialing association]'s counsel"). As a result of prohibiting Mr. Nicholas from cross-examining adverse witnesses, critical information went undisclosed: Defendant Det. DeBonis had an *ex parte* conversation with Mullen that "described the incident from Detective DeBonis' point of view." Mullen Tr. at 63–67. Mullen considered this *ex parte* conversation with Det. DeBonis when making his decision about whether to reinstate Mr. Nicholas' credential. *Id.* at 67–68. But Mullen and Defendants DeBonis and Whyte never informed Mr. Nicholas about this conversation, despite Mr. Nicholas' specific request for any undisclosed information Mullen was considering. ¶ 124. *See Escalera* v. *New York City Housing Authority*, 425 F.2d 853, 862 (2d Cir. 1970) (public housing authority wrongly denied tenant facing eviction right to confront and cross-examine adverse evidence by secretly considering evidence from unnamed persons). This type of proceeding fails to satisfy the requirements of Due Process.

## CONCLUSION

For the foregoing reasons, Plaintiff is entitled to summary judgment on his First Amendment and Due Process claims.


Dated: New York, New York
      July 16, 2018

CAHILL GORDON & REINDEL LLP

By: ___s/ Joel Kurtzberg_____
      Joel Kurtzberg
      Merriam Mikhail
80 Pine Street
New York, New York 10005
Tel: 212-701-3000
Fax: 212-269-5420

*Attorneys for Plaintiff Jason B. Nicholas*