UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON B. NICHOLAS,

                              Plaintiff,                    15-CV-9592 (JPO)

            -v-                                            OPINION AND ORDER

WILLIAM BRATTON, *Police Commissioner,*
*New York City Police Department*, et al.,

                              Defendants.

J. PAUL OETKEN, District Judge:

    Plaintiff Jason B. Nicholas brings this civil rights action against Defendants the City of

New York ("the City"), William Bratton, Stephen Davis, Eugene Whyte, and Michael DeBonis

pursuant to 42 U.S.C. Section 1983 ("Section 1983"), alleging violations of his First, Fourth and

Fourteenth Amendment rights.  (Dkt. No. 126.)  Before the Court now are cross-motions for

summary judgment filed by Plaintiff and Defendants Davis and DeBonis (collectively,

"Individual Defendants")[1], as well as Defendants' motion to preclude the testimony and opinions

of Plaintiff's expert witness Mickey Osterreicher from summary judgment and trial.  (Dkt. Nos.

170, 180, 185.)  For the reasons that follow, Plaintiff's motion for summary judgment is denied,

the Individual Defendants' motion for summary judgment is granted in part and denied in part,

and Defendants' motion to preclude Plaintiff's expert testimony is denied.

## I.    Factual Background

    Familiarity with the background of this dispute is presumed based on this Court's prior

opinions on Plaintiff's motion for a preliminary injunction, *see Nicholas v. Bratton*, No. 15 Civ.

---

[1]        Defendant Whyte also purports to join the Individual Defendants' motion for
summary judgment (*see* Dkt. No. 180), but their motion does not address any of the claims
brought against Defendant Whyte.

9592, 2016 WL 3093997 (S.D.N.Y. June 1, 2016), Defendants' motions to dismiss, *see Nicholas v. City of N.Y.*, No. 15 Civ. 9592, 2017 WL 766905 (S.D.N.Y. Feb. 27, 2017); *Nicholas v. Bratton*, No. 15 Civ. 9592, 2018 WL 1054567 (Feb. 23, 2018), and Plaintiff's motion for leave to file a Second Amended Complaint, *see Nicholas v. City of N.Y.*, No. 15 Civ. 9592, 2017 WL 2537293 (S.D.N.Y. June 12, 2017). The additional facts detailed below are drawn primarily from the parties' Local Rule 56.1 statements (*see* Dkt. Nos. 193, 202), and are not subject to genuine dispute unless otherwise noted.

### A. The Parties

Plaintiff Jason B. Nicholas is a self-described professional photojournalist who has done freelance work for various New York City-based media outlets since at least 2006. (Dkt. No. 193 ¶ 1.) In 2007, Nicholas first applied for and obtained a New York City Police Department ("NYPD")-issued press credential, and he has successfully applied to renew his credential at every two-year interval thereafter. (Dkt. No. 193 ¶ 4.) With the primary exception of the NYPD's eight-month confiscation of his credential following the events at issue in this suit,[2] Nicholas has been in possession of an NYPD press credential continuously since 2007. (Dkt. No. 193 ¶ 4; Dkt. No. 202 ¶ 81.)

During the times relevant to this action, Defendant Stephen Davis was NYPD's Deputy Commissioner of Public Information ("DCPI") (Dkt. No. 202 ¶ 2), and Defendant Michael DeBonis was a detective assigned to NYPD's DCPI Office (Dkt. No. 202 ¶ 1). The DCPI Office

---

[2] In his Second Amended Complaint, Nicholas also alleges that Defendant Whyte temporarily seized Nicholas's press credential twice before in connection with two unrelated incidents. (*See* Dkt. No. 126 ¶¶ 62–64; *see also* Dkt. No. 183-3.) The Court has previously denied Plaintiff leave to assert claims against Defendant Whyte in his individual capacity for his conduct in connection with these two specific incidents. *Nicholas*, 2017 WL 2537293, at *3.

is the office that was responsible for the review and approval of Nicholas's applications for an NYPD-issued press credential.  (Dkt. No. 193 ¶ 4; Dkt. No. 202 ¶ 4.)

Nicholas also asserts claims against three other Defendants: the City of New York, Eugene Whyte, and William Bratton.  (Dkt. No. 126 ¶¶ 12, 14, 16, 164.)  The Court previously bifurcated discovery with respect to Nicholas's *Monell* claims against the City (Dkt. No. 67), and none of these three parties are presently moving for summary judgment with respect to Nicholas's live claims against them.  These three Defendants have, however, joined in the motion to preclude the testimony and opinions of Plaintiff's expert from summary judgment and at trial.  (Dkt. No. 170.)

**B.  Issuance and Use of NYPD Press Credentials**

The rules governing the issuance and use of NYPD press credentials are set forth in Title 38, Chapter 11 of the Rules of the City of New York.  *See* 38 RCNY § 11-01 *et seq.*  These rules provide that a

> bearer of a Press Card is entitled to (i) subject to safety and evidence preservation concerns, cross police, fire lines or other restrictions, limitations or barriers established by the City of New York at emergency, spot, or breaking news events and public events of a non-emergency nature where police, fire lines or other restrictions, limitations or barriers established by the City of New York have been set up for security or crowd control purposes, within the City of New York; and (ii) subject to space limitations, attend events sponsored by the City of New York which are open to members of the press.

*Id.* §11-01(a).

Subsections (b) and (c) of Section 11-01 establish the eligibility criteria for the issuance of NYPD press credentials.  *Id.* §§ 11-01(b)–(c).  In relevant part, these subsections provide that in order to obtain an NYPD press credential, one must be a "member of the press" who has previously attended and reported from at least six City-sponsored events or New York City "emergency, spot or breaking news events and/or public events of a non-emergency nature"

3

within the twenty-four month period preceding the application.  *Id.*  Defendant DeBonis testified at his deposition that during his four years working as a DCPI official tasked with reviewing applications for press credentials, he would issue a credential to an applicant as a matter of course upon confirming that the applicant met the eligibility criteria set out in Subsections (b) and (c) of Section 11-01.  (Dkt. No. 193 ¶ 133; Dkt. No. 201-4 at 98:13–103:16; *see also id.* at 103:2–5 ("The criteria set forth in the rules is the qualifying material to obtain a press card.  If someone obtains or meets that criteria qualifications [sic], they're granted a press card . . . .").) The back of an NYPD-issued press credential provides that it "is the property of the New York City Police Department," and that "[i]t may be taken away by competent authority at any time." (Dkt. No. 202 ¶ 7; *see also* Dkt. No. 183-2.)

Both journalists and City officials have testified that bearers of NYPD press credentials are generally permitted to cross police and fire lines that bar public access to emergency or restricted areas unless they are given express orders not to do so.  (Dkt. No. 193 ¶ 9.)  The Rules of the City of New York require that "[w]hen the bearer's ability to cross police, fire lines or other restrictions, limitations or barriers established by the City of New York or attend events sponsored by the City of New York is denied, such denial must come from a supervising officer or a member of [NYPD's DCPI Office]."  38 RCNY § 11-01(a).  NYPD has also required recipients of press credentials to sign a separate acknowledgment that they understand that "access pursuant to the Press Card does not include access to interior crime scenes or areas frozen for security purposes."  (Dkt. No. 193 ¶ 9 (quoting Dkt. No. 183-1 at 6).)

With respect to access to non-emergency newsworthy events such as parades and press conferences, different hosting organizations have adopted varying policies with respect to requiring a press pass.  (Dkt. No. 193 ¶ 8.)  But it is undisputed that certain organizations, including, for example, NYPD itself, use possession of an NYPD press credential as a method

for regulating access to their events. (*Id.*; *see also* Dkt. No. 188-10 at 125; Dkt. No. 188-13 at 100; Dkt. No. 188-21 at 2 (City Law Department press release recognizing that "[m]any non-City entities also rely on the City press card to distinguish who is a member of the media").)

More generally, the parties dispute the extent to which possession of an NYPD press credential is, as a practical matter, a necessary prerequisite to obtaining work as a photojournalist in New York City. (*See, e.g.*, Dkt. No. 193 ¶¶ 136–47.)

### C. Procedures Governing the Suspension or Revocation of NYPD Press Credentials

Since 2010, Chapter 11 of Title 38 of the Rules of the City of New York has provided a hearing procedure for challenges to any "suspension" or "revocation" of an NYPD press credential. (Dkt. No. 193 ¶ 159.) Specifically, Subsection (b) of Section 11-11 provides that where NYPD-issued "press credentials are summarily suspended, a hearing may be requested by the holder of the press credential and such hearing shall be provided no later than five (5) business days from the request." 38 RCNY § 11-11(b). Subsection (c) of Section 11-11 provides that where NYPD seeks a "revocation" of an NYPD-issued press credential, "a hearing shall be provided before such revocation shall take effect. However, if there has been a summary suspension of the press credential which is the subject of the revocation, the hearing for the suspension can also serve as the hearing required herein." *Id.* at § 11-11(c). The City is required to issue a written decision following any such hearing in the event that the City concludes that the suspension or revocation was justified, and it must do so within forty-five days of the hearing's conclusion. *Id.* at § 11-11(e). Journalists have a right to counsel at these "Section 11-11 hearings," *see id.* at § 11-11(d), as well as the right to appeal adverse decisions to NYPD's DCPI, *id.* at § 11-12.

Neither the City nor NYPD has ever enacted a formal policy governing when suspensions of NYPD-issued press credentials may be appropriate. (*See* Dkt. No. 43 at 28 (counsel for

Defendants explaining that "there's nothing in the rules about a written standard for what's necessary to take a summary suspension").) At his deposition, Detective DeBonis explained that incidents resulting in the seizure or suspension of an NYPD-issued press credential "usually [involved] an interaction where . . . , for example, if [a credential holder is] in an area where they're not supposed to be[, they are warned] 'Hey, you have to be over there,' [and] then something else leads up to the removal of the press card." (Dkt. No. 201-4 at 180.)

When NYPD has spoken on the issue in its training materials and as part of its guidance to its patrol officers, NYPD has counseled its officers to take steps to avoid seizing or confiscating press credentials. For example, DCPI's training materials for NYPD officers instruct officers to identify press-credential holders at the scenes of breaking news events and to notify DCPI as to their presence, but "not [to] remove [their] press credentials." (Dkt. No. 188-84 at 11.) And an April 2016 bulletin from NYPD's Office of the Deputy Commissioner for Legal Matters instructs NYPD officers not to interfere with people documenting police activities unless or until there is an "***actual*** interference with the performance of an official police function," such as an "intru[sion] into the 'zone of safety' established by [an] officer in the performance of his or her duties." (Dkt. No. 188-89 at 3 (emphasis in original).) Even in cases involving such interferences or intrusions, the bulletin instructs NYPD officers to respond by first "issu[ing] a warning." (Dkt. No. 188-89 at 4.) The bulletin provides a non-exclusive list of "[a]cceptable warnings" for cases of actual interference or intrusions into an officer's zone of safety, a list that includes "Please step back!" and "Please get on the sidewalk!" (*Id.*)

In addition to the October 30, 2015 incident at issue in this suit and discussed further below, NYPD's DCPI Office has identified exactly seven instances of NYPD's having "suspended" a journalist's press credential during the period spanning August 19, 2010 to April 12, 2018. (Dkt. No. 193 ¶ 154; Dkt. No. 188-86.) All seven of these suspensions involved

either: (1) the arrest of the credential holder or (2) allegations by NYPD of the credential holder's repeated refusal to comply with express directives from City officials.  (Dkt. No. 193 ¶ 155; Dkt. No. 188-82.)  NYPD did not provide written notice to any of these credential holders regarding the status of their press credentials or the remedial measures available to them following the suspensions of their credentials.  (Dkt. No. 188-86.)[3]

During the period spanning August 19, 2010 to April 12, 2018, NYPD never once "revoked" a press credential.  (Dkt. No. 193 ¶ 153.)

Prior to Nicholas's Section 11-11 hearing described further below, NYPD had never conducted such a hearing.  (Dkt. No. 193 ¶ 160.)  Despite having never held any formal Section 11-11 hearings before Nicholas's, NYPD had in a number of previous cases returned seized press credentials or reinstated suspended press credentials to credential holders, at times doing so immediately after the seizure of a credential, and at other times doing so following informal meetings between the credential holder and officers with NYPD's DCPI Office.  (Dkt. No. 193 ¶¶ 152, 160.)

### D.  The Events of October 30, 2015

The pending motions for summary judgment largely concern a series of events stemming from an October 30, 2015 partial building collapse on West 38th Street in midtown Manhattan.  (*See* Dkt. No. 193 ¶ 11; Dkt. No. 202 ¶ 8; Dkt. No. 188-23.)  While the parties' dispute will bring us far afield from the collapse itself, the gravity of the event that precipitated the instant dispute should not be lost in the fray.  Two constructions workers were caught inside the collapsed building—one of the trapped workers was killed by the collapse instantaneously, and the other worker, who was eventually rescued alive, spent hours trapped under thousands of pounds of

---

[3]     Docket Numbers 188-82 and 188-86 have been filed under seal.  These documents shall remain under seal pending further order from the Court.

debris.  (*Id*.)  The rescue of the second trapped worker proved to be a prolonged and complex

process:  As will be explored more fully below, testimony from eyewitnesses to the rescue and

video evidence of the scene reveal that dozens of City vehicles and even more personnel from at

least four different City agencies participated in the hours-long operation.  (Dkt. No. 202 ¶¶ 10,

14, 18; Dkt. No. 182-5 at 80:6–7; *see also generally* Dkt. No. 188-95 ("Ramos Video").)  In

addition to the core rescue operation, City personnel also set up various workstations on the West

38th Street block, including a workshop to cut timber to shore up the collapsed building[4] (Dkt.

No. 202 ¶ 16) and a "command center" (Dkt. No. 202 ¶ 18; Dkt. No. 182-2 at 295:9–10).

The scene of the collapse and the rescue operation quickly drew substantial public and

media attention.  The collapse followed closely on the heels of a *New York Daily News* report on

a purported spike in construction accident fatalities in New York City.  (Dkt. No. 193 ¶ 12.)  As

emails exchanged among City public relations officials soon after the collapse reveal, the City

was aware that this collapse "could feed [the] Daily News story," and the City devised a strategy

for disseminating information about the incident as circumstances were unfolding on the ground.

(Dkt. No. 188-24 ("We are NOT stating patient is pinned/trapped – only stating patient is serious

---

[4]        Nicholas testified that he observed this woodcutting station on the scene of the
building collapse (Dkt. No. 188-1 at 54:9–25), and the station is also observable in video footage
taken of the scene (*see, e.g.*, Ramos Video at 13:57, 18:56).  Still, Nicholas objects to
Defendants' characterization of this wood as having been cut in order "to shore up the immediate
and identified collapse area" as lacking foundation.  (Dkt. No. 202 ¶ 16.)  Defendants base their
description of the purpose of the woodcutting on deposition testimony from individuals who
would appear to have foundation for their testimony, such as a public information officer with
the New York City Fire Department who was present at the scene and who helped coordinate the
rescue operation.  (*See, e.g.*, Dkt. No. 202 ¶ 15; Dkt. No. 182-5 at 79:22–80:5.)  This testimony
is also corroborated by other aspects of Plaintiff's own testimony, including his having observed
City personnel prepare "beams, joists and jacks" at the scene.  (Dkt. No. 202 ¶ 36.)  Still, the
Court declines to address the parties' dispute regarding the cut wood's purpose at this stage of
the case, because the dispute is inconsequential to the outcome of the currently pending motions.

and still onscene.").)[5]  Meanwhile, some dozens of members of the press flocked to the scene to

document the rescue.  (Dkt. No. 193 ¶ 30 (witness describing seeing 15 to 25 members of the

press in an NYPD-created "press pen"); ¶ 33 (witnesses identifying at least two other journalists

taking photographs from a restaurant close to the scene); ¶ 39 (witnesses and photos identifying

at least six other City-employed "press personnel" on the scene).)  Among these members of the

press was Nicholas, who was dispatched to the scene by the *Daily News*.  (Dkt. No. 193 ¶ 14.)

Nicholas testified at his deposition that upon arriving at the site of the building collapse,

he observed no indications that the scene was closed to the public or the press (other than to

vehicular traffic).  (Dkt. No. 193 ¶ 16.)  Instead, Nicholas went straight up to the collapsed

building with his NYPD press credential around his neck, and he took several photographs of the

ongoing rescue from right in front of the building.  (Dkt. No. 193 ¶¶ 15, 18.)  According to

Nicholas, at first no police officers attempted to stop him (or another photographer on the scene)

from approaching the building or from taking such pictures.  (Dkt. No. 193 ¶¶ 16, 18.)  Nicholas

recalled that eventually, an unidentified individual asked Nicholas to move, and to avoid a

confrontation, Nicholas went inside a store adjacent to the collapsed building.  (Dkt. No. 193

¶ 19.)  Nicholas remained in that store for approximately one and a half hours, photographing the

scene from the store's window.  (Dkt. No. 193 ¶ 20.)  He twice temporarily exited the store

during this period to observe the rescue efforts directly from the street before returning to the

inside of the store shortly after doing so; according to Nicholas, none of the NYPD or New York

City Fire Department ("FDNY") officers who walked by him during these two forays outside of

---

[5]         The Court previously ordered that portions of the email chain at Docket Number
188-24, referred to by the Parties as "Exhibit 27," be redacted and filed under seal.  (*See* Dkt.
Nos. 189, 192.)  "Because of the importance of th[is] sealed material to [the] disposition of this
matter, [the Court] order[s] that [this email chain now] be unsealed."  *Cox v. Onondaga Cty.
Sheriff's Dep't*, 760 F.3d 139, 150 (2d Cir. 2014).

the store asked him to leave the block.  (Dkt. No. 193 ¶ 22.)  While photographing the rescue

operation from inside the store, Nicholas allegedly also saw a number of City employees

photographing the scene directly from the street.  (Dkt. No. 193 ¶ 21.)

Meanwhile, Individual Defendants DCPI Davis and Detective DeBonis also arrived at the

scene of the building collapse sometime during the rescue operation.   (Dkt. No. 202 ¶ 12.)  Their

recollections of the scene differ somewhat from Nicholas's.  According to Davis and DeBonis,

upon arriving at the scene of the collapse they found that NYPD had already established what

they describe as a "frozen zone" limiting public access to the collapsed building.  (Dkt. No. 202

¶ 19.)  DeBonis and Davis understood that NYPD had established this frozen zone to ensure that

the rescue operation would proceed unencumbered.  (*Id.*)  DeBonis and Davis testified that they

played no role in setting up this frozen zone, and that the frozen zone they found encompassed

the entirety of the collapsed building's block, excluding interiors of the block's stores and other

buildings.  (Dkt. No. 202 ¶¶ 21–22.)  According to DeBonis and Davis, the extent of the frozen

zone was demarcated by a police line blocking pedestrian access to the building from either end

of West 38th Street, and because of the frozen zone, no pedestrians were permitted to approach

the emergency scene unless escorted by law enforcement officers.  (Dkt. No. 202 ¶¶ 23–24.)

Nicholas disputes a number of aspects of Davis and DeBonis's account.  As an initial

matter, Nicholas disputes Davis and DeBonis's asserted definition of "frozen zone."  (Dkt. No.

202 ¶ 20.)  DeBonis defines "frozen zone" as an "area[] established by NYPD competent

authority where there is an ongoing emergency response and the safety of certain persons and/or

the public, or the preservation of evidence, would be compromised" by open public access.  (*Id.*;

*see also* Dkt. No. 183 ¶ 8.)  According to DeBonis, "[m]edia personnel and members of the

public are not allowed in 'frozen zones.'"  (*Id.*)  In disputing this definition, Nicholas cites

deposition testimony from numerous New York City-based journalists describing their

experiences with NYPD's allegedly inconsistent, vague, or arbitrary standards for establishing frozen zones.  (Dkt. No. 202 ¶ 20.)  No party identifies any New York City or NYPD rules, regulations, or policies providing a governing definition or standard for the establishment of "frozen zones."  There are, however, references to "frozen" areas in some official NYPD documents, including, for example, the acknowledgements that NYPD requires recipients of NYPD press credentials to sign.  (*See* Dkt. No. 183-1 at 6 (providing that "access pursuant to [a] Press Card [d]oes not include access to . . . areas frozen for security purposes"); *see also* Dkt. No. 188-87 at 3 (NYPD Patrol Guide provision permitting press-access restrictions to "areas frozen for security reasons").)

Nicholas also disputes whether there was ever in fact any sort of "frozen zone" of the type described by Davis and DeBonis on West 38th Street in the area surrounding the October 30, 2015 building collapse.  (Dkt. No. 202 ¶ 20.)  To counter the testimony of Defendants DeBonis and Davis that such a frozen zone actually existed, he cites witness testimony, photos, and videos evidencing the presence of a number of civilians, other journalists, and non-emergency City personnel inside the purported frozen zone.  (Dkt. No. 193 ¶¶ 33–39; Dkt. No. 202 ¶ 20.)  Nicholas also testified that upon arriving at the scene, it was impossible for him to tell that the area around the building collapse had been classified as a frozen zone due to the absence of any warning signs or demarcations to that effect.  (Dkt. No. 193 ¶ 27; Dkt. No. 202 ¶ 37.)  Finally, Nicholas cites witness testimony describing changes to the boundaries of the frozen zone to show that "[w]hile there may have been some initial restrictions on pedestrians accessing the so-called 'frozen zone,' these restrictions were lessened as the day went on, and pedestrians were allowed to go into the frozen zone to patronize stores before the victim was removed."  (Dkt. No. 193 ¶ 35.)

Photo and video evidence helps clarify the parties' and other witnesses' conflicting recollections of the scene. Perhaps most thorough is an approximately fifty-minute video Nicholas refers to as the "Ramos Video."[6] (*See* Dkt. No. 188 ¶ 97; *see also* Dkt. No. 193 ¶ 50.) Joseph John Ramos, the author of the "Ramos Video," is a civilian and self-described "fire buff" who frequents FDNY rescue scenes in order to record and post videos of FDNY rescues to YouTube. (Dkt. No. 193 ¶ 49.) Ramos makes an effort to favorably depict FDNY in his videos, and he deletes negative comments about NYPD and FDNY from his YouTube page. (*Id.*) Like other fire buffs, Ramos frequently wears clothing from fire departments when documenting FDNY rescues. (Dkt. No. 193 ¶ 53 (citing Dkt. No. 188-11 at 43–45).)

The first twelve or so minutes of the Ramos Video capture Ramos's initial arrival on the scene of the October 30, 2015 building collapse and consist mostly of footage of the scene outside of the area DeBonis and Davis describe as the "frozen zone." (Ramos Video 00:00–12:20.) This section of the video confirms the presence of police tape blocking public access from both the east and west to the portion of the West 38th Street block with the collapsed building. (Dkt. No. 193 ¶ 52; *see also, e.g.*, Ramos Video at 01:32–01:43, 07:57–08:06.) Ramos himself does not attempt to cross this police tape in his video, but his video does show the presence of a number of civilians on the portion of the block just inside the police tape. (*Id.*) This section of Ramos's video also shows a large number of emergency vehicles continuously arriving on the scene. (*See, e.g.*, Ramos Video at 07:20–07:55 (depicting at least fifteen emergency vehicles on the western edge of the closed portion of the West 38th Street block).)

Though Ramos himself never attempted to cross the police tape blocking access to the collapsed building from either end of West 38th Street, Ramos was eventually able to access the

---

[6] The "Ramos Video" is also published online at the following webpage: https://www.youtube.com/watch?v=AQCZH4OdNSM. (*See* Dkt. No. 188 ¶ 97.)

sidewalk adjacent to the collapsed building, which was inside the area described by DeBonis and Davis as "frozen," by traveling through two other buildings and climbing down a fire escape. (Dkt. No. 193 ¶ 53; Dkt. No. 202 ¶ 50; Dkt. No. 188-11 at 73–77.)  The parties dispute whether Ramos may be said to have "snuck into" the rescue area, as well as whether and to what extent NYPD and the Individual Defendants acquiesced to his presence therein.  (Dkt. No. 193 ¶ 53; Dkt. No. 202 ¶ 50.)  But it is undisputed that once Ramos was inside the "frozen zone," none of the dozens of City officials nearby ever asked Ramos to leave, although they may at some points have asked Ramos to move to or from specific areas on the block.  (Dkt. No. 193 ¶ 55.)

Ramos's extended video footage from this location confirms that he was indeed able to remain in and film nearly the entire rescue operation as it unfolded right outside the collapsed building on West 38th Street.  (*See* Ramos Video at 12:20–47:17.)  Ramos's video footage thus provides a comprehensive picture of what that rescue operation looked like on the ground. Perhaps most relevant to the present motions, Ramos's video confirms that of the many dozens, if not hundreds, of individuals in the immediate vicinity of the rescue operation, nearly all were uniformed City personnel.  (*See, e.g.*, Ramos Video 17:17–17:53; 22:51–24:20; 27:00–29:39; 38:52–42:14.)  However, Ramos's video shows that in addition to Ramos himself, a few other nonuniformed civilians were also able to take pictures or video of the rescue from inside the supposed frozen zone.  (*See, e.g.*, Ramos Video at 19:50–19:51, 40:30–40:31; *see also* Dkt. No. 188-33 at 4 (picture of civilian taking photo of rescue operation from inside frozen zone).)  In addition, a number of other civilians can be seen in Ramos's video freely traversing the scene as the rescue was unfolding.  (*See, e.g.*, Ramos Video at 31:04–31:09, 40:50–40:58, 41:10–41:18; *see also* Dkt. Nos. 188-30, 188-31, 188-32, 188-33 at 2, 5 (pictures of civilians standing in or walking through the frozen zone).)  Finally, Ramos's video depicts a number of City personnel

13

freely moving about the scene with cameras and cellphones, taking pictures and videos.[7] (*See, e.g.*, Ramos Video at 33:06–33:15, 33:43–34:24, 40:10–40:14.)

This video brings to life the scene that confronted DeBonis and Davis when they arrived on the West 38th Street block of the collapsed building on October 30, 2015. As members of NYPD's DCPI Office, Davis and DeBonis had come to the scene in order to "deal with whatever press was on the scene . . . and keep them informed of what was happening and to help establish a place where they could observe the activity at the scene." (Dkt. No. 202 ¶ 26.) Upon finding that the West 38th Street block was what they believed to be a "frozen zone," DeBonis and Davis began working to establish a "designated press area" inside that "frozen zone" so as to allow the media to document the scene from a safe distance. (Dkt. No. 202 ¶¶ 22, 26.) Given the large media presence and the need to allow unencumbered access of emergency vehicles to the scene, DeBonis described this task as a difficult one. (Dkt. No. 202 ¶¶ 27, 30.) Still, DeBonis and Davis assert that they were able to carve out a "designated press area" within the frozen zone that was sufficiently close to the rescue operation so as to allow the press to document most of the scene without obstruction. (Dkt. No. 202 ¶¶ 29, 32; *see also* Dkt. No. 183 ¶ 16.)

Nicholas disputes whether members of the press in the "designated press area" were able to effectively observe and document the rescue operations. (Dkt. No. 202 ¶ 29.) He cites testimony from photographers both in and outside of the designated press area who felt that "in the position [they] were in[,] in [that] situation it was impossible to depict, to accurately depict

---

[7]     In all, Nicholas has produced evidence confirming that at least fifteen City employees took photographs or videos of the rescue from the area DeBonis and Davis describe as the "frozen zone." (Dkt. No. 193 ¶ 41.) Photos from six of these employees, some of whom worked for the City's press or social media teams, were published by the City or its agents during the time public press access to the West 38th Street block remained restricted. (Dkt. No. 193 ¶¶ 42–46.) Press outlets such as the *AP* and the *New York Post* eventually either requested to use or did in fact make use of the City's photos in their own publications. (Dkt. No. 193 ¶¶ 47–48.)

the actual activity going on in the rescue efforts that were happening in that day." (Dkt. No. 202 ¶ 29 (quoting Dkt. No. 188-13 at 110); *see also* Dkt. No. 193 ¶¶ 29–30.) For their part, Defendants concede that the arrival of the ambulance that ultimately transported the formerly trapped worker from the scene did end up obstructing the designated press area's view of the victim's rescue. (Dkt. No. 202 ¶ 32.) Photos taken from inside the designated press area show that about ten to fifteen storefronts separated the location of the press area on the West 38th Street block from the collapsed building. (*See* Dkt. No. 188-33.) These photos also confirm that the ambulance that eventually arrived to rescue the trapped worker blocked the designated press area's view of the victim as he was being removed from the building. (*See* Dkt. No. 188-33.)

The parties also dispute whether Nicholas ever learned that a designated press area had been established during the period he was waiting inside the store adjacent to the collapsed building. (Dkt. No. 193 ¶¶ 31–32; Dkt. No. 184 at 15.) But whether or not Nicholas knew about the frozen zone and press area, it is undisputed that Nicholas never actually went to the press area after it had been established. (Dkt. No. 202 ¶ 34.) While other members of the press on the scene gathered in their designated area, Nicholas remained inside the store adjacent to the collapsed building and waited inside for some more newsworthy events to unfold. (Dkt. No. 202 ¶¶ 34–35.) Eventually, Nicholas received word from his boss at the *Daily News*, whose access to the collapsed building from the western side of West 38th Street had been obstructed by the police tape captured in the Ramos Video, that an ambulance had arrived on the scene. (Dkt. No. 202 ¶ 40; *see also* Dkt. No. 182-10 at 30.) This ambulance would soon be used to transfer the injured construction worker away from the scene. (Dkt. No. 202 ¶ 39.)

Upon learning of the ambulance's arrival from his boss, Nicholas exited the store where he had been waiting and walked toward the ambulance in order to photograph the rescued

worker.  (Dkt. No. 193 ¶ 62; Dkt. No. 202 ¶ 40; Dkt. No. 188-94 ("Nicholas Video")[8].)  Along the way, Nicholas walked by a line of police tape that had fallen to the ground.  (Dkt. No. 202 ¶ 45; Nicholas Video at 00:19–00:24.)  At no point during his approach to the ambulance did any City officials stop Nicholas or ask him to relocate.  (Dkt. No. 193 ¶ 64; Nicholas Video at 00:00–00:34.)

Nicholas walked directly to the side of the ambulance as the rescued worker was being lifted inside.  (Nicholas Video at 00:30–00:35; Ramos Video at 39:33–39:39.)  Nicholas positioned himself next to the ambulance's back door and behind a line of City officials surrounding the worker, and he began shooting the scene from there.  (*Id.*; *see also* Dkt. No. 193 ¶ 66; Dkt. No. 202 ¶ 48.)  At this moment, the very moment at which the rescued worker was being lifted inside the ambulance, Nicholas was the only civilian on the street near the ambulance.  (Ramos Video at 39:33–39:36.)  He would later describe himself as having been approximately "a foot" or "a yard" from the emergency personnel tending to the rescued worker.  (Dkt. No. 193 ¶ 68; Dkt. No. 202 ¶ 43.)  The next closest civilian, who was Ramos, was recording the events from the sidewalk a number of yards away.  (Dkt. No. 202 ¶¶ 49–51; Ramos Video at 39:33–39:36.)  Among the City employees who were standing near the rescued worker was an FDNY employee with a camera who was also documenting the scene.  (Ramos Video at 39:33–39:36; *see also* Dkt. No. 193 ¶¶ 70–71.)  This employee, who was also a Captain with FDNY and a trained EMT, was taking pictures from alongside and from inside the ambulance as the rescued worker was being lifted into the ambulance, and some of her pictures would eventually be published by FDNY.  (Dkt. No. 193 ¶ 73; Dkt. No. 202 ¶ 54.)

---

[8]  The "Nicholas Video" is an approximately ninety-second video recorded by Plaintiff that captures his approach to the ambulance through his ultimate removal from the scene.  (*See* Dkt. No. 188 ¶ 96.)

Nicholas was able to record and photograph the rescue from this vantage point for approximately three seconds without obstruction. (Nicholas Video at 00:30–00:35; Ramos Video at 39:33–39:39.) Photo and video evidence confirms that immediately thereafter, a City official next to Nicholas raised her arm to cover Nicholas's camera. (Dkt. No. 193 ¶ 75; Dkt. No. 188-27 at 22; Ramos Video at 39:39.) Defendant DeBonis and another uniformed NYPD officer then approached Nicholas and moved him away from the ambulance. (Dkt. No. 193 ¶ 76; Ramos Video at 39:39–39:42.) As DeBonis removed Nicholas from alongside the ambulance, his words to Nicholas were caught on the videotape Nicholas was shooting of the scene: "What are you doing? What are you doing? What are you doing? You're not allowed behind the press line. You're not allowed behind this . . . Walk with me." (Dkt. No. 193 ¶ 77; Nicholas Video at 00:33–00:42.) While DeBonis was escorting Nicholas away from the scene, he was joined by Defendant Davis, and the following exchange ensued:

Davis: "You know what the—you know what the rules are here pal."

Nicholas: "What do you mean? I've been in there the whole time."

Davis: "Yeah? Good for you. This is the last time you'll do that."

Nicholas: "What do you mean?"

Davis: "You know what I mean. Everyone else is over there working with us. We work with you all the time. Don't bullshit me."

Nicholas: "How do I know? How do I know that?"

(Dkt. No. 193 ¶¶ 80–82; Nicholas Video at 00:55–01:11.)

By the end of this exchange, the Individual Defendants had come into possession of Nicholas's press credential, although the parties dispute whether the Individual Defendants "took" Nicholas's credential or whether Nicholas "surrender[ed]" it to them. (Dkt. No. 193 ¶ 83; Dkt. No. 202 ¶ 55; *see also* Dkt. No. 188-33 at 7 (photo taken from designated press area

depicting Defendant DeBonis in possession of Nicholas's press credential).) Davis told

DeBonis: "Hold on to that Michael. And talk to me before you think about giving it back.

Alright? Me personally." (Dkt. No. 193 ¶ 83; Nicholas Video at 01:14–01:19.) DeBonis

answered Davis with a "Yes sir." (Dkt. No. 193 ¶ 83; Nicholas Video at 01:19.) Nicholas can

then be heard on video remarking that he had been "staying out of the way," and Davis answers

by telling Nicholas to: "Get out of here. Get out of here. Team player." (Dkt. No. 193 ¶¶ 84,

86; Nicholas Video at 01:20–01:27.) Davis can then be heard telling DeBonis to escort Nicholas

off of the block, and DeBonis answered Davis with another "Yes sir." (Dkt. No. 193 ¶ 86;

Nicholas Video at 01:27–01:30.) Nicholas's video ends at this point.

At his deposition, Nicholas testified that following the exchange that was captured on

video, DeBonis told Nicholas that the rescued worker would likely die and that Nicholas should

take that fact into account prior to disseminating his footage of the rescue. (Dkt. No. 193 ¶ 87.)

DeBonis denies having said this to Nicholas. (*Id.*) When they arrived at the edge of the West

38th Street block, DeBonis instructed the NYPD officers there not to allow Nicholas to reenter

the block. (Dkt. No. 193 ¶ 89.) DeBonis then returned to the designated press area inside the

frozen zone, where the City held a press conference for the members of the press located there.

(Dkt. No. 193 ¶¶ 90–91.) According to other journalists present at the press conference,

DeBonis instructed the journalists there to "[t]ell [their] boys in the [New York Press

Photographers Association] that [Nicholas] is never getting his press card back." (Dkt. No. 193

¶ 91.) DeBonis denies having said this, too. (*Id.*)

That evening, Nicholas sent DeBonis two emails containing a total of three photos

showing Nicholas's location relative to the ambulance prior to his removal from the scene; the

second email, containing two photos, had the phrase "FAR FROM AMBULANCE" in the

subject line. (Dkt. No. 193 ¶¶ 97–98; Dkt. Nos. 188-69, 188-70.) DeBonis responded to the

second email with the following email text: "FROZEN ZONE." (Dkt. No. 193 ¶ 98; Dkt. No. 188-70.)

Around the same time Nicholas was sending these emails to DeBonis, the *Daily News* published at least one of Nicholas's images from alongside the ambulance in connection with their reporting on the West 38th Street building collapse. (Dkt. No. 202 ¶ 48; *see also, e.g.*, Dkt. No. 188-23 at 2.)

### E. Post-October 30, 2015 Events

At 8:19 a.m. on the morning of October 31, 2015, the day following the building collapse, Nicholas sent the following email to Detective DeBonis, with the subject line "APOLOGY":

> Thank you for taking the time to respond to my email regarding yesterday's incident.
>
> First and foremost, Mike, you above all have treated myself and my colleagues at all times with the utmost consideration and respect. You act in great fairness regardless of who or what the situation entails and I want to make it crystal clear I would never willfully do anything to undermine the generosity and respect you, and the office of the deputy commissioner have shown me.
>
> I am truly regretful that any actions taken by me yesterday in the course of my job while on assignment for the New York Daily News could in any way be seen as contradicting your authority or be construed as disrespectful to you or the Deputy Commissioner or your office.
>
> We thread a fine needle in our work, Detective, and in that work Mike sometimes our jobs intersect perfectly and cooperation while always the goal is sometimes even inadvertently almost untenable.
>
> On this day, my goal was simply to make a photograph of a man being rescued and transported by paramedics - which, as a newspaper photographer is really our only photo.
>
> This, I achieved, as many of my colleagues do, by trying to be as mindful and respectful of your directives, and my responsibilities to make photos in a safe and lawful manner.

I was at that moment, tucked away with any number of civilians with cellphones in hand doing precisely what I described above.  There is video and still evidence of this.

I do not say this to defend anything or be combative - but to simply to dispel [sic] any misinformation you may have heard.

I remained calm at all times when you and I interacted.  And i [sic] complied with your directives to surrender my credential without argument or delay.

I am, of course, available, should it be convenient for you and the Deputy Commissioner to discuss this further and allow me to apologize in person and discuss how important my work is, and how valuable your work is to my work.

Sincerely,

JB Nicholas

(Dkt. No. 183-5.)  DeBonis received but never responded to this email.  (Dkt. No. 193 ¶ 100.)

Over the weeks following the October 30, 2015 incident, Nicholas claims to have experienced a significant decrease in work assignments from the *Daily News*.  (Dkt. No. 202 ¶¶ 60, 80.)  The parties dispute the extent to which this decrease in *Daily News* assignments—and Nicholas's inability to find photojournalist work elsewhere—can be attributed to his lack of a press credential during this period.  (Dkt. No. 193 ¶ 126.)  One of Nicholas's former editors at the *Daily News* testified at his deposition that he stopped assigning Nicholas work at this time in part because without a press credential Nicholas "didn't have the tools to work."  (Dkt. No. 193 ¶ 127.)  Another *Daily News* editor similarly stopped assigning Nicholas work in part due to a personal policy of never assigning work to photographers without press credentials.  (Dkt. No. 193 ¶ 128.)  Nicholas testified at his deposition that he was also unable to get work with other media outlets in New York City during this period.  (Dkt. No. 193 ¶ 131.)  According to Nicholas, only after his press credential was eventually reinstated was he was once again able to get work as a reporter with New York City-based media outlets.  (Dkt. No. 193 ¶ 132.)

According to Defendants, Nicholas's lapse in work assignments from the *Daily News* and other news outlets during this period is attributable to Nicholas's arrest record and his misconduct at the scene of the October 30, 2015 building collapse rather than to his lack of an NYPD press credential. (Dkt. No. 193 ¶¶ 126, 131.) Defendants also emphasize that Nicholas was only ever a "part time independent contractor" for the *Daily News* prior to the October 30, 2015 incident, a fact they contend refutes Nicholas's contention that he was entitled to continued workflow from the *Daily News*. (*Id.*; *see also* Dkt. No. 202 ¶¶ 77–78.) Nicholas acknowledges that he was employed by the *Daily News* in a freelance capacity, but he contends that his editors at the *Daily News* had in the past agreed to provide him with a certain minimum number of assignments per week, and that the *Daily News* ceased to comply with this agreement only after Nicholas no longer had an NYPD-issued press credential. (Dkt. No. 202 ¶¶ 77, 79.) Only one of the *Daily News* editors deposed in this case was asked about this agreement, and he could not confirm its existence. (*Id.*)

Defendants also note that Nicholas actually received a few final assignments from one specific *Daily News* editor in the month following the October 30, 2015 seizure of his press credential, a fact they construe as rebutting Nicholas's contention that his lack of a credential in this period made him unemployable as a photojournalist. (Dkt. No. 193 ¶ 129; Dkt. No. 202 ¶ 60.) While Nicholas does not dispute that he did receive some assignments from this *Daily News* editor during this period, he disputes that these assignments were of comparable quality or quantity to those that he would have received had he been a photographer with a press credential. (*Id.*) In doing so, Nicholas cites the assigning editor's deposition testimony explaining that during this period Nicholas

> was obviously not really able to accept the kind of assignments that I would normally give him without the press credential, breaking news assignments specifically. It's hard to produce without one. . . . He never got his press card

back and I could no longer give him the assignments that I would give him which means I could not—I was able to give him less work. . . .  Those were limited and few and far between. . . .  Those jobs were significantly reduced from what I remember.

(Dkt. No. 202 ¶ 60 (quoting Dkt. No. 188-7 at 49–50, 53, 55).)  That editor further testified that during this period he could assign Nicholas only "[t]hings that [were] not breaking news assignments that would not come under the administrative jurisdiction of the NYPD."  (Dkt. No. 188-7 at 54.)

The parties do not dispute that by December 2015, after this last editor willing to give Nicholas assignments at the *Daily News* had left the newspaper, Nicholas stopped receiving assignments altogether from the *Daily News*.  (Dkt. No. 202 ¶¶ 60, 80.)

On December 1, 2015, Nicholas sent another email to DeBonis, in which he asked DeBonis for permission to "come in and talk about [his] press card."  (Dkt. No. 193 ¶ 101; Dkt. No. 188-71.)  According to an NYPD IT administrator who conducted a database search of DeBonis's email account, DeBonis's email account never received this email from Nicholas.  (Dkt. No. 193 ¶ 101; Dkt. No. 196 ¶¶ 1, 9, 17.)

One week later, on December 8, 2015, Nicholas filed the instant suit challenging the October 30, 2015 seizure of his press credential.  (Dkt. No. 2.)  Other than the parties' exchange at the scene of the building collapse on October 30, 2015, and DeBonis's email to Nicholas sent that evening consisting of the text "FROZEN ZONE," none of the Defendants corresponded with Nicholas or provided Nicholas with further information or notice regarding their confiscation of his press credential prior to his commencement of this action.  (Dkt. No. 193 ¶¶ 102, 104, 109; *see also* Dkt. No. 201-5 at 224–26.)

## II.     Procedural Background

Nicholas commenced this action on December 8, 2015 by filing a complaint against the

City of New York, William Bratton, Stephen Davis, and Michael DeBonis.  (Dkt. No. 2.)  At the

time, Nicholas was proceeding *pro se*.[9]  Simultaneously with his initiation of this action,

Nicholas also filed a motion for a preliminary injunction ordering Defendants to return to him his

NYPD press credential, alleged to have been "summarily revoked" on October 30, 2015.  (Dkt.

No. 3 at 1.)

The Court held oral argument on Nicholas's motion on May 12, 2016.  (*See* Dkt. No. 43.)

At oral argument, Defendants' lawyers explained that Nicholas's press credential had not been

"revoked" but had only been "summarily suspended" pursuant to Title 38, Section 11-11(b) of

the Rules of the City of New York, and that Nicholas was eligible for a Section 11-11 hearing

challenging that suspension.[10]  (Dkt. No. 202 ¶ 62.)  It was at this hearing that Nicholas first

learned that Section 11-11 provided a mechanism for him to obtain a hearing challenging the

suspension.  (Dkt. No. 202 ¶ 62.)  At the conclusion of oral argument, the Court took Nicholas's

motion for a preliminary injunction under advisement.[11]  (*See* Minute Entry, May 12, 2016.)

The next day, Plaintiff emailed Defendant Davis to request a Section 11-11 hearing.

(Dkt. No. 193 ¶ 115; Dkt. No. 202 ¶ 63.)  On May 17, 2016, Lisa Bland, Special Counsel to the

---

[9]     Nicholas continued to represent himself *pro se* until July 6, 2017, at which point he retained counsel.  (*See* Dkt. Nos. 106–109.)

[10]     Plaintiff continues to dispute Defendants' characterization of their seizure of his press credential as a "summary suspension," noting that Defendants themselves referred the press credential's "revocation" or "removal" when briefing Plaintiff's motion for a preliminary injunction, and only later at the May 12, 2016 hearing adopted the position that his card had been "summarily suspended" rather than "revoked."  (Dkt. No. 193 ¶¶ 112–14.)

[11]     The Court eventually denied Nicholas's motion for a preliminary injunction without prejudice to his renewing the motion following his exhaustion of the Section 11-11 hearing process.  (Dkt. No. 34 at 8.)

DCPI's Office, emailed Nicholas to notify him that his Section 11-11 hearing would be held on

May 19, 2016.  (Dkt. No. 202 ¶ 64; Dkt. No. 182-15.)  The notice consisted of the following:

> The department has received your request dated May 13, 2016, for a hearing
> regarding the suspension of your press credentials.  Pursuant to Title 38 of the
> Rules of the City of New York, section 11-11(b), a hearing has been scheduled for
> Thursday, May 19, 2016, at One Police Plaza, Room 1320, New York, New York,
> 10038 at 2:00pm.

(Dkt. No. 182-15.)  Nicholas responded to Bland's email with a number of questions regarding

the hearing, including:

> [A]m i [sic] allowed to call witnesses at the hearing?  [I]f so, how do I gain
> admittance for them into the building?
>
> [A]m i [sic] allowed to present documentary evidence at the hearing?  [I]f so, how
> do I get it and a computer into the building?
>
> [W]ho is the hearing officer?
>
> [W]ill a record of the hearing be made?  [I]f not, can i [sic] record the proceeding
> with a digital audio recorder?

(Dkt. No. 188-76 at 3.)  Bland answered each of Nicholas's questions, and asked Nicholas for

further information regarding the evidence he intended to introduce at the hearing.  (*Id.*)  In a

follow-up email, Nicholas disclosed that he intended to introduce video and photo evidence as

well as testimony from three witnesses to the October 30, 2015 incident, and he asked Bland to

disclose "what witnesses or evidence[] the police department [would] be considering other than

what [he] proffer[ed]."  (*Id.*)  Bland answered that "[t]he department will present any

documentary evidence that it deems relevant to the issue of reinstatement of the press pass."

(Dkt. No. 188-76 at 2.)  After Nicholas sent another follow-up email again asking that Bland

disclose the evidence NYPD intended to produce so as to avoid surprise, Bland explained that

the hearing would "not [be] an adversarial proceeding . . . [and i]f the department present[ed] any

documentary evidence, it would not be anything that [Nicholas] w[as]n't previously aware of."
(*Id.*)

Nicholas's Section 11-11 hearing was subsequently conducted as scheduled on May 19, 2016.[12]  (Dkt. No. 193 ¶ 119.)  The hearing was conducted by DCPI's former Commanding Officer, Chief Edward Mullen.  (*Id.*)  Also present at the hearing were Defendant Whyte and Lisa Bland, each of whom asked questions of Nicholas and his witnesses during the hearing. (*Id.*; *see also* Dkt. No. 202 ¶ 68.)

Nicholas calls into question the fairness of some aspects of his Section 11-11 hearing. For example, Nicholas protests that because Mullen was a direct subordinate of Defendant Davis, and because Davis had previously directed DeBonis not to return Nicholas's credential without his personal approval, Mullen was not an impartial adjudicator.  (Dkt. No. 193 ¶ 120.) In addition, Nicholas notes that Mullen admitted at his deposition that he took into account a prior conversation with Defendant DeBonis regarding the October 30, 2015 incident when adjudicating Nicholas's request for reinstatement of his press credentials, even though DeBonis had not been called as a witness at the hearing and Mullen had indicated that NYPD did not intend to consider evidence that had not been discussed at the hearing.  (Dkt. No. 193 ¶¶ 121– 24.)  Nicholas did not note his objections to these aspects of the hearing on the record of that proceeding, but he did describe them (and a number of others) in a five-page letter filed with this Court and hand-delivered to Defendants' counsel the next morning.  (Dkt. No. 202 ¶ 69; Dkt. No. 28.)

NYPD ultimately elected to reinstate Nicholas's press credential following the conclusion of his Section 11-11 hearing.  (Dkt. No. 193 ¶ 125; Dkt. No. 202 ¶ 73.)  Defendants contend that

---

[12]        A transcript of the Section 11-11 hearing is included as part of the summary judgment record at Docket Number 188-25.

this decision was made by Chief Mullen alone, although Nicholas disputes this, in part on the basis of Mullen's persistent use of the plural "we" when describing his decision-making process at the hearing. (Dkt. No. 202 ¶ 73.) It is also unclear precisely when that decision was made. Nicholas was first informed that his credential would be reinstated by Defendants' counsel in this action at a June 23, 2016 conference before this Court. (*Id.*) That evening, Special Counsel Bland emailed Nicholas to confirm that his credential would be reinstated and directed him to contact Defendant Whyte for instructions for retrieving the credential. (Dkt. No. 182-18.) Nicholas picked up his credential three days later. (Dkt. No. 193 ¶ 125.) As of the time of the parties' briefing of the present motions, Nicholas continued to be in possession of an NYPD-issued press credential. (Dkt. No. 202 ¶ 81.)

After the return of his press credential, Nicholas moved this Court for leave to file an amended complaint against Defendants the City of New York, William Bratton, Stephen Davis, and Michael DeBonis. (Dkt. No. 48.) The Court granted Nicholas's motion for leave to file an amended complaint on August 5, 2016. (Dkt. No. 51.) Defendants then moved to dismiss the amended complaint, and the Court denied that motion on February 27, 2017. (Dkt. No. 85.)

On June 12, 2017, the Court granted Nicholas leave to file a second amended complaint naming Lieutenant Whyte as a Defendant in this action, but only with respect to Whyte's conduct in connection with the events of October 30, 2015. (Dkt. No. 99.) Nicholas then filed the operative Second Amended Complaint. (Dkt. No. 126.) The Second Amended Complaint asserts the following four live claims: (1) violations by Defendants Davis and DeBonis of Nicholas's First, Fourth and Fourteenth Amendment rights when they removed Nicholas from the scene of the October 30, 2015 building collapse (Dkt. No. 126 ¶ 159); (2) violations by Defendants Davis and DeBonis of Nicholas's Fourteenth Amendment right to equal protection when they removed Nicholas from the scene of the October 30, 2015 building collapse and

revoked his press credential (Dkt. No. 126 ¶ 160); (3) violations by Defendants Davis and

DeBonis of Nicholas's procedural and substantive due process rights when they failed to notify

him of either the existence of a frozen zone at the scene of the October 30, 2015 building

collapse or of his right to a timely opportunity to be heard to challenge their suspension of his

press credential (Dkt. No. 126 ¶ 161); and (4) violations by all five Defendants of Nicholas's

First, Fourth and Fourteenth Amendment rights in creating, following, and enforcing a custom or

practice that interferes with newsgathering (Dkt. No. 126 ¶ 164).

Currently pending before the Court are the following motions: (1) Defendants' motion to

preclude the testimony and opinions of Plaintiff's expert witness Mickey Osterreicher from

summary judgment and trial (Dkt. No. 170); (2) Individual Defendants Davis and DeBonis and

Whyte's motion for summary judgment (Dkt. No. 180); and (3) Plaintiff's motion for summary

judgment (Dkt. No. 185). The Court is now prepared to rule on these motions.

## III.  Motions for Summary Judgment

### A.  Legal Standard

A "court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the

suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d

Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

In reviewing a motion for summary judgment, a court must consider the evidence "in the

light most favorable to the non-moving party and draw all reasonable inferences in its favor."

*Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). "It is well established that '[c]redibility

assessments, choices between conflicting versions of the events, and the weighing of evidence

are matters for the jury, not for the court on a motion for summary judgment.'" *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) (alteration in original) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). In cases in which "a relevant videotape whose accuracy is unchallenged" is part of the summary judgment record, that video "should be credited by the court on [a summary judgment] motion if it so utterly discredits [one] party's version [of events such] that no reasonable juror could fail to believe the version advanced by the [other] party." *Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007).

Finally, in cases involving cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (quoting *Schwabenbauer v. Bd. of Educ.*, 667 F.2d 305, 314 (2d Cir. 1981)).

**B.      First Amendment**

The parties cross-move for summary judgment on Plaintiff's First Amendment claims. (Dkt. No. 184 at 7–18; Dkt. No. 187 at 8–24.) For the reasons that follow, the Court concludes that genuine disputes of material fact exist with respect to the substantive aspects of Nicholas's First Amendment claims, but that Individual Defendants Davis and DeBonis are entitled to partial summary judgment with respect to Nicholas's First Amendment claims against them on the basis of qualified immunity.

**1.   Press Right to Access Co-Equal with the Government**

As a threshold matter, Nicholas contends that Defendants violated the First Amendment when they provided the City's own press officers with preferential access to the scene of the building collapse, to the exclusion of other members of the press. (Dkt. No. 187 at 9–12.) Nicholas points to undisputed evidence in the summary judgment record showing that at the

same time Defendants confined most journalists to a press area up the street from the collapsed building and expelled Nicholas from the scene for taking photos from alongside the ambulance, Defendants simultaneously permitted City press officials to freely move about the scene and to take photos from alongside and inside the ambulance. (Dkt. No. 187 at 10–12.) In support of his contention that this conduct constituted a First Amendment violation, Nicholas cites a Second Circuit case, *Legi-Tech, Inc. v. Keiper*, 766 F.2d 728 (2d Cir. 1985), in which the Second Circuit explained that the government "may not grant the state press special access to governmental proceedings or information and then deny to the private press the right to republish such information," *id.* at 733. On the basis of *Legi-Tech*'s rejection of actions that "allow[] the government to control the form and content of the information reaching the public," *id.*, Nicholas argues that Defendants' conduct here constituted a First Amendment violation as a matter of law.

The Court disagrees. Despite *Legi-Tech*'s far-reaching language, it would be improper to extrapolate from that language a blanket rule requiring co-equal access for government press officials and private journalists to all newsworthy events, including emergency situations such as the one that existed on West 38th Street on October 30, 2015. *Legi-Tech* was not about access to emergency rescues. Instead, *Legi-Tech* involved a challenge to a New York statute that prohibited companies that sold electronic access to certain legislative material from accessing a state-run database that contained, among other things, the text of pending state legislation. *Id.* at 731. In reversing the district court's holding that the state's interest in "protect[ing its] natural monopoly on computer supplied legislative information" justified such a legislative scheme, the Second Circuit held that a statutory scheme that had no justification beyond the creation such a monopoly would be "an [impermissible] exercise of censorship." *Id.* at 733 (first quoting *Legi-Tech, Inc. v. Keiper*, 601 F. Supp. 371, 381 (N.D.N.Y 1984)).

The state's preferential access to legislative materials in *Legi-Tech* is entirely unlike the preferential access the City here provided its own employees to the scene of a building collapse in midtown Manhattan. Unlike in *Legi-Tech*, where the state offered no justification for allowing itself preferential access beyond an asserted right to control the flow of information, Defendants here justify their decision to control access to the scene of the emergency by pointing to their need to manage the "dynamics of an emergency response to a partial building collapse where human life was at risk." (Dkt. No. 199 at 8 n.6.) Because the Court has little trouble concluding that such a need, if it in fact exists, can provide a legally sufficient justification for the government to restrict access to the immediate vicinity of an ongoing emergency, *Legi-Tech* does not establish that the City's choice on its face runs afoul of the First Amendment.[13] Thus, it remains a factual question whether the events of October 30, 2015, as a matter of fact, presented the City with a need to manage the "dynamics of an emergency response" that was sufficient to justify the restrictive steps that the City took.

In so holding, the Court does not carve out of *Legi-Tech*'s rejection of unjustified government monopolies on information a *carte blanche* for government entities to provide their own officials with exclusive or preferential rights of access to information about emergency situations. Instead, as with all situations involving "restriction[s] which afford[] different degrees of access to members of the press," courts confronting challenges to such restrictions retain the obligation to ensure that they are both content neutral and "serve a legitimate

---

[13] Nicholas also cites two other cases that rejected policies that provided the government with exclusive access to newsworthy information (*see* Dkt. No. 187 at 10 & n.5), but each of these cases involved fact situations equally unlike the live emergency situation at issue in this case, *see Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979) (concerning newspaper's right to publish names of juvenile offenders); *Nat'l Ass'n of Soc. Workers v. Harwood*, 874 F. Supp. 530 (D.R.I. 1995) (concerning lobbyist access to legislative floor), *rev'd on other grounds*, 69 F.3d 622 (1st Cir. 1995).

governmental purpose, [are] rationally related to the accomplishment of that purpose, and . . . outweigh the systemic benefits inherent in unrestricted (or lesser-restricted) access." *Stevens v. N.Y. Racing Ass'n*, 665 F. Supp. 164, 175 (E.D.N.Y. 1987) (second quoting *D'Amario v. Providence Civic Ctr. Auth.,* 639 F. Supp. 1538, 1543 (D.R.I. 1986)). The Court turns to each of these inquiries below.

With these important limiting principles in mind, the Court declines to interpret *Legi-Tech*'s rejection of a state government's standalone interest in maintaining a monopoly on legislative information as having established a uniform rule that forbids governmental entities from ever providing their own press officials with preferential access to the scenes of emergency rescues. The fact that the government chose to do so here, then, does not by itself entitle Nicholas to summary judgment.

### 2. Press Right to Access Co-Equal with the Public and Other Journalists

The parties cross-move for summary judgment on the issue of whether Defendants' conduct at the scene of the October 30, 2015 building collapse resulted in the exclusion of the press from an area open to the general public, as well as whether Defendants impermissibly provided particular members of the press with preferential access to the scene. (Dkt. No. 187 at 12–15; Dkt. No. 184 at 7–9.) Because the record contains evidence sufficient to convince a reasonable juror either that Defendants did not impermissibly afford the public or specific journalists differing levels of access to the scene, or, alternatively, that Defendants did impermissibly afford preferential access to particular journalists on the basis of the content of their speech, no party is entitled to summary judgment on this question.

### a. Governing Law

The parties generally do not disagree on the legal standards governing the press's right of access to spaces that are open to the general public. (Dkt. No. 187 at 12–13; Dkt. No. 199 at 6–

7.)  It is well settled that "press organizations have a . . . right of access to newsworthy events in their capacity as representatives of the public and on their own behalf as members of the press," *WPIX, Inc. v. League of Women Voters*, 595 F. Supp. 1484, 1489 (S.D.N.Y. 1984), for "without some protection for seeking out the news, freedom of the press could be eviscerated," *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).  But this right is not unlimited.  For example, "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Id.* at 684.  With respect to emergency situations, "[n]ews[people] have no constitutional right of access to the scenes of crime or disaster when the general public is excluded." *Id.* at 684–85.  The First Amendment does, however, require that "the media's right of access [be] at least equal to that of the general public."[14] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 586 n.2 (1980) (Brennan, J., concurring in judgment).

Moreover, whenever an area is open to either the general public or to some members of the press, the First Amendment restricts the government's ability to selectively regulate the press's access to that area.  Thus, generally, "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media." *Am. Broad. Cos. v. Cuomo* (*ABC*), 570 F.2d 1080, 1083 (2d Cir. 1977).  But again, this "right to equal access under the [F]irst [A]mendment is not absolute, . . . and the interest to be served by the newsgathering activity at issue must be balanced against the interest served by denial of that activity." *WPIX*, 595 F. Supp. at 1489.  In conducting this balancing, courts in this Circuit have asked two primary questions: (1) whether the unequal access afforded to different

---

[14]      NYPD has incorporated this principle into its own internal procedures.  (Dkt. No. 188-87 at 2 (NYPD Patrol Guide provision providing that "[a] member of the press with proper credentials may not be excluded from an area where the general public has access").)

journalists is based on content-neutral grounds, and (2) whether that unequal access serves a legitimate governmental objective and the benefits derived from the restriction are greater than the benefits that would result from lifting the restriction. *See Stevens*, 665 F. Supp. at 175. If both of these questions are answered in the affirmative, the government may enforce a policy giving some members of the press more favorable access to newsworthy information than others. *Id.*

Under the foregoing principles, for Nicholas to be entitled to summary judgment on his First Amendment right of access claim, he must point to undisputed evidence showing that he or other members of the press were denied equal access to spaces to which the public was given access; or, alternatively, that Defendants provided unequal access to the scene to particular journalists on the basis of the content of their speech or for arbitrary reasons. On the other hand, for Defendants to be entitled to summary judgment on Nicholas's right of equal access claim, they must point to undisputed evidence showing that the areas to which Nicholas claims a right of access were in fact closed to the general public.[15] In addition, Defendants would also have to point to undisputed evidence showing that, to the extent any journalists were permitted to gather news inside the areas to which Nicholas claims a right of access, all journalists were allowed equal access to those areas; or, alternatively, any journalists given preferential access were selected without reference to the content of their speech and in furtherance of legitimate government interests whose accomplishment outweighed any harms caused by the unequal access.[16]

---

[15]     As will be explored more fully below, there are also important First Amendment constraints governing Defendants' closure of almost an entire public block to newsgathering. *See infra* Section III.B.3. Here, however, the Court asks only whether the City did in fact adopt such an access restriction and apply it evenhandedly as to both the public and press.

[16]     Even if content-based, Defendants' restrictions on newsgathering at the site of the building collapse still might theoretically pass First Amendment muster if they could survive

33

### b.    Plaintiff's Motion

### i.    Public Access

Nicholas moves for summary judgment on the ground that Defendants provided members of the general public with greater access to the rescue operations on West 38th Street than they provided to the press.  (Dkt. No. 187 at 12–15.)  In support of this contention, Nicholas cites evidence showing pedestrians traversing the area at the same time that Defendants DeBonis and Davis were confining most members of the press to a specific designated press area.  (Dkt. No. 187 at 13.)  He also cites evidence of pedestrians traversing the rescue area moments after Defendants DeBonis and Davis expelled him from the scene.  (*See* Ramos Video at 39:34–39:41, 40:50–40:58, 41:10–41:18.)  In response, Defendants assert that despite the presence of *some* civilians at the emergency scene, none were *permitted* to be there, and accordingly, neither the public nor the press may be said to have enjoyed any right of access to the emergency rescue site under the First Amendment.  (Dkt. No. 199 at 6–8.)

Viewing the evidence in the light most favorable to Defendants, as the Court must in considering Nicholas's motion for summary judgment on this basis, the Court concludes that the record does not unequivocally support Nicholas's contention that Defendants allowed the public greater access to the scene than was given to the press.  Instead, the Court concludes that the evidence in the record would allow a reasonable juror to credit Defendants' characterization of the area as a whole as having been closed to both the public *and* the press.

Defendants DeBonis and Davis testified at their depositions that they observed an NYPD-created "frozen zone" that closed West 38th Street to both the press and the public, excepting

---

strict scrutiny.  *Nat'l Council of Arab Ams. v. City of N.Y.*, 478 F. Supp. 2d 480, 491 (S.D.N.Y. 2007).  However, Defendants do not contend that they are entitled to summary judgment on the ground that any exemptions to the "frozen zone," if content based, would survive strict scrutiny.  Nor could they, as for reasons the Court will discuss further below, *see infra* Section III.B.2.c., genuine disputes of fact would preclude granting summary judgment to Defendants on this basis.

only the interiors of the block's stores and other buildings and a designated press area that DeBonis and Davis later established. (Dkt. No. 202 ¶¶ 19, 22.) According to DeBonis and Davis, this frozen zone was demarcated by police tape blocking pedestrian access from either end of West 38th Street, and the police barred any pedestrian not escorted by police from accessing the immediate vicinity of the emergency scene. (Dkt. No. 202 ¶¶ 23–24.)

Davis and DeBonis's testimony regarding the block's closure to pedestrians is corroborated by both contemporaneous statements from the media (*see, e.g.*, Dkt. No. 193 ¶ 88 (*Metro New York* tweet announcing West 38th Street is "now open to pedestrians" following the collapse; suggesting that the street had earlier been closed)) and the deposition testimony of other City officials who were at the scene (*see, e.g.*, Dkt. No. 182-5 at 77:3–80:13 (FDNY official describing establishment of a "collapse zone" and suggesting that access to the zone would be restricted to people with specialized "training.")). Perhaps more importantly, their testimony is also corroborated by extensive video evidence of the scene showing police tape blocking pedestrian access from either end of West 38th Street, as well as the almost exclusive presence of City officials in emergency uniforms on the portion of the block closest to the collapsed building. (*See, e.g.*, Ramos Video at 01:32–01:40, 07:57–08:06, 08:26–08:33, 17:17–17:53, 22:51–24:20, 27:00–29:38, 38:52–42:13.)

Viewing this evidence in the light most favorable to Defendants, the Court concludes that a reasonable juror could find credible Defendants' contention that the West 38th Street block as a whole had been closed to the public. Nicholas's evidence that some pedestrians were on portions of the block at some moments during the incident could reasonably be viewed as showing only that Defendants were not completely successful in enforcing a policy intended to exclude all members of the public from a midtown Manhattan block during a weekday afternoon. This evidence does not, however, foreclose Defendants' contention that they had classified this area

as a "scene[] of crime or disaster [from which] the general public [was] excluded" and as such, as an area to which "[n]ews[people] [such as Nicholas enjoyed] no constitutional right of access." *Branzburg* 408 U.S. at 684–85.

### ii. Press Access

The Court's conclusion that a reasonable juror could determine that the general public did not enjoy access to West 38th Street during the rescue operation does not fully dispose of Plaintiff's summary judgment motion with respect to the First Amendment right of access. This is because Defendants' alleged decision to allow the City's own press officials into the block while relegating all other journalists to a designated press area within the restricted zone triggered "the First Amendment require[ment of] equal access to all of the media." *ABC¸* 570 F.2d at 1083. Citing this principle, Nicholas argues that Defendants' policy of giving the City's press officials preferential access to the scene's news was rooted in content-based purposes and thus violated the First Amendment. (Dkt. No. 187 at 11–12.) In addition, Nicholas argues that he is entitled to summary judgment on the basis of evidence that, he says, shows that a few select civilian journalists were able to document the scene freely and for extended periods of time from outside the designated press area for arbitrary or content-based reasons. (Dkt. No. 187 at 12–15.)

If the only reasonable conclusion that could be drawn from this evidence is that these select journalists were given preferential access either because of the content of their speech or without reference to a legitimate government objective whose accomplishment justified the denial of equal access, then Nicholas might well be entitled to summary judgment on his First Amendment claims. *See Stevens*, 665 F. Supp. at 175. But because the record contains evidence sufficient to allow a reasonable juror to draw conclusions contrary to Nicholas's, his motion for summary judgment on the basis of unequal access among members of the press is denied.

**City's press officials:** The Court begins by considering the undisputed evidence showing that the City's press officials were given freer access to the emergency rescue operations than were other members of the press. At least fifteen City employees took photographs or videos of the rescue from inside the rescue area, (Dkt. No. 193 ¶ 41), and some of these employees are captured on video doing so from outside of the designated press area (*see, e.g.*, Ramos Video at 37:20–37:25, 40:03–40:15). According to Nicholas, one of these photographers was even standing closer than was Nicholas to the rescued construction worker at the moment Defendant DeBonis approached Nicholas to expel him from the rescue area. (Ramos Video at 39:33–39:36; *see also* Dkt. No. 193 ¶¶ 70–71.) This employee, who was also a Captain with FDNY and a trained EMT, not only took pictures from alongside the ambulance summoned to transport the worker away from the scene, but also took pictures through the open side door of the ambulance to capture the image of the injured worker within. (Ramos Video at 40:03–40:15; *see also* Dkt. No. 193 ¶¶ 70–73.)

The City, however, has produced evidence sufficient for a reasonable juror to conclude that its reasons for allowing its own press officials to freely access the scene were not based on the content of their speech, and that their freer access "serve[d] a legitimate governmental purpose, [was] rationally related to the accomplishment of that purpose, and . . . outweigh[ed] the systemic benefits inherent in [universally] unrestricted (or lesser-restricted) access" for all press officials. *Stevens*, 665 F. Supp. at 175 (quoting *D'Amario,* 639 F. Supp. at 1543). Accordingly, Nicholas cannot be granted summary judgment on these grounds.

"In the analysis of whether a regulation is content-based or content-neutral, the 'principal inquiry . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hobbs v. Cty. of Westchester,* 397 F.3d 133, 149 (2d Cir. 2005) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The Supreme

Court has long recognized that "interference with ingress or egress" and "the need to protect . . . security" are valid content-neutral concerns, even where such "facially neutral [concerns] . . . may disproportionately affect speech on certain topics." *McCullen v. Coakley*, 134 S. Ct. 2518, 2531 (2014) (first alteration in original) (first and second quoting *Boos v. Barry,* 485 U.S. 312, 321 (1988)). Accordingly, the City here was entitled to afford its own press officials preferential access to the scene if its purpose for doing so was genuinely directed toward the legitimate objectives of effectively regulating access to the block or the safety of those on the scene. This is true even if an incidental result of this policy was the dissemination of speech more uniformly pro-City than would have issued had press officials not employed by the City been given similar access—provided, of course, that the policy did not burden substantially more speech than was necessary for the City to advance any of its legitimate goals.

Defendants contend that the City's decision to allow its own press officials to freely access the scene stemmed from the City's need to manage "[t]he dynamics of an emergency response to a partial building collapse where human life was at risk." (Dkt. No. 199 at 8 n.6.) This qualifies as a content-neutral basis, and the record contains sufficient evidence to support Defendants' characterization of the scene as a dynamic emergency situation. (Dkt. No. 202 ¶¶ 9, 14, 16, 18; Dkt. No. 182-5 at 77–80 (FDNY official describing the extent of emergency operations at the scene) *see also generally* Dkt. No. 188-95 ("Ramos Video").) The record also contains evidence corroborating Defendants' assertion that allowing only City press officials to access the scene aided them in their management of the scene. For example, unlike some of the private journalists at the scene, many of the City's press officials at the scene can be seen wearing both identifying credentials and protective helmets (Ramos Video at 22:48–22:49, 39:25–39:28), and some of them had extensive medical and emergency training (*see, e.g.*, Dkt. No. 202 ¶ 54). These facts support Defendants' contention that their presence would have posed

fewer risks to the City's management of "ingress or egress," or its "need to protect . . . security,"

*McCullen*, 134 S. Ct. at 2531 (alteration in original) (quoting *Boos*, 485 U.S. at 321).  If a jury is

persuaded by Defendants' contention that it was these concerns that inspired the City's choice to

permit only its own journalists to freely access the rescue area, then this choice may be said to

have been content neutral.

In arguing that the content-based nature of the City's restriction is beyond reasonable

dispute, Nicholas relies principally on a 1987 case from the Eastern District of New York,

*Stevens v. New York Racing Association*.  The court in *Stevens*, in considering a journalist's First

Amendment claims premised on unequal press access to a racetrack, carefully analyzed

"inconsistencies between the statements of defendant's executives [that] ma[d]e [defendant's]

position that the restriction [at issue] was imposed due to [content-neutral reasons] less than

believable."  *Id*.  Nicholas points to a number of similar inconsistencies in Defendants'

statements and conduct here.  (*See, e.g.*, Dkt. No. 187 at 16 n.8.)  But the *Stevens* court was

engaged in a "likelihood of success on the merits" analysis for purposes of granting a

preliminary injunction.  *Stevens*, 665 F. Supp. at 171.  In contrast, for purposes of summary

judgment, the Court does not consider whether either party is more *likely* to succeed on the

merits, but only whether either *could* persuade a reasonable jury of its position.  *See Am. Int'l

Grp., Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir. 1981) ("[S]ummary

judgment is improper when the court merely believes that the opposing party is unlikely to

prevail on the merits after trial.").  Having determined that Defendants' evidence of content-

neutral reasons for allowing only City press officials to access the scene is sufficient for purposes

of defeating summary judgment, the Court need go no further.

"Even assuming, however, that [D]efendant[s'] restriction [was] not content-based,"

Nicholas could "invalidate [this] content-neutral restriction on [some] press access" if he could

"demonstrate that the restriction [did] not serve a legitimate government objective or that the benefits derived from the restriction [were] fewer than the harm that it cause[d]." *Stevens*, 665 F. Supp. at 176. Nicholas fails to persuade the Court that no reasonable juror could find that the City's restriction adequately served legitimate aims. Management of "[t]he dynamics of an emergency response to a partial building collapse where human life was at risk" (Dkt. No. 199 at 8 n.6) is indisputably a legitimate governmental interest, *see, e.g.*, *Marcavage v. City of N.Y.*, 689 F.3d 98, 104 (2d Cir. 2012) (recognizing City's "significant interest in keeping its public spaces safe" (quoting *Bery v. City of N.Y.*, 97 F.3d 689, 697 (2d Cir. 1996))); *United for Peace and Justice v. City of N.Y.*, 243 F. Supp. 2d 19, 29 (S.D.N.Y. 2003) (describing the "significant government interest of public safety"). And to the extent that the City's effective management of that emergency required some dissemination of updates to the public, a juror could reasonably conclude that the City's choice to have its own public information officers access the scene to prepare and issue those updates was a safe and effective means of achieving that end. (*Cf.*, Dkt. No. 193 ¶ 48 (describing public's use of and praise for FDNY's dissemination of news from the scene).) Accordingly, and crediting as true the evidence in the record that lends support to Defendants' proffered reasons for giving the City's own press officials preferential access to the scene, the Court concludes Nicholas is not entitled to judgment as a matter of law on this basis.

**Other journalists:** The Court now turns to an examination of Plaintiff's evidence of journalists on the scene other than the City's own press officials. A careful review of Nicholas's evidence regarding the presence of civilian newsgatherers outside of the designated press area during the rescue demonstrates that the evidence is insufficient to entitle Nicholas to summary judgment.

Plaintiff first points to evidence showing that two photographers from *Reuters* and the *New York Post* were allowed to remain inside a restaurant on the block during the rescue

operation. (Dkt. No. 187 at 13–14; Dkt. No. 193 ¶¶ 17, 33.) These individuals' presence in a store on the block, however, is consistent with Defendants' assertion that the area that was closed to the press did not extend to the insides of stores. (Dkt. No. 202 ¶¶ 22, 24.) Moreover, Nicholas himself testified that he also spent much of the rescue operation inside a store on the block during the rescue operation, and that, like the two journalists from *Reuters* and the *New York Post*, he too was never instructed by any City officials who saw him in the store to depart. (Dkt. No. 193 ¶¶ 20–22.) Accordingly, Nicholas's evidence showing the presence of two photographers inside a restaurant on West 38th Street does nothing to rebut Defendants' contention that they had adopted a uniform policy of excluding all press from the *street* surrounding the collapsed building.

Plaintiff also points to evidence showing that two "fire buffs," or individuals who seek out FDNY emergency rescues in order post videos of those rescues to YouTube, were also able to document and photograph the rescue outside of the designated press area and directly from the street. (Dkt. No. 187 at 14–15; Dkt. No. 193 ¶¶ 49–55.) However, Defendants continue to maintain that these fire buffs "snuck into" the rescue area. (Dkt. No. 202 ¶ 50.) It is undisputed that the fire buff Ramos, the civilian who was closest to the rescue operation at the time Nicholas was expelled, accessed the rescue by going around the scene's police tape, through two buildings, and down a fire escape. (*Id.*) Moreover, Ramos wore clothing with a fire department's logo. (Dkt. No. 193 ¶ 53 (citing Dkt. No. 188-11 at 43–45).) Video evidence confirms that the other of the two fire buffs on the scene was also wearing fire department garb. (*See* Ramos Video at 41:05–41:10; *see also* Dkt. No. 193 ¶ 53.) Accordingly, a reasonable juror could construe Nicholas's evidence to show at most that Defendants failed to expel from the scene two unauthorized civilian newsgatherers, both of whom were dressed in clothing that suggested some affiliation with rescue services. Given the many other exigencies facing the City

throughout the morning of October 30, 2015, a reasonable factfinder would hardly be required to construe Plaintiff's evidence showing the presence of two individuals in fire department garb as demonstrating that Defendants had affirmatively allowed these individuals preferential access to the scene.

Finally, and importantly, Nicholas makes no showing that any member of the public or non-City press attempted to access the precise location from which Defendants expelled him, which, according to Nicholas, was approximately "a foot" or "a yard" from emergency personnel watching the victim of the building collapse being lifted into an ambulance. (Dkt. No. 193 ¶ 68; Dkt. No. 202 ¶ 43.) The next closest civilian to this location, who was Ramos, was recording the events from the sidewalk across the street a number of feet away. (Dkt. No. 202 ¶¶ 49–51; Ramos Video at 39:33–39:36.) Because Nicholas has produced no evidence showing that any other member of the public, either pedestrian or journalist, attempted to go anywhere nearly as close as he did to the ongoing rescue operation, he has failed to point to undisputed facts that demonstrate that some members of the press were given greater accesses to the rescue than was denied to him.

Nicholas's uniquely close proximity to the ambulance also distinguishes the two out-of-Circuit cases he cites involving First Amendment claims of camerapeople who had been excluded from public spaces by emergency responders. (*See* Dkt. No. 187 at 13.) These cases both involved camerapeople in locations where "the general public was [also] present and" where there was "no claim . . . that [the cameraperson] was in an improper place." *Channel 10, Inc. v. Gunnarson*, 337 F. Supp. 634, 638 (D. Minn. 1972); *see also Connell v. Town of Hudson*, 733 F. Supp. 465, 469, 473 (D.N.H. 1990) (granting summary judgment in favor of photographer who was "ordered . . . to stop taking pictures from positions that did not interfere with police activity," *id.* at 473, because order was not "reasonably justified," *id.* at 469). In contrast, here a

juror could reasonably construe the video evidence showing Nicholas's proximity to the ambulance relative to the other members of the public press on the scene as supporting Defendants' assertions that Nicholas was in a closed location and that he was actually interfering with police activity.

In short, Nicholas's evidence showing that a handful of journalists and civilians made it inside a "frozen zone" that spanned an entire New York City block on a weekday for an hours-long rescue operation is insufficient to warrant summary judgment on his First Amendment equal access claims. Accordingly, Nicholas's motion for summary judgment on that basis is denied.

### c. Individual Defendants' Motion

The Individual Defendants cross-move for summary judgment on Nicholas's claim that he was denied equal access to the West 38th Street block in violation of the First Amendment. (Dkt. No. 184 at 7–8, 13–14.)

Viewing the record evidence in the light most favorable to Nicholas, the Court concludes that he has produced evidence sufficient for a reasonable juror to conclude that Defendants afforded both the City's own press officials and the fire buffs on the scene freer access to the events of the day than was allowed to Nicholas because of the content of each's speech. Because granting some journalists freer access to the scene on the basis of the content of their speech would run afoul of "the First Amendment require[ment] [of] equal access to all of the media" to any "public function" at which there is "participation by some of the media," Individual Defendants cannot be granted summary judgment on this basis. *ABC*, 570 F.2d at 1083.[17]

---

[17] Defendants' allegedly selectively enforced restrictions on newsgathering, even if content-based, might pass First Amendment muster if they could survive strict scrutiny. *Nat'l Council of Arab Ams.*, 478 F. Supp. 2d at 488. "Under the strict-scrutiny test, a content-based restriction may be upheld if the restriction serves a compelling governmental interest, is *necessary* to serve the asserted [compelling] interest, is precisely tailored to serve that interest,

The timing of the building collapse is particularly relevant to the Court's analysis of the question. As already noted, the collapse followed closely on the heels of a *Daily News* report criticizing the City for a purported spike in construction accident fatalities (Dkt. No. 193 ¶ 12), and City public relations officials exchanged emails shortly after the collapse expressing worry that it "could feed [the] *Daily News* story" (Dkt. No. 188-24 (italics added)). "Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own." *Nat'l Council of Arab Ams. v. City of N.Y.*, 478 F. Supp. 2d 480, 491 (S.D.N.Y. 2007) (quoting *Ridley v. Mass. Bay Transp. Auth.,* 390 F.3d 65, 86 (1st Cir. 2004)). Indeed, it is precisely this worry—that selective press access could be used as a method for excluding journalists most critical of the government from newsworthy events—that has led courts to subject such policies to strict First Amendment scrutiny. *See ABC*, 570 F.2d at 1083; *see also McCullen*, 134 S. Ct. at 2533 ("[A]n exemption from an otherwise permissible regulation of speech may represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." (internal quotation marks omitted)).

Particularly because Nicholas had been dispatched to the scene by the *Daily News*, the very press entity for which City officials were on heightened alert at the scene of the building

---

and is the least restrictive means readily available for that purpose." *Hobbs,* 397 F.3d at 149 (alteration in original) (internal quotation marks and citations omitted). The parties do not address whether the exemption to the "frozen zone" given to the City's own press officials, if content based, could survive a strict-scrutiny analysis. The Court need not even consider this question here, however, because there also remains a genuine dispute of fact with respect to whether Defendants separately exempted the fire buffs from the West 38th Street "frozen zone" on the basis of *their* speech's content. Because the record contains no evidence at all to support the possibility that permitting the fire buffs to gather news inside the "frozen zone" served any government interest, let alone a compelling one, the open question of whether the fire buffs were permitted to gather that news on the basis of their speech's content precludes summary judgment for Defendants under strict scrutiny.

collapse, "this Court need not accept Defendants' proposed justifications at face value." *Nat'l Council of Arab Ams.*, 478 F. Supp. 2d at 491. Instead, this "[C]ourt must carefully sort through the reasons offered to see if they are genuine." *Id.* (quoting *Olivieri v. Ward,* 801 F.2d 602, 606 (2d Cir. 1986)); *see also Huminski v. Corsones*, 396 F.3d 53, 87 (2d Cir. 2005) ("A professed security concern cannot . . . be used to mask . . . aversion to the views of the person who seeks access. Avoidance of such viewpoint discrimination is, of course, at the heart of much First Amendment protection.").

By way of contrast with Nicholas's supervising news outlet, the *Daily News*, fire buff Ramos consistently published materials that overwhelmingly depicted FDNY favorably; indeed, he would even go so far as to delete negative comments about NYPD and FDNY from his videos. (Dkt. No. 193 ¶ 49.) There is a corresponding contrast between Defendants Davis and DeBonis's treatment of Nicholas and the treatment that was given to fire buff Ramos. While DeBonis and Davis expelled Nicholas from the West 38th Street block after he had spent approximately thirty-five *seconds* recording events outside of the designated press area (*see* Nicholas Video at 00:00–00:35), Ramos stood in close proximity to the rescue scene for a period spanning around thirty-five *minutes* without any issues with City officials or the DCPI officers charged with regulating press on the scene (*see* Ramos Video at 12:59–47:17). Indeed, the parties do not dispute that no City officials asked Ramos to leave the block at any point throughout the rescue efforts. (Dkt. No. 193 ¶ 55.) The treatment of the second fire buff on the scene stands in even starker contrast to the Individual Defendants' treatment of Nicholas. This second fire buff was not only allowed to remain inside the "frozen zone" for much of the rescue, but a juror could construe the evidence to suggest that he was even affirmatively assisted in his newsgathering by a uniformed firefighter, who borrowed the fire buff's camera in order to gather

pictures of the inside of the collapsed building on his behalf. (*See* Dkt. No. 202 ¶ 24; Ramos Video at 41:05–41:10.)

As the Court previously recognized, the two fire buffs may have blended into the scene to a certain extent due to their fire department garb. But they also stood out in some visible ways. For example, one of the fire buffs is seen on video of the incident wearing shorts rather than long pants, and he is the only individual in FDNY garb seen wearing such shorts on the scene. (Ramos Video at 41:05–41:10.) It is also undisputed that at least one City public information officer on the scene asked Ramos to back away from the rescue operations, which could be seen to indicate that this officer knew that Ramos was not a member of any of the City's rescue teams, yet this officer did not expel Ramos from the block entirely. (Dkt. No. 193 ¶ 55.) Finally, it is further undisputed and confirmed by Ramos's video that Individual Defendant DeBonis passed directly in front of Ramos just moments before DeBonis expelled Nicholas from the scene. (*Id.*; Ramos Video at 39:23–39:49.)

Evidence of the dialogue among Nicholas, DeBonis, and Davis during Nicholas's expulsion from the scene buttresses the conclusion that the content of Nicholas's speech may have contributed to his expulsion. Specifically, Nicholas's testimony, if believed, that DeBonis warned Nicholas that the rescued worker would likely die and that Nicholas should take that fact into account prior to disseminating any of his footage of the rescue, could be taken to indicate that he was concerned about the content of the reporting he could expect from Nicholas, and that this content-based concern motivated Nicholas's expulsion from the scene. (*See* Dkt. No. 193 ¶ 87; *see also* Nicholas Video at 01:20–01:27 (in which Davis could be understood to sarcastically refer to Nicholas as "team player" during his expulsion from scene).) Plaintiff's evidence of the unequal treatment afforded to the fire buffs vis-a-vis himself, and the correlation between this differential treatment and the content of the coverage the Individual Defendants

might have expected from each of them, is sufficient to permit a reasonable jury to find that the Individual Defendants acted on a preference for the content of the fire buffs' speech over that of Nicholas.

A similar conclusion is warranted with respect to the City's policy of allowing its own press officials unrestricted access to the purported "frozen zone" on West 38th Street. "There is nothing inherently suspect about providing some kind of exemption to allow individuals who work [for] the [City] to enter or remain within the [City's frozen] zones," so long as the City "ensures that the exemption is limited to its purpose of allowing the employees to do their jobs." *McCullen*, 134 S. Ct. at 2533. But the Court here faces a "very different question [because] it turn[s] out that [the City] authorized [its press officials] to speak about [their work from] inside the [frozen zone]." *Id.* at 2534. If the "exemption for [the City] employees [was designed to] facilitate speech on only one side of [a] debate," that would be "a clear form of viewpoint discrimination that would support" Plaintiff's First Amendment claim. *Id.*

The record here contains evidence sufficient to call into question the assertion that the City restricted press access to the block only for purposes of ensuring public safety and the safety of the City's emergency responders. For example, John Grimm, Assistant Commissioner of Operations of the City's Office of Emergency Management, explained that his agency's press officers would often be allowed exclusive access to the scenes of emergency rescues in order to ensure that the City's "external messaging is being properly managed by the City" and that "there isn't differing information that is being made public." (Dkt. No. 201-10 at 97–98.) Indeed, the City's photographers posted a number of their photos of the scene to City social media accounts throughout the day on October 30, 2015, and private media outlets in turn asked to use or did in fact make use of those up-close photos of the scene in their own publications. (Dkt. No. 193 ¶¶ 42, 47–48.)

DeBonis and Davis continue to deny that they knew or were aware of the purpose or activities of the City photographers on the scene at the moment that they expelled Nicholas. (Dkt. No. 193 ¶ 42.) But as Plaintiff notes in his summary judgment brief, "the sheer volume of [City] photographers openly taking photos inside the so-called 'frozen zone' close to where Defendants [DeBonis and Davis] were standing [would permit] a reasonable jury . . . [to] conclude that, despite their denials, Davis and DeBonis *did* know that City photographers took photos for press purposes." (Dkt. No. 203 at 16 n.8 (internal citations omitted).) DeBonis and Davis also assert that Nicholas "mischaracteriz[es]" Grimm's testimony (Dkt. No. 193 ¶ 40), and indeed, Grimm later clarified that the City's desire to control what information reached the press about emergencies was only a "secondary" reason for allowing unlimited access for the City's own press officer to such locations (Dkt. No. 201-10 at 100). While these arguments may rebut the persuasiveness of Nicholas's evidence, they do not warrant summary judgment. A jury is entitled to evaluate all of this evidence, and it is for a jury to determine whether this evidence reflects that the Individual Defendants impermissibly enforced a policy allowing City press officials preferential access to this emergency rescue based on a preference for the content of their speech.

Finally, the Individual Defendants argue that even if the record evidence could support the conclusion that the policy of restricting press access into the frozen zone violated the First Amendment, no reasonable juror could find that their removal of Nicholas from the scene was unlawful. After all, they argue, it is beyond reasonable dispute that they removed Nicholas as a consequence of the safety hazard he posed and not in an effort to enforce a potentially unlawful policy based on speech content. (Dkt. No. 184 at 12–13.) But while DeBonis and Davis may have legitimately believed that Nicholas's conduct posed a unique safety hazard, a reasonable juror would be free to reject this contention in light of the presence of another City press official

48

on the scene engaging in conduct similar to Nicholas's. (Dkt. No. 193 ¶¶ 70–72.) Nicholas's position next to a City photographer at the moment DeBonis confronted him and removed him from the scene could be seen to belie Defendants' contention that his presence near the ambulance for purposes of newsgathering created a safety hazard worse than that posed by the presence of only the City's own press officials. (Dkt. No. 193 ¶ 70–72; Ramos Video at 39:30–39:42.) And because, for reasons already discussed, DeBonis and Davis's differential treatment of Nicholas and that City photographer may reasonably be attributed to the respective content of their speech, DeBonis and Davis are not entitled to summary judgment on their contention that this differential treatment did not violate the First Amendment.

"[C]ourts must [always] be cognizant of disguised attempts to refuse the fullest scope of free speech allegedly based on governmental concerns such as safety." *Tunick v. Safir*, No. 99 Civ. 5053, 1999 WL 511852, at *7 (S.D.N.Y. July 19, 1999), *aff'd*, 228 F.3d 135 (2d Cir. 2000) (per curiam). Here, "there are disputed issues of fact regarding whether the City's purported justifications for denying Plaintiff[]" access to the street adjacent to the ambulance are being used as "pretext for content based discrimination." *Nat'l Council of Arab Ams.*, 478 F. Supp. 2d at 494 (citing *Olivieri,* 801 F.2d at 606, for proposition "that issues of fact regarding whether purported justifications are pretextual may warrant a trial on the merits"). Because a reasonable jury could conclude that Davis and DeBonis unjustifiably treated Nicholas differently from the fire buffs or from the City's own press officials for content-based reasons, summary judgment cannot be granted to them on the question of their having provided equal access to the scene of the emergency rescue to all newsgatherers without reference to content.

### 3. Time, Place, and Manner Restriction

Even assuming that the City did adopt an access restriction to the scene of the building collapse on West 38th Street that was equally applicable to both the press and public, the Court's

First Amendment inquiry still remains unfinished. That is because in order to have so restricted open access to First Amendment activities such as newsgathering on a public street, an area the Supreme Court has described as occupying a "special position in terms of First Amendment protection," Defendants still must show that their restriction was a "reasonable restriction[] on the time, place, or manner of protected speech." *McCullen*, 134 S. Ct. at 2529 (first quoting *United States v. Grace,* 461 U.S. 171, 180 (1983); second quoting *Ward*, 491 U.S. at 791). To do so, Defendants must show three things: [1] that their chosen policy was "justified without reference to the content of the regulated speech, [2] that [it was] narrowly tailored to serve a significant governmental interest, and [3] that [it left] open ample alternative channels for communication of the information." *Id*. (quoting *Ward*, 491 U.S. at 791).

The parties cross-move for summary judgment on the question whether the "frozen zone" on West 38th Street and Defendants' enforcement of that frozen zone as against Nicholas qualified as the enforcement of a reasonable restriction on the time, place, or manner of Nicholas's newsgathering. (Dkt. No. 184 at 9–12; Dkt. No. 187 at 15–24.)[18]

### a. Content Neutrality

"In the analysis of whether a regulation is content-based or content-neutral, the 'principal inquiry . . . , in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the

---

[18]     In addition to the requirements articulated above, "time, place and manner restrictions of speech in public fora are [also] unconstitutional if they confer overly broad discretion on regulating officials. Thus, when assessing the constitutionality of a content-neutral time, place and manner restriction, the court must determine whether the regulation contain[s] adequate standards to guide the official's decision and render it subject to effective judicial review." *Nat'l Council of Arab Ams.*, 478 F. Supp. 2d at 488 (second alteration in original) (internal quotation marks and citations omitted). The parties do not address the question whether the absence of formal City policies or rules governing the creation of "frozen zones" runs afoul of this principle. Nicholas is not precluded from introducing this argument in connection with his *Monell* claims.

message it conveys.'" *Hobbs,* 397 F.3d at 149 (alteration in original) (quoting *Ward*, 491 U.S. at 791). This inquiry turns primarily on the purposes underlying the government's policy of restricting protected First Amended activities. "The existence of reasonable grounds for limiting access to a forum 'will not save a regulation that is in reality a facade for viewpoint-based discrimination.'" *Nat'l Council of Arab Ams.*, 478 F. Supp. 2d at 488 (quoting *Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.,* 473 U.S. 788, 811 (1985)).

As the Court has already discussed, there exists a genuine dispute of fact as to whether the "frozen zone" that Defendants contend NYPD had established on West 38th Street was based on or enforced with reference to content-neutral criteria. *See supra* Sections III.B.2.b, c. This is because a reasonable juror could construe the blanket exemption given to City press officials from the "frozen zone" policy as having been created either to further the legitimate government interest of protecting public safety, or, alternatively, for the purpose of furthering the illegitimate government interest of regulating the content of the speech that issued from the "frozen zone." *See id.* That same conclusion applies here. If a jury finds that the "frozen zone" on West 38th Street was designed to aid the newsgathering of particular journalists because of the content of their speech, that finding would dictate that the "frozen zone" was not a reasonable time, place, or manner restriction. Until that fact issue is resolved, summary judgment on this element of the time, place and manner test cannot be granted to any party.

**b.** **Narrow Tailoring**

Assuming *arguendo* that the "frozen zone" on West 38th Street was created for content-neutral purposes, the Court must consider whether that "frozen zone" was narrowly tailored to serve a significant government interest. *See McCullen*, 134 S. Ct. at 2529. The narrow-tailoring

requirement for content-neutral time, place, or manner restrictions is laxer than the tailoring requirement for content-based restrictions:

> For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests. Such a regulation, unlike a content-based restriction of speech, need not be the least restrictive or least intrusive means of serving the government's interests. But the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.

*Id.* at 2535 (internal quotation marks and citations omitted). The Supreme Court has instructed lower courts applying this standard not to "sift[] through all the available or imagined alternative means of regulating [a public interest] in order to determine whether [a proposed] solution [is] 'the least intrusive means' of achieving the desired end." *Ward*, 491 U.S. at 797. That said, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 134 S. Ct. at 2540.

Defendants describe the "frozen zone" that NYPD created at the scene of the building collapse as having stretched the entirety of the West 38th Street block, excluding only the insides of stores and buildings and the "designated press area" that was eventually established by Individual Defendants Davis and DeBonis when they arrived on the scene. (Dkt. No. 202 ¶ 22.) "Authorized emergency personnel" were also exempted from the "frozen zone." (Dkt. No. 193 ¶ 23.) Defendants contend that this "frozen zone" was narrowly tailored to "promote[] the substantial government interest of safety and the protection of human life." (Dkt. No. 184 at 11.) According to Defendants, a "frozen zone" of this extent and scope was required because West 38th Street was an area at which there was "an ongoing emergency response and the safety of certain persons and/or the public . . . would [have] be[en] compromised" if "[m]edia personnel and members of the public [were] allowed in." (Dkt. No. 202 ¶ 20; *see also* Dkt. No. 183 ¶ 8.)

The parties do not genuinely dispute that significant and substantial governmental interests were at stake on West 38th Street on October 30, 2015. Numerous courts have recognized the government's "significant interest in keeping its public spaces safe." *See, e.g.*, *Marcavage v. City of N.Y.*, 689 F.3d 98, 104 (2d Cir. 2012) (quoting *Bery v. City of N.Y.*, 97 F.3d 689, 697 (2d Cir. 1996)); *United for Peace and Justice v. City of N.Y.*, 243 F. Supp. 2d 19, 29 (S.D.N.Y. 2003) (describing the "significant government interest of public safety"). And as the Court has already exhaustively explored, the summary judgment record establishes beyond dispute that the City's interests in promoting public safety and saving lives were implicated by the emergency setting that was the scene of the October 30, 2015 building collapse. (*See* Dkt. No. 202 ¶¶ 14, 18; Dkt. No. 182-5 at 80; *see also generally* Dkt. No. 188-95 ("Ramos Video").) Accordingly, the frozen zone may at least be said to have "further[ed] the government's legitimate interests." *McCullen*, 134 S. Ct. at 2535 (quoting *Ward*, 491 U.S. at 799).

Nicholas does not take issue with most of the foregoing. But he does assert that the City's "frozen zone" policy was improperly tailored. (Dkt. No. 187 at 20–24.) Specifically, he contends that the enforcement of the frozen zone that resulted in his expulsion from the scene was overbroad because it "burden[ed] 'substantially more speech than [was] necessary to further the government's legitimate interest[]'" of ensuring the safety of those involved in the rescue operation. *McCullen*, 134 S. Ct. at 2535 (quoting *Ward*, 491 U.S. at 799).

Nicholas would be entitled to summary judgment on this contention if he could point to undisputed facts sufficient to establish as a matter of law that "a substantial portion of the burden on speech [that resulted did] not serve to advance [any of the City's legitimate] goals." *Id.* (quoting *Ward*, 491 U.S. at 799). But Defendants have produced evidence sufficient to support their contention that the closure of the entire West 38th Street block was an appropriate measure given the exigencies of the scene. The record is replete with testimony from FDNY and NYPD

officials describing the difficulties they faced in working to ensure that City vehicles and and personnel were able to access rescue operations. (*See, e.g.*, Dkt. No. 182-5 at 78–79 (FDNY official testifying that "[West] 38th Street . . . was a very narrow block [with] cars parked and work trucks parked . . . in front of the building in question"); Dkt. No. 182-2 at 95 (DeBonis describing large press presence on scene and spatial difficulties posed by press presence).) And video of the scene provided by fire buff Ramos buttresses this testimony. (*See, e.g.*, Ramos Video at 07:20–07:55 (depicting at least fifteen emergency vehicles on the western edge of the closed portion of the West 38th Street block); 17:17–17:53, 22:51–24:20, 27:00–29:39, 38:52–42:14 (depicting City emergency workers and vehicles covering nearly entire block adjacent to the collapsed building).)

With respect to the extent of the frozen zone, which extended past the collapsed building to the edges of West 38th Street, one FDNY official explained that while a closed area around a collapsed building will typically be initially established "in front of the building in question," that size of the zone may be expanded depending on the height of the collapsed building and any attendant risks posed by the possibility of further collapse. (Dkt. No. 182-5 at 77–80.) This official also explained that the closed area often must be expanded depending on a number of circumstance-specific features of the area, particularly those impacting the City's ability to get any necessary tools, equipment, and personnel to that location. (*Id.*) Yet again, Ramos's video confirms the applicability of these concerns to the scene of the October 30, 2015 collapse. (*See, e.g.*, Ramos Video at 13:57, 18:56 (depicting use of large equipment and tools on the scene of collapse); *see also* Dkt. No. 188-2 at 103 (Nicholas describing the "preparation of . . . beams, joists[,] and jacks" at the scene).) A reasonable juror could view all of this evidence as establishing that the City's choice to close the entirety of the West 38th Street block "promote[d]

a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (internal quotation marks omitted).

On the other hand, the record also contains evidence sufficient to permit a reasonable juror to conclude that substantially less restrictive measures readily available to the City would have achieved its legitimate goals with equal effectiveness. Importantly, because the record discloses a number of less restrictive alternatives by which the City might have achieved its interests, Defendants bear the burden of "demonstrate[ing] that alternative measures that burden substantially less speech would [have] fail[ed] to achieve [its] interests." *McCullen*, 134 S. Ct. at 2539–40 (considering preexisting state laws and policies in holding that the state had "available to it . . . [other] approaches that appear[ed] capable of serving its interests, without excluding individuals from areas historically open for [First Amendment activities]"). Here, Nicholas has produced photographic and video evidence showing that a number of civilians safely and without incident traversed the "frozen zone" throughout the rescue operation, including immediately before and after the trapped worker's transfer from the building to the ambulance. (*See, e.g.*, Ramos Video at 31:04–31:09, 40:50–40:58, 41:10–41:18; *see also* Dkt. Nos. 188-30, 188-31, 188-32, 188-33 at 2, 5 (pictures of civilians standing in or walking through the frozen zone).) He has also produced evidence showing that a number of these civilians engaged in the protected First Amendment activity of newsgathering by taking of pictures and videos on the scene. (*See, e.g.*, Ramos Video at 19:50–19:51, 40:30–40:31; *see also* Dkt. No. 188-33 at 4 (picture of civilian taking photo of rescue operation from inside frozen zone).) Finally, Ramos's video also depicts a significant number of City personnel freely moving about the scene with cameras and

cellphones,[19] including some who took pictures and videos in the immediate vicinity of the emergency responders working near the collapsed building or tending the rescued worker as he was being lifted into the ambulance. (*See, e.g.*, Ramos Video at 33:06–33:15, 33:43–34:24, 40:10–40:14.) Taken together, this evidence indicates that the closure of the entire block to the public and the confining of the press to a one specific area on the block may have "regulate[d] expression in such a manner that a substantial portion of the burden on speech [that resulted did] not serve to advance [the City's] goals." *McCullen*, 134 S. Ct. at 2535.

On the basis of these genuine disputes of fact, summary judgment cannot be granted to either party on the tailoring element of the time, place, and manner restriction analysis as applied to the West 38th Street "frozen zone."

### c.    Alternative Channels

Nicholas moves for summary judgment on the contention that even if the time, place, or manner restriction that was the "frozen zone" was content neutral and properly tailored, it runs afoul of the First Amendment because it failed to "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791. "The requirement that ample alternative channels exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand." *Marcavage*, 689 F.3d at 107 (internal quotation marks omitted). Instead, "[a]ll that is required is that an alternative channel be ample—*i.e.*, an adequate[.]" *Id.* (internal quotation marks omitted). "Whether an alternative channel is adequate cannot be determined in an objective vacuum, but instead requires practical recognition [of] the facts." *Id.* at 108 (alteration in original) (internal quotation marks omitted).

---

[19]        In all, Plaintiff has produced evidence confirming that at least fifteen City employees took photographs or videos of the rescue from the area DeBonis and Davis describe as the "frozen zone." (Dkt. No. 193 ¶ 41.)

Here, the Court concludes that genuine disputes of fact preclude granting summary judgment to either party on the question whether the designated press area that DeBonis and Davis established inside the "frozen zone" constituted an adequate alternative channel under the time, place, or manner rubric.

There are a number of genuine fact disputes specific to whether those in the designated press area had a clear line of sight of the collapsed building sufficient to allow them to document and gather any news regarding the rescue. (*See, e.g.*, Dkt. No. 193 ¶ 29 (citing conflicting witness testimony on this question); Dkt. No. 188-13 at 110 (journalist in designated press area expressing that "in the position we were in in this situation it was impossible to . . . accurately depict the actual activity going on in the rescue efforts that were happening in that day"); Dkt. No. 183 ¶ 16 (DeBonis describing designated press area as one from which "the media to be within the sight of and to hear sounds from the ongoing emergency response" and from which "[m]edia personnel were able to film and report").) Photos taken from inside the designated press area could be viewed as supporting either of the parties' conflicting descriptions of the view available from that area. (*See generally* Dkt. No. 188-33.) These photos confirm that DCPI in fact provided the press an area from which to gather news that was inside the police tape closing West 38th Street, but these photos also show a number of civilians standing even closer to the rescue operation without any apparent interference with the rescue, and they also confirm that the ambulance that arrived to transport the worker trapped inside the collapsed building blocked the press area's direct view of the scene. (*See id.*) This ambiguous photographic evidence, particularly when viewed in the context of disputed fact questions going to whether the "frozen zone" as a whole was properly tailored, forecloses summary judgment for either party on the question of the adequacy of the alternative channels for newsgathering Defendants provided at the scene of the building collapse.

### 4.   Individual Defendant's Liability and Qualified Immunity

Individual Defendants Davis and DeBonis move for summary judgment on Nicholas's First Amendment claims against them in their individual capacities on two additional grounds: (1) lack of personal involvement in the asserted constitutional violation sufficient to establish individual Section 1983 liability (Dkt. No. 184 at 15–17); and (2) qualified immunity (Dkt. No. 184 at 35–38).

### a.   Personal Involvement

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983.'" *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994)). Accordingly, in a Section 1983 suit "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).

Davis and DeBonis contend that their role at the scene of the building collapse was limited to the establishment of a designated press area and the removal of Nicholas from alongside the ambulance, and that these two actions by themselves do not constitute a First Amendment violation.  (Dkt. No. 184 at 16.)  According to Davis's deposition testimony, his responsibilities at the emergency site were limited to "deal[ing] with whatever press was on the scene . . . and keep them informed of what was happening and to help establish a place where they could observe the activity at the scene."  (Dkt. No. 182-1 at 39.)  The Individual Defendants emphasize that neither Davis nor DeBonis played any role in creating what they describe as the "frozen zone" or in the decision to permit other City press officials to freely access the scene. (Dkt. No. 184 at 16 –17.)

Davis and DeBonis's argument is insufficient to warrant summary judgment for two reasons. First, the Second Circuit has held that a law enforcement officer's personal involvement in the execution of an unconstitutional policy may by itself be sufficient to establish Section 1983 liability, even in cases where that officer played no role in creating that policy. *See Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (officers who "actually enforced [unconstitutional parole c]ondition by arresting [plaintiff] . . . clearly [had] personal involvement in any violation of [plaintiff's] constitutional rights"). Accordingly, so long as Davis and DeBonis's acts of confining the civilian press to the designated press area and of expelling Nicholas from the scene for his violation of the "frozen zone" were effectuated pursuant to the City's unconstitutional restrictions on newsgathering, they may be held personally liable under Section 1983.

Second, even putting the *Farrell* principle aside, the genuine dispute of fact as to whether DeBonis and Davis themselves treated Nicholas differently from the fire buffs on the scene for content-based reasons also precludes summary judgment for lack of personal involvement. As already explored, there is a genuine dispute of fact as to whether Davis and DeBonis undertook their personal obligation of "deal[ing] with whatever press was on the scene" (Dkt. No. 202 ¶ 26) differently with respect to Nicholas and the fire-buffs for content-based reasons, *see supra* Section III.B.2.c. To the extent that the frozen zone was being enforced in a content-discriminatory manner, then, Plaintiff has produced evidence sufficient to show that Davis and DeBonis were themselves entirely culpable for any corresponding First Amendment violation.

Accordingly, Davis and DeBonis's motion for summary judgment on the basis of their limited personal involvement in Plaintiff's alleged constitutional injury is denied.

### b. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). In assessing an individual defendant's entitlement to qualified immunity, courts must consider two separate questions: (1) whether the individual defendant violated a federal statutory or constitutional right, and (2) whether the unlawfulness of the individual defendant's conduct was clearly established at the time of the violation. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).

With respect to question one, as the Court has already discussed, the conduct of Davis and DeBonis may have amounted to a violation of Nicholas's First Amendment rights under two distinct theories: (1) impermissible content-based differential treatment of members of the press, *see supra* Section III.B.2.c.; or (2) the enforcement of an unreasonably tailored time, place, or manner restriction, *see supra* Section III.B.3.b. Having identified these two possible constitutional violations, the Court must turn to the question whether the unlawfulness of these aspects of Davis and DeBonis's conduct was clearly established as of October 30, 2015. *See Wesby*, 138 S. Ct. at 589.

This inquiry, in turn, must result in a grant of qualified immunity if either "of two conditions is satisfied: (a) the defendant's action did not violate *clearly established* law, or (b) it was *objectively reasonable* for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (emphases added) (quoting *Russo v. City of Bridgeport,* 479 F.3d 196, 211 (2d Cir. 2007)). Furthermore, a plaintiff cannot avoid qualified immunity merely by showing that the broad rule of law a defendant is alleged to have violated was clearly established at the time of the violation; for a right to be "clearly established" for purposes of qualified immunity, the right must be "'clearly established' in a more particularized, and hence more relevant, sense." *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (quoting *Anderson*

*v. Creighton*, 483 U.S. 635, 640 (1987)).  In addition, courts in this Circuit must consider only "Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right." *Garcia*, 779 F.3d at 92 (quoting *Okin v. Vill. of Cornwall-on-Hudson Police Dep't,* 577 F.3d 415, 433 (2d Cir. 2009)). However, the "'absence of a decision by [the Second Circuit] or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established' so long as preexisting law 'clearly foreshadow[s] a particular ruling on the issue.'" *Id.* (second alteration in original) (quoting *Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000)).

Finally, courts considering assertions of qualified immunity must always remember that "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments.'" *Messerschmidt*, 565 U.S. at 546 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  This means that the qualified immunity standard "is 'forgiving' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001)).

With these principles in mind, the Court turns to the question whether Davis and DeBonis are entitled to qualified immunity with respect to Plaintiff's surviving First Amendment claims against them.

### i.   Content-Based Differential Treatment of the Press

The Court has now denied the parties' cross-motions for summary judgment on Nicholas's claim that Davis and DeBonis engaged in unjustified content-based differential treatment of members of the press, citing genuinely disputed fact questions.  *See supra* Section III.B.2.c.  These same disputed fact questions also require denying Davis and DeBonis's motion for summary judgment based on qualified immunity at this stage.

As of October 30, 2015, the First Amendment bar on unjustified content-based discrimination between different members of the press was clearly established in the Second Circuit. In *ABC, Inc. v. Cuomo*, 570 F.2d 1080 (2d Cir. 1977), the Second Circuit held that "once there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media," *id.* at 1083, grounding its holding in the recognition that any other rule might result in "those of the media who are in opposition [to the regulating government entity] or who the [regulating government entity] thinks are not treating [it] fairly [being] excluded," *id.* at 1083. Despite the "'complex and nuanced contours of First Amendment [l]aw,' . . . a reasonable officer in [Davis and DeBonis's] position would not have believed that the First Amendment permitted [them] to choose which people could" gather news from the frozen zone with reference to "content-based restrictions" on newsgathering. *Deferio*, 306 F. Supp. 3d 517 (quoting *Zalaski v. City of Hartford*, 838 F. Supp. 2d 13, 47 (D. Conn. 2012)).

As the Court has explained, there exists a live fact question with respect to whether Davis and DeBonis targeted Nicholas for removal from the scene because of their personal dislike of the content of his speech rather than security concerns. (*See, e.g.*, Dkt. No. 193 ¶ 87 (DeBonis allegedly disparaging Nicholas for taking pictures of possibly dead accident victim); Nicholas Video at 01:25–01:27 (Davis seeming to refer sarcastically to Nicholas as "team player" during his expulsion from scene).)[20] "[W]here a more specific intent is actually an element of the plaintiff's claim as defined by clearly established law, it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Locurto v. Safir*, 264 F.3d

---

[20]  Davis and DeBonis also contend that an objectively reasonable officer in their situation might have singled out Nicholas for expulsion from the frozen zone for the content-neutral reason of his uniquely close proximity to the ambulance. But, as the Court has already explained, a reasonable juror could reject this explanation as pretextual.

154, 169 (2d Cir. 2001). And with respect to determining whether a restriction on speech is impermissibly based on content, "[t]he government's purpose is the controlling consideration." *Ward*, 491 U.S. at 791. Indeed, any other conception of the law would amount to a green light to government officers to intentionally discriminate based on content, so long as those officers could later conceive of any pretextual content-neutral reason for their having acted that way. The law in the Second Circuit is clear, however, "that issues of fact regarding whether purported justifications are pretextual may warrant a trial on the merits" to ensure that any purported justifications for restrictions on First Amendment activity are genuine. *Nat'l Council of Arab Ams.*, 478 F. Supp. 2d at 494 (citing *Olivieri,* 801 F.2d at 606).

Here, the live factual issue as to DeBonis and Davis's content-based discriminatory purpose precludes a grant of summary judgment for defendants Davis and DeBonis, both on the merits and on qualified immunity grounds. On the basis of the clearly announced principle in *ABC, Inc. v. Cuomo* that differential treatment of members of the press runs afoul of the First Amendment, no reasonable officer in Davis and DeBonis's situation would have failed to realize that content-based discrimination between different journalists on the scene of the building collapse would run afoul of governing Second Circuit law. Here, the record allows for the conclusion that Defendants Davis and DeBonis acted on their personal preference for the speech of some journalists over others, or at least in furtherance of a "frozen zone" they knew granted preferential access to the scene to the City's own press officials for content-based reasons. Because of unresolved fact questions going to whether Davis and DeBonis's differential treatment of newsgatherers inside the West 38th Street frozen zone was a byproduct of content-based discrimination, Davis and DeBonis cannot yet be granted qualified immunity on this First Amendment claim.

###### ii. Enforcement of an Unreasonable Time, Place, or Manner Restriction

Assuming *arguendo* that the City's "frozen zone" on West 38th Street was designed and

enforced with reference to content-neutral criteria, the question remains whether DeBonis and

Davis are entitled to qualified immunity with respect to Nicholas's claim that the West 38th

Street "frozen zone" was an unreasonable time, place, or manner restriction on newsgathering.

*See supra* Section III.B.3.b.  The Court concludes that they are.  Even if the "frozen zone" was

overbroad or failed to leave open sufficient alternative channels for newsgathering, Davis and

DeBonis are entitled to qualified immunity on this aspect of Nicholas's First Amendment claim,

because it would have been "objectively reasonable for [them] to believe that [their] action[s] did

not violate [First Amendment] law."  *Garcia*, 779 F.3d at 92 (quoting *Russo*, 479 F.3d at 211).

 Here, DeBonis and Davis found themselves in the midst of a live emergency scene, one

in which they and their colleagues describe themselves as having been forced to make on-the-fly

decisions with respect to the extent to which public and press access could be safely permitted.

(*see, e.g.*, Dkt. No. 182-2 at 95; Dkt. No. 182-5 at 78–80.)  As the Court has explained, there

may be some genuine disputes of fact pertaining to whether the scope of the resulting frozen

zone was overbroad.  (*See, e.g.*, Dkt. No. 202 ¶¶ 9, 15–17 (describing parties' disputes with

respect to extent of emergency operations).)  But even when resolving all of these factual

disputes in a manner favorable to Nicholas, the unambiguous video evidence of the rescue

sufficiently corroborates Defendants' descriptions of the scene as requiring *some* sort of

limitations on public and press access.  (*See generally* Ramos Video.)   And mindful that

"[q]ualified immunity 'gives government officials breathing room to make reasonable but

mistaken judgments,'" *Messerschmidt*, 565 U.S. at 546 (quoting *al-Kidd*, 563 U.S. at 743), the

Court cannot say that Davis and DeBonis's "judgment was so flawed that no reasonable officer

would have made a similar choice" when deciding whether and how to regulate public and press access to the emergency rescue. *Provost* 262 F.3d at 160 (internal quotation marks omitted).

Accordingly, and assuming for purposes of this analysis that DeBonis and Davis's decisions were made with reference to content-neutral criteria, the Court concludes that they are entitled qualified immunity with respect to Nicholas's contention that they enforced an improperly tailored time, place or manner restriction that lacked ample alternative channels.

## C. Procedural Due Process

The parties cross-move for summary judgment on Nicholas's procedural due process challenge to the process that was afforded to him following the suspension of his press credential. (Dkt. No. 184 at 19–30; Dkt. No. 187 at 24–40.) "To determine whether a plaintiff [has been] deprived of [liberty or] property without due process of law in violation of the Fourteenth Amendment, [courts] must first identify the property [or liberty] interest involved. Next, [courts] must determine whether the plaintiff received constitutionally adequate process in the course of the deprivation." *O'Connor v. Pierson*, 426 F.3d 187, 196 (2d Cir. 2005). The Court addresses each of these two questions in turn.

### 1. Protected Interest

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972). The parties dispute whether Plaintiff held either a liberty interest or a property interest in his NYPD-issued press credential sufficient to entitle him to the protections of due process. (Dkt. No. 184 at 19–24; Dkt. No. 187 at 24–34.)

For the reasons that follow, the Court determines that Plaintiff did have a protected liberty interest in the continued enjoyment of his NYPD-issued press credential.[21]

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty.'" *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). The Supreme Court has long assumed that the rights guaranteed by the "First Amendment . . . are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States." *Gitlow v. New York*, 268 U.S. 652, 666 (1925); *see also Roth*, 408 U.S. at 575 n.14 (explaining that due process may be required before "a State [may take action that] would directly impinge upon interests in free speech or free press").

Equally entrenched in Supreme Court case law is the principle that the First Amendment's protections for free speech include a constitutionally protected right to gather news, for "without some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg*, 408 U.S. at 681. And precedents in this Circuit make clear that among the rights to newsgathering protected by the First Amendment is the guarantee of equal access for members of the press to any areas open to some members of the press.[22] *See, e.g.*, *ABC*, 570 F.2d at 1083.

_____

[21] Because the Court holds that Plaintiff had a protected *liberty* interest in the continued enjoyment of his NYPD-issued press credential, the Court need not address the parties' arguments with respect to whether Nicholas also held a protected *property* interest in the credential.

[22] *ABC* did not provide a standard or definition to be used to determine whether a person qualifies as a member of the press or media entitled to assert this First Amendment right. *See ABC*, 570 F.2d at 1082–83. Here, the parties do not dispute that Nicholas has been in possession of an NYPD press credential for more than ten years (Dkt. No. 193 ¶ 4; Dkt. No. 202 ¶ 81), and that the Rules of the City of New York expressly limit the category of those eligible for such credentials to "members[s] of the press," 38 RCNY § 11-01(b). This is sufficient for purposes of establishing that Nicholas qualifies as a member of the press entitled to enjoy the right of "equal access to all of the media" to any "public function [open to] participation by some of the media." *ABC*, 570 F.2d at 1082–83.

66

On the basis of these principles, the D.C. Circuit has held that a "bona fide" journalist's right to obtain press credentials qualifies as a protected liberty interest subject to the due process clause, even when those credentials provide access to areas closed to the general public. *Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977). *Sherrill* involved a journalist's challenge to the procedures afforded to him following the White House Press Office's denial of his application for a White House press pass on the recommendation of the Secret Service, *id.* at 126–27. In denying the journalist's application, the Press Office had disclosed to the applicant only that the denial was based on "reasons relating to the security of the President," but the Secret Service refused to provide the journalist with any further information regarding that decision or any opportunity for him to review or challenge the basis for that determination. *Id.* at 127. On its way to holding that the Secret Service's procedures fell short of the requirements of procedural due process, the D.C. Circuit determined that "the interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the [F]irst [A]mendment," and that this "[F]irst [A]mendment interest undoubtedly qualifies as [a] liberty which may not be denied without due process of law." *Id.* at 130.

District courts in the District of Columbia continue to faithfully adhere to the holding in *Sherrill*. *See, e.g.*, *Cable News Network, Inc. v. Trump*, No. 18 Civ. 2610, Dkt. No. 23-1 at 8 (D.D.C. Nov. 16, 2018) ("*Sherrill* holds that once the White House opens a portion of it up to reporters for their use, some kind of First Amendment liberty interest protected by a due process right is created, and I [must] apply that precedent here."). The Second Circuit has also favorably cited *Sherrill* for the principle that "[n]ot only news[people] and the publications for which they write, but also the public at large have an interest protected by the [F]irst [A]mendment in assuring that restrictions on newsgathering be no more arduous than necessary." *Huminski*, 396 F.3d at 84 (quoting *Sherrill*, 569 F.2d at 129–30).

Defendants argue that this Court should decline to adopt *Sherrill*'s holding regarding a journalist's liberty interest in obtaining a press pass, because *Sherrill* erroneously expanded the scope of liberty interests protected by the First Amendment to encompass a right of access to areas that government entities may in their discretion close to the public. (Dkt. No. 214 at 2.) It is of course true that "the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684. But as the court in *Sherrill* persuasively explained, in rejecting an identical argument by the Secret Service, that the First Amendment calculus changes once the government chooses to open the door to *some* press:

> [The Secret Service] argue[s] that because the public has no right of access to the White House, and because the right of access due the press generally is no greater than that due the general public, denial of a White House press pass is [not ordinarily] violative of the [F]irst [A]mendment. . . . [But] there exist additional [F]irst [A]mendment considerations ignored by [the Secret Service]. . . . [W]e are presented with a situation where the White House has voluntarily decided to establish press facilities for correspondents who need to report therefrom. These press facilities are perceived as being open to all bona fide Washington-based journalists, whereas most of the White House itself, and press facilities in particular, have not been made available to the general public. White House press facilities having been made publicly available as a source of information for newsmen, the protection afforded newsgathering under the [F]irst [A]mendment guarantee of freedom of the press[] requires that this access not be denied [without due process]. Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the [F]irst [A]mendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from sources of information.

*Sherrill*, 569 F.2d at 129–30 (internal citations and footnotes omitted).

This Court agrees with the principles announced in *Sherrill* and concludes that those principles govern here. As with access to the White House in *Sherrill*, here the parties do not dispute that the City has created a system allowing for possessors of NYPD-issued press credentials to access areas to which the public has no general right of access, such as NYPD

press conferences or, subject to safety concerns, the areas inside police lines. (Dkt. No. 193 ¶¶ 8–9.) Also as in *Sherrill*, the City here has put in place a system whereby NYPD-issued press credentials are made available to any "bona fide" journalist who is able to satisfy certain criteria. (Dkt. No. 201-4 at 99–103.) Moreover, like *Sherrill, see* 569 F.2d at 127, this case involves a press pass denied or withheld for reasons purportedly relating to security (Dkt. No. 202 ¶¶ 52, 55). And finally, as in *Sherrill*, it is also well established in this Circuit that all members of the press must be afforded access to newsgathering on fairly equal terms once any space is opened to some members of the press. *Compare Sherrill*, 569 F.2d at 130 ("[I]ndividual news[people] [may] not be arbitrarily excluded from sources of information.") *with ABC*, 570 F.2d at 1083 ("[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media . . . .").

Defendants present no compelling reason to depart from *Sherrill*'s holding, which was based on binding Supreme Court case law as applied in a context not meaningfully distinguishable from that presently before the Court. Finding *Sherrill* persuasive, the Court adopts its reasoning. Accordingly, the Court in this case "conclude[s] that notice, opportunity to rebut, and a written decision are required" following the denial, suspension, or revocation of an NYPD-issued press pass, "because the denial of a pass potentially infringes upon [F]irst [A]mendment guarantees," including a journalist's right to gather news on equal terms with her fellow journalists. *See Sherrill*, 569 F.2d at 128.

### 2. Due Process

The Court now turns to consideration of the adequacy of the process Defendants provided Nicholas following their summary suspension of his credential press credential on October 30, 2015. The Court need only address one requirement of procedural due process: notice. The Court concludes that Defendants' failure to provide Nicholas with practically any notice at all

regarding the status of his press credential or the remedial measures available to him, either at or following the incident at issue in this case, fell short of the requirements of procedural due process.[23]

"An elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to [provide] interested parties . . . [with] an opportunity to present their objections" to the state action at issue. *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950).[24] In the context of notice of license revocations or suspensions, courts have recognized that the while the "particularity with which alleged misconduct [giving rise to the revocation or suspension] must be described varies with the facts and circumstances of the individual case . . . , due process notice contemplates specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations." *Spinelli, v. City of N.Y,* 579 F.3d 160, 172 (2d Cir. 2009). "Thus, notice must do more than simply inform an aggrieved party of his entitlement to a hearing." *Nnebe v. Daus*, 184 F. Supp. 3d 54, 74 (S.D.N.Y. 2016). Instead, constitutionally sufficient "notice must adequately inform the party as to what the critical issues of the hearing will be, for purposes of permitting the party to present his objections to the decisionmaker." *Id.* (internal quotation marks and alterations omitted). This is because those deprived of a protected interest "cannot know *whether* a challenge to [that

---

[23]     For purposes of this analysis only, the Court assumes that the exigencies of the building collapse created a "necessity of quick action by the State" that justified the seizure of Nicholas's credential prior to providing him with "any meaningful predeprivation process." *Burtnieks v. City of N.Y.*, 716 F.2d 982, 988 (2d Cir. 1983) (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)).

[24]     Although *Mullane* involved a challenge to notice of a pending judicial proceeding by which absent parties would be bound but of which they would otherwise be unaware, *see Mullane*, 339 U.S. at 312–13, courts have applied its foundational principles in the context of license revocations or suspensions, *see, e.g.*, *Spinelli v. City of N.Y*, 579 F.3d 160, 172 (2d Cir. 2009) (applying *Mullane* standard to notice of revocation of gun dealer license); *Nnebe v. Daus*, 184 F. Supp. 3d 54, 74 (S.D.N.Y. 2016) (applying *Mullane* standard to notice of suspension of taxi license).

government] action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the [ ] action." *Kapps v. Wing*, 404 F. 3d 105, 124 (2d Cir. 2005) (considering notice following denial of energy subsidies for low income households). "The degree of required specificity also increases with the significance of the interests at stake." *Spinelli*, 579 F.3d at 172.

When considering the adequacy of the notice afforded to an individual deprived of a protected liberty or property interest, courts apply the three-part balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See, e.g.*, *Kapps*, 404 F.3d at 123–26; *Spinelli*, 579 F.3d at 170–72. *Mathews* requires that courts evaluating the sufficiency of the process afforded to a plaintiff weigh: "(1) the private interest affected, (2) the risk of erroneous deprivation through the procedures used and the value of other safeguards, and (3) the government's interest." *Spinelli*, 579 F.3d at 170 (citing *Mathews*, 424 U.S. at 335). Applying that framework here with respect to the notice afforded to Nicholas following the summary suspension of his press credential on October 30, 2015, the Court concludes that Nicholas is entitled to summary judgment on his assertion that it fell short of the requirements of procedural due process.

The Court begins with a comprehensive summary of *all* of the communications exchanged between Nicholas and Defendants in the time between their initial suspension of his credential on October 30, 2015 and his commencement of this action on December 8, 2015. The communications recounted below constitute all of the notice Nicholas received with respect to the basis for Defendants' seizure of his credential, the status of his credential following that seizure, and the mechanisms by which he might contest Defendants' decision.

The majority of these communications occurred at the scene of the building collapse itself, and came from DeBonis and Davis during their altercation with Nicholas that culminated in the suspension of his credential. As DeBonis removed Nicholas from alongside the

71

ambulance, he said to Nicholas: "What are you doing?  What are you doing?  What are you

doing?  You're not allowed behind the press line.  You're not allowed behind this . . . .  Walk

with me."  (Dkt. No. 193 ¶ 77; Nicholas Video at 00:33–00:42.)  The following exchange

between Davis and Nicholas then followed:

> Davis:  "You know what the—you know what the rules are here pal."
>
> Nicholas:  "What do you mean?  I've been in there the whole time."
>
> Davis:  "Yeah?  Good for you.  This is the last time you'll do that."
>
> Nicholas:  "What do you mean?"
>
> Davis:  "You know what I mean.  Everyone else is over there working with us.
> We work with you all the time.  Don't bullshit me."
>
> Nicholas:  "How do I know?  How do I know that?"

(Dkt. No. 193 ¶ 80–82; Nicholas Video at 00:55–01:10.)

Davis also told DeBonis, in Nicholas's presence, to "[h]old on to [the credential].  And

talk to me before you think about giving it back.  Alright?  Me personally."  (Dkt. No. 193 ¶ 83;

Nicholas Video at 01:14–01:19.)  Nicholas then appears to have remarked that he had been

"staying out of the way," and Davis appears to have answered by telling Nicholas: "Get out of

here.  Get out of here.  Team player."  (Dkt. No. 193 ¶¶ 84, 86; Nicholas Video at 01:20–01:26.)

Following this exchange, Nicholas avers that DeBonis explained to Nicholas that the rescued

construction worker might die, although DeBonis denies having said that.  (Dkt. No. 193 ¶ 87.)

The record does not contain any evidence of any other specific communications between

Defendants to Nicholas at the scene of the collapse.

Nicholas also sent DeBonis a number of emails prior to the commencement of this action,

only some of which DeBonis confirms that he received.  (Dkt. No. 193 ¶¶ 97–102.)  In one of the

emails DeBonis has confirmed that he received, Nicholas indicated that he was "available,

should it be convenient for [DeBonis] and [DCPI Davis] to discuss [Nicholas's conduct at the site of the building collapse] further." (Dkt. No. 193 ¶¶ 99–100; Dkt. No. 183-5.) When DeBonis received this email, he circulated it to three of his colleagues at NYPD, including to Defendants Whyte and Davis, but he never responded to Nicholas. (*See id.*; *see also* Dkt. No. 201-4 at 225.) DeBonis did respond to one of Nicholas's other emails, however, by sending Nicholas the following email text: "FROZEN ZONE." (Dkt. No. 193 ¶ 98; Dkt. No. 188-70.)

Defendants do not contend that DeBonis, Davis, or any other City officials engaged in any further correspondences with Nicholas or that they provided him with any other information regarding the status of his press credential in the period spanning from October 30, 2015, the date of the building collapse, through December 8, 2015, the date of Nicholas's commencement of the instant action. (*See, e.g.*, Dkt. No. 193 ¶¶ 103, 106; Dkt. No. 201-5 at 224–25.) Instead, Defendants have asserted that they were under no obligation to provide Nicholas with any other information regarding his credential's status until he had formally requested a "Section 11-11" hearing pursuant to Title 38, Chapter 11 of the Rules of the City of New York. (*See, e.g.*, Dkt. No. 193 ¶ 104; Dkt. No. 201-5 at 226 ("The way you would [learn the status of a seized press credential] would be to contact [DCPI] and ask for a hearing as to your press card being returned.").) With respect to Nicholas's contention that he first learned of the availability of a Section 11-11 hearing during oral argument on his motion for a preliminary injunction (Dkt. No. 43 at 6), Defendants maintain that Nicholas had been on constructive notice of the availability of a Section 11-11 hearing prior to that date because of its codification in the Rules of the City of New York (Dkt. No. 193 ¶ 105).

Defendants further contend that they did not construe Nicholas's email in which he said, "I am, of course, available, should it be convenient for you and the Deputy Commissioner to discuss this further" (Dkt. No. 183-5), as a request for an opportunity to be heard, because it was

part of an "apology letter" in which Nicholas acknowledged that he had acted wrongfully (Dkt. No. 201-4 at 225, 227; *see also* Dkt. No. 13 ¶¶ 21–22). Finally, Defendants maintain that Nicholas received adequate notice of the pendency of his Section 11-11 hearing once he finally requested that hearing in May 2016 following oral argument on Nicholas's motion for a preliminary injunction. (Dkt. No. 193 ¶ 106.)

The Court turns now to the test provided in *Mathews v. Eldridge*, 424 U.S. 319 (1976). With respect to the first *Mathews* factor, the private interest affected, the Court concludes that Nicholas's First Amendment interest in the credential is substantial. The Second Circuit has recognized that "the rights accorded by the First Amendment provide quintessential protection for the individual." *Huminski*, 396 F.3d at 83. In so holding, the Second Circuit has emphasized the degree to which any "person singled out for exclusion [from access to public proceedings in violation of the First Amendment] is placed at an extraordinary disadvantage in his or her attempt to compete in the 'marketplace of ideas.'" *Id.* at 84. *Accord Sherrill*, 569 F.2d at 129 – 30 ("[N]ews[people][, along with] the publications for which they write [and] the public at large[,] have an interest protected by the [F]irst [A]mendment in assuring that restrictions on newsgathering [not result in] individual news[people] [being] arbitrarily excluded from sources of information.")

The Second Circuit has also recognized that "interests[] implicating the practice of one's chosen profession are substantial." *Spinelli*, 579 F.3d at 172 (internal quotation marks and citations omitted). Applying that principle here confirms the significance of Nicholas's interest in continued enjoyment of his press credential. The record reflects that Nicholas's assigning editors at the *Daily News* gave him fewer assignments following the suspension of his credential, and that Nicholas avers that he was also unable to obtain work as a photojournalist with other news outlets during the period he was without a press credential. (Dkt. No. 193 ¶¶ 127–32.)

74

Despite the presence of some yet-unresolved fact questions going to the extent to which possession of an NYPD-issued press credential is akin to a job requirement for a photojournalist in New York City, the undisputed facts in the record confirming that the suspension of Nicholas's credential at least "implicat[ed]" his ability to pursue his chosen profession lend further support to the Court's conclusion that Nicholas's interest in the credential qualifies as "substantial." *Spinelli*, 579 F.3d at 172.

Ultimately, however, even if the Court were to hold that Nicholas's interest in continued enjoyment of his press credential was a relatively insignificant private interest, factors two and three of the *Mathews* test weigh so substantially in his favor that the Court would still conclude that the notice afforded to Nicholas was constitutionally deficient as a matter of law.

*Mathews* factor two requires that courts consider "the risk of erroneous deprivation through the procedures used and the value of other safeguards." *Id.* at 170 (citing *Mathews*, 424 U.S. at 335). Accordingly, here the Court will consider the extent to which the notice Nicholas actually received mitigated the risk of prolonged erroneous deprivation of his press credential.

"Notice, to comply with due process requirements, . . . must set forth the alleged misconduct with particularity." *In re Gault,* 387 U.S. 1, 33 (1967) (internal quotation marks omitted). As video evidence at the scene confirms, Defendants provided Nicholas with the following descriptions of the misconduct he was accused of having committed at the time of his credential's suspension: "you're not allowed behind the press line," "you know what the rules are here," "you know what I mean,"  "everyone else is over there working with us," "we work with you all the time," and  "don't bullshit me."  (Nicholas Video at 00:33–01:09.)  Other than these communications, the only further information Defendants provided to Nicholas regarding his alleged misconduct was in an DeBonis sent to Nicholas saying only: "FROZEN ZONE." (Dkt. No. 193 ¶ 98.)  This fell short of Defendants' obligation to provide Nicholas with

"specifications of acts or patterns of conduct, not general, conclusory charges unsupported by specific factual allegations." *Spinelli*, 579 F.3d at 172.

Also absent from the relevant communications between Defendants and Nicholas are any descriptions of the status of his credential, namely its having been "summarily suspended,"[25] or perhaps more importantly, the methods by which Nicholas might access the remedial measures available to him. In all of the communications between Nicholas and Defendants following the seizure of his credential that are reproduced in the summary judgment record, the only reference Defendants made to Nicholas's ability to seek the return of his credentials were Davis's comment to Nicholas telling him that "[t]his is the last time you'll do that," and Davis's order to DeBonis in Nicholas's presence to "[h]old on to that [credential] Michael. And talk to me before you think about giving it back. Alright? Me personally." (Dkt. No. 193 ¶¶ 80, 83; Nicholas Video at 01:01–01:19.)

Defendants assert that Nicholas was on constructive notice of the availability of a Section 11-11 hearing, and that Defendants were therefore under no obligation to provide Nicholas of notice above and beyond what he could have learned had he consulted the Rules of the City of New York. (Dkt. No. 193 ¶ 105; Dkt. No. 201-5 at 224–26.) But as courts in this District have made clear, providing constructive notice of available remedial measures by publishing them in the Rules of the City of New York is not an absolute defense to procedural due process claims premised on lack of notice. *Frith v. Hill*, No. 07 Civ. 5899, 2009 WL 3073716, at *4 (S.D.N.Y. Sept. 23, 2009) (rejecting City's argument that inmate whose property had been seized during

---

[25]     Even after the commencement of this action, Defendants continued to provide Nicholas with inconsistent descriptions of the status of his credential, alternatively referring to its "revocation" and "removal" when briefing Plaintiff's motion for a preliminary injunction, before only later at a hearing before this Court decisively adopting the position that the card had been "summarily suspended" rather than "revoked." (Dkt. No. 193 ¶¶ 112–14; *see also* Dkt. No. 43 at 26.)

criminal proceedings was on constitutionally sufficient constructive notice of available remedial measures when those measures were codified in Rules of the City of New York). Instead, as the court in *Frith* explained, this form of "constructive notice" may be relevant to considering the adequacy of notice, but the "primary purpose of the notice required by the Due Process Clause [remains] to ensure that the opportunity for a hearing is meaningful." *Id.* (quoting *W. Covina v. Perkins*, 525 U.S. 234, 240 (1999)).

Here, the Court need not decide whether Nicholas might otherwise have been on adequate constructive notice of the availability of Section 11-11 hearing, because Davis's instructions to Nicholas at the scene that directly contradicted the procedures outlined in Section 11-11 greatly increased the risk of continued erroneous deprivation of Nicholas's credential. (*See, e.g.*, Nicholas Video at 01:14–01:19 (Davis telling his colleague in Nicholas's presence to "talk to me . . . about giving [him his credential] back. Alright? Me personally").) And that risk was further exacerbated by Defendants' failure to respond to Nicholas's email inquiring into the possibility of visiting DeBonis to discuss the October 30, 2015 incident and resulting surrendering of his credential. (*See* Dkt. No. 183-5.) Even though that email that was eventually circulated to Defendants DeBonis, Whyte, and Davis (*see* Dkt. No. 201-4 at 225–26), none of the Defendants responded to Nicholas's inquiry with any further information or notice regarding his credential's status or his right to be heard. Given all of these circumstances, the Court concludes that "the means employed [here were not] such as one desirous of actually informing [Nicholas] might reasonably [have] adopt[ed] to accomplish it." *Frith*, 2009 WL 3073716, at *4 (quoting *Mullane*, 339 U.S. at 315).

This leads the Court to "[t]he third *Mathews* factor," which "examines 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Spinelli*, 579 F.3d at 174 (quoting

*Mathews*, 424 U.S. at 335).  Defendants identify no government interest furthered by the minimal notice they provided Nicholas and no "fiscal and administrative" costs they would have incurred had they chosen to provide Nicholas with more comprehensive notice of the status of his credential or the availability of a Section 11-11 hearing.  The Court can readily identify numerous burden-free methods.  For example, Defendants might inform journalists about the availability and mechanisms for arranging such hearings by including that information among the many instructions, disclosures, and acknowledgements already provided to credential applicants and upon the issuance of a credential.  (*See, e.g.*, Dkt. Nos. 183-1, 183-2.)  Or, when DeBonis responded to Nicholas's email with the text "FROZEN ZONE" (*see* Dkt. No. 193 ¶ 98), or when he forwarded to his colleagues Nicholas's email regarding his perspective on the October 30, 2015 incident (Dkt. No. 201-4 at 225–26), he might also have given Nicholas some information regarding the status of his credential and the availability of a Section 11-11 hearing at practically zero additional administrative or fiscal burden.  The Court thus concludes that third *Mathews* factor also weighs in Nicholas's favor.

    In short, "[t]he City has advanced no legitimate reason for not immediately providing [Nicholas] with the information [he] needed to" go about obtaining the return of his credential.  *Spinelli*, 579 F.3d at 172.  Accordingly, the Court concludes that the extent of the notice Defendants provided Nicholas regarding their seizure of his press credential "was not constitutionally adequate."  *Id.*  For this reason, Nicholas has shown that, on the undisputed facts of this case, the Individual Defendants violated due process as a matter of law.[26]

---

[26]    Because the lack of notice in this case is by itself sufficient to resolve the instant motions for summary judgment, the Court need not address Nicholas's remaining challenges to the procedures afforded to him, including Defendants' failure to afford him a predeprivation hearing or the alleged unfairness of the procedures governing his Section 11-11 hearing.  (*See generally* Dkt. No. 187 at 36–40.)

### 3.  Qualified Immunity

The Individual Defendants argue that they are entitled to qualified immunity with respect to Nicholas's procedural due process claim.  (Dkt. No. 184 at 38–39.)  The question whether Plaintiff possessed a protected liberty or property interest in his NYPD-issued press credential had not been clearly answered by either the Second Circuit or the Supreme Court at the time of the conduct at issue in this suit.  Indeed, the Court made just this observation when denying Defendants' motion to dismiss this claim on the merits, *Nicholas v. City of N.Y.*, No. 15 Civ. 9592, 2017 WL 766905, at *7 (S.D.N.Y. Feb. 27, 2017) ("Under Second Circuit precedent, the question of whether Nicholas has a protected interest in the NYPD-issued press credential is an open one."), and at least one court in this District has even implied in dicta a conclusion contrary to the Court's resolution of this question, *see Kalfus v. N.Y. & Presbyterian Hosp.*, 706 F. Supp. 2d 458, 468 (S.D.N.Y. 2010).  Nicholas's constitutionally protected interest in his press credential therefore was not "clearly established" at the time of the conduct at issue in this suit. *Saucier*, 533 U.S. at 202.  Accordingly, the Individual Defendants are entitled to qualified immunity on Nicholas's procedural due process claim.

### D.  Substantive Due Process

The Individual Defendants move for summary judgment with respect to Nicholas's substantive due process claim.  (Dkt. No. 184 at 34–35.)

"[F]or [more than] half a century now," the Supreme Court has "spoken of the cognizable level of executive abuse of power [sufficient to support a substantive due process claim] as that which shocks the conscience."  *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998).  Nicholas has failed to produce evidence of conduct sufficiently conscience-shocking to meet this high threshold, and accordingly, the Court grants Individual Defendants' motion for summary judgment with respect to the Nicholas's substantive due process claims on this basis.

Moreover, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* at 842 (alteration in original) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)). Here, the First Amendment and the procedural component of the due process clause adequately "cover" the conduct at issue in this case. *See id.* For this reason as well, summary judgment in favor of Individual Defendants with respect to Nicholas's substantive due process claims is also appropriate.

### E. Equal Protection Clause

The Individual Defendants move for summary judgment with respect to Nicholas's Equal Protection Clause claim. (Dkt. No. 184 at 31–34.)

To establish a violation of equal protection based on a theory of selective enforcement, Nicholas would have to show that: (1) compared with others similarly situated, he was selectively treated; and (2) any selective treatment was based on impermissible considerations, for example to punish his exercise of a constitutional right. *See LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994).

The same record evidence that was sufficient to defeat the Individual Defendants' motion for summary judgment on Nicholas's claim of content-based discrimination is sufficient to defeat their motion for summary judgment on his claim of selective enforcement in violation of the Equal Protection Clause. *See supra* Section III.B.2.c. Because this "evidence clearly raises a question of material fact that the . . . enforcement [of the City's 'frozen zone'] was intended to inhibit the exercise of a constitutional right," here, Nicholas's right to gather news on equal terms with his fellow journalists, summary judgment on that claim is not warranted. *LaTrieste Rest. & Cabaret Inc.*, 40 F.3d at 590; *see also id.* at 592 (overturning grant of summary judgment

to defendants facing an Equal Protection Clause claim on basis of "material issues of fact as to whether the defendants are impermissibly engaging in . . . selective discriminatory enforcement of the laws, designed to prevent [plaintiff's] exercise of First Amendment rights"); *Bery*, 97 F.3d at 699 (2d Cir. 1996) (overturning district court's "rejection of [claim brought] under the Equal Protection Clause" against a City ordinance that "impermissibly impinge[d] on a fundamental [First Amendment] right"). The Court therefore denies Individual Defendants' motion for summary judgment with respect to Nicholas's Equal Protection Clause claim against them.

## IV.     Motion to Preclude Expert Testimony

Defendants move to preclude from summary judgment and trial the testimony and opinions of Mickey Osterreicher, Plaintiff's expert. (Dkt. No. 170.) Specifically, Defendants challenge the following three of Osterreicher's opinions:

> 1. Mr. Nicholas' Manner and Proximity to the Victim [Rescued from the October 30, 2015 Building Collapse] Comports with Professional Photojournalistic Standards of Care. (Dkt. No. 171-1 at 30–39; *see also* Dkt. No. 173 at 1.)

> 2. An NYPD-Issued Press Credential Is a Functional Requirement to Regularly Work as a Photojournalist in the City of New York Covering in Person, Emergency, Spot, or Breaking News Events and/or Public Events of a Non-Emergency Nature. (Dkt. No. 171-1 at 40–45; *see also* Dkt. No. 173 at 1–2.)

> 3. Holders of NYPD-Issued Press Credentials Expect that Their Press Credentials May Not Be Withheld Without a Showing of Wrongdoing of Some Kind and an Opportunity to Be Heard. (Dkt. No 171-1 at 45–49; *see also* Dkt. No. 173 at 2.)

It is well settled that a court may rule on a motion to exclude expert testimony at the summary judgment stage, and where, as here, the evidentiary record is well developed, the court may do so without holding a hearing. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581–82 (S.D.N.Y. 2007).

Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), courts evaluating challenges to expert testimony must engage in a two-step inquiry. First, the court must evaluate whether the proposed expert is sufficiently qualified to testify in such a capacity. *See Davis v. Carroll*, 937 F. Supp. 2d 390, 411–12 (S.D.N.Y. 2013). Second, courts must determine whether the challenged testimony "has a sufficiently reliable foundation." *Id.* (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)). Relevant indicia of reliability include "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" *Amorgianos*, 303 F.3d at 265 (quoting Fed. R. Evid. 702). These factors, however, are not exclusive or unyielding—the inquiry is a "flexible" one, *id.* at 266 (quoting *Daubert*, 509 U.S. at 594), and the exclusion of an expert is "the exception rather than the rule," *Vazquez v. City of N.Y.*, No. 10 Civ. 6277, 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014) (quoting *Floyd v. City of N.Y.*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012)). For example, this analysis does not necessarily require an expert witness to testify with exact precision or through the use of scientific methodology; the reliability inquiry may instead turn on the experiential knowledge of the expert. *Davis*, 937 F. Supp. 2d at 412.

## A. Rule 702 and *Daubert*

First, the Court considers Defendants' challenges to Osterreicher's expert qualifications. (Dkt. No. 173 at 3–5.) Defendants contend that Osterreicher has not demonstrated sufficient expertise in journalistic safety standards or the management of building collapses to testify regarding the propriety of Nicholas's behavior at the scene of the October 30, 2015 West 38th Street building collapse. (*Id.*) They assert that his most relevant experiences, which include decades of work as a reserve sheriff's deputy in Buffalo, as a journalist, and as a First

Amendment lawyer (Dkt. No. 171-1 ¶ 1), do not provide him with any "expertise whatsoever to opine on what is safe or not safe at the scene of a partial building collapse on a busy street block of Manhattan" (Dkt. No. 173 at 5).

Defendants' challenges regarding the relevance of Osterreicher's experiences to the management of journalists in emergency settings in New York City may go to the weight Osterreicher's opinions as applied to the facts of this case, but they do not establish that he lacks sufficient qualifications to testify as an expert regarding journalistic safety standards. Osterreicher's report lays out his relevant experiences in detail. For example, Osterreicher has served for twelve years as General Counsel of the National Press Photographers Association ("NPPA"), a professional organization composed of approximately 6,000 journalists. (Dkt. No. 171-1 ¶ 5.) In this role, Osterreicher has worked with law enforcement agencies from around the country, training both commanders and patrol officers on proper management of the press and on journalists' rights. (Dkt. No. 171-1 ¶¶ 8–9.) In addition, Osterreicher has been a uniformed reserve sheriff's deputy with the Erie County Sheriff's Department for more than forty years, and he has been a practicing photojournalist throughout this period as well. (Dkt. No. 171-1 ¶¶ 14–15.) The Court concludes that Osterreicher's background and experiences as a law enforcement officer, a journalist, and a First Amendment lawyer qualify him as an expert on journalistic standards of conduct in emergency settings.

The Court turns now to the second step of the Rule 702 inquiry: whether Osterreicher's testimony has a sufficiently reliable foundation. Defendants contend that Osterreicher "has applied no methodology at all, much less a 'reliable methodology.'" (Dkt. No. 173 at 16.) The Court disagrees. Osterreicher represents that his opinions are based on his "over 40 years as a professional journalist and reserve sheriffs deputy, as well as five years as an expert consultant and expert witness on the constitutional rights of citizens and journalists to photograph and

record emergency personnel performing their official duties and the proper policies and training regarding such rights." (Dkt. No. 171-1 ¶ 21.) As already discussed, these experiences are sufficient to qualify Osterreicher as an expert. There is no separate Rule 702 issue stemming from the fact that "the relevant reliability concerns [here] focus upon personal knowledge or experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). This is simply another case "[w]here a proposed expert witness bases his testimony on practical experience rather than scientific analysis, [and] courts recognize that '[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called "general truths derived from . . . specialized experience."'" *Fort Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014) (third and fourth alterations in original) (quoting *Kumho Tire Co.*, 526 U.S. at 148). Osterreicher's failure to describe more concretely the method by which he applied that extensive experience to the materials he considered in reaching his opinions in this case does not run afoul of Rule 702. *See, e.g.*, *Katt v. City of N.Y.*, 151 F. Supp. 2d 313, 356 (S.D.N.Y. 2001) ("[T]hat an expert's opinion is not based on statistical studies does not render that opinion inadmissible . . . .").

With respect to the materials upon which Osterreicher based his opinions, Osterreicher's report lists 94 different exhibits upon which he relied, exhibits which include photographs and videos of the building-collapse scene, deposition testimony from parties to this case, New York City Rules and NYPD training materials, and secondary sources from both press and academic publications. (Dkt. No. 171-1 ¶ 21.) Also among the materials cited in Osterreicher's report are existing written standards of care for photojournalists from organizations such as the NPPA and the *Associated Press*. (Dkt. No. 171-1 ¶¶ 49–51.) Thus, to the extent Defendants contend that Osterreicher's opinions regarding such a standard of care are made "without reference to any standard at all" (Dkt. No. 173 at 16), they are simply incorrect.

Defendants do not identify any other global issues with respect to whether Osterreicher's "testimony is grounded on sufficient facts or data." *Amorgianos*, 303 F.3d at 265. To the extent Defendants have raised concerns regarding Osterreicher's characterization of particular exhibits to his report or the specific manner in which he has opined upon them (*see, e.g.*, Dkt. No. 173 at 7 n.2, 13 n.3), these concerns go to his testimony's weight or his credibility, and not his testimony's admissibility under Rule 702.

## B. Relevance

Defendants assert that none of Osterraicher's three proffered opinions are relevant to Nicholas's claims. (Dkt. No. 173 at 5–8.)

The Second Circuit has instructed "trial court[s] [to] look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant." *Amorgianos*, 303 F.3d at 265. Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

With respect to Osterreicher's first opinion—that Nicholas complied with "professional photojournalistic standards of care" (Dkt. No. 171-1 at 30–39)—his testimony will be relevant to the jury's assessment of Defendants' assertions that they believed Nicholas's conduct at the scene of the building collapse posed a safety risk. As already discussed, Nicholas's First Amendment claim will turn on, among other things, "disputed issues of fact regarding whether the City's purported justifications for denying Plaintiff[]" access to a street adjacent to the ambulance are "a pretext for content based discrimination." *Nat'l Council of Arab Ams. v. City of N.Y.*, 478 F. Supp. 2d at 494. Defendants are thus correct to note that Nicholas cannot win his claim by proving to the jury only that he acted reasonably; instead, Nicholas must show that "Davis and . . . DeBonis violated [P]laintiff's First Amendment rights at the scene of the partial

building collapse by removing him therefrom when," as Defendants put it, "he interfered with the rescue of the critically injured construction worker." (Dkt. No. 173 at 6.) But Defendants' argument seems to take for granted that Nicholas in fact "interfered with the rescue." As the Court has explained, however, there is a live dispute of fact going to whether or not Nicholas did in fact pose any danger to the emergency responders in his vicinity. (*See, e.g.*, Dkt. No. 193 ¶¶ 71–74.) Osterraicher's expert opinion that Nicholas behaved no differently than any other reasonable journalist in his shoes would have could be helpful to the jury in assessing the credibility of Defendants' contrary explanations of their conduct. Because Osterraicher's opinion would render less believable Defendants' assertions that they acted out of concern that Nicholas was actually interfering with the rescue, it is relevant to Nicholas's First Amendment claim of content-based discrimination.

With respect to Osterraicher's second and third opinions (Dkt. No. 171-1 at 40–49), both are relevant to Nicholas's procedural due process claims. For example, these opinions are relevant to the question whether Nicholas possessed a protected property interest in his press credential, *see Spinelli*, 579 F.3d at 169, as well as to the balancing of the relative strength of that interest alongside the City's countervailing interests in adopting the minimal notice procedures that were employed in Nicholas's case, *see id.* at 170. The Court has already resolved Nicholas's procedural due process claims against Individual Defendants Davis and DeBonis. *See supra* Section III.C. But because Nicholas still has live *Monell* claims that are premised in part on procedural due process violations (*see* Dkt. No. 126 ¶ 164), these two opinions also may not be excluded on grounds of irrelevance at this stage.

Finally, Defendants urge the Court to exclude Osterreicher's opinions because they address lay matters that a jury could fully understand without the aid of his expert testimony. (Dkt. No. 173 at 8–15.) The Court disagrees. The average juror with no experience working as a

photojournalist will have no frame of reference whatsoever for photojournalistic standards of care or to consider the process by which photojournalists obtain, lose, or make use of NYPD-issued press credentials.  "[T]he subject matter of the expert's testimony" here is thus clearly "beyond the ken of the average juror."  *United States. v. Escobar*, 462 F. App'x 58, 62 (2d Cir. 2012) (summary order) (quoting *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)). Osterraicher's expert opinions, based on his extensive experience both using and counseling those involved in these processes, will likely aid a jury in its interpretations of any evidence to be presented this case.

### C.  Rule 403

Defendants also move to preclude Osterraicher's testimony on the basis of Federal Rule of Evidence 403.  (Dkt. No. 173 at 5–8.)  "Even if expert testimony is deemed admissible, . . . it is still subject to exclusion under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice to the moving party."  *Katt*, 151 F. Supp. 2d at 353.

In moving to preclude Osterraicher's opinions on Rule 403 grounds, Defendants mostly restate their arguments with respect to relevance, and they do not cite any concerns of undue prejudice other than those stemming from misleading the jury or confusing the issues.  (Dkt. No. 173 at 5–8.)  However, for the reasons already discussed, the Court concludes that Osterraicher's opinions are both relevant to the issues of this case and are capable of aiding a jury in its inquiry. Defendants' motion to preclude Osterraicher from testifying at trial pursuant to Rule 403 is therefore denied.

### V.  Conclusion

For the foregoing reasons, it is hereby ORDERED that:

Plaintiff's motion for summary judgment on his First Amendment claim and his procedural due process claim is DENIED;

Individual Defendants' motion for summary judgment on Plaintiff's substantive due process claim is GRANTED;

Individual Defendants' motion for summary judgment on Plaintiff's Equal Protection Clause claim is DENIED;

Individual Defendants' motion for summary judgment on Plaintiff's First Amendment claims is GRANTED in part and DENIED in part;

Individual Defendants' motion for summary judgment on Plaintiff's procedural due process claims is GRANTED on the basis of qualified immunity; and

Defendants' motion to preclude Plaintiff's expert testimony is DENIED.

The parties are directed to confer regarding further proceedings and to submit a joint letter addressing the parties' proposals by April 15, 2019.

The Clerk of Court is directed to close the motions at Docket Numbers 170, 180, and 185.

SO ORDERED.

Dated: March 26, 2019
        New York, New York

_____
                    J. PAUL OETKEN
              United States District Judge